**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| **NEW WAY MACHINE COMPONENTS, INC.** | : | **Case No. 24-** |
| **t/a NEW WAY AIR BEARINGS** | : | |
| | : | |
| **Debtor** | : | |
| | : | |

**DECLARATION OF ANDREW J. DEVITT IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Andrew J. Devitt, declare under penalty of perjury:

1.      I am the founder, Chairman and Chief Executive Officer of New Way Machine

Components, Inc. t/a New Way Air Bearings (the "Debtor"), a debtor and debtor in possession in

the above-captioned Subchapter V case.  In this capacity, I am generally familiar with the Debtor's

day-to-day operations, organization, financial affairs, and books and records.

2.      On April 22, 2024 (the "Petition Date"), the Debtor filed a voluntary bankruptcy

petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under

chapter 11, Subchapter V of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq.  (the

"Bankruptcy Code").

3.      The Debtor is operating its business and managing its property as a debtor in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Except as otherwise indicated, all facts set forth herein are based upon my personal

knowledge of the Debtor's operations and finances, information learned from my review of

relevant documents, and information supplied to me by other members of the Debtor's

management and employees, and the Debtor's advisors.  I am authorized to submit this Declaration

on behalf of the Debtor and, if called upon to testify, I would testify competently to the facts set

forth herein.

5.      I submit this Declaration (a) to provide an overview of the Debtor and this chapter 11 case and (b) in support of the Debtor's chapter 11 petition and "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions") and the relief requested in the proposed orders therein, which have been filed to minimize the adverse effects of filing for chapter 11 protection and to enhance the Debtor's ability to maximize the value of its estate.

## BACKGROUND

### A.     The Debtor's Business

6.      The Debtor is one of the world's leading independent designer and manufacturer of modular air bearing products and a recognized provider of porous media air bearing solutions with sales in over thirty (30) countries worldwide.  Over the years, I have invented and designed many of the products sold by the Debtor.  I have also filed domestically and internationally for over 100 patents for my inventions.

7.      The Debtor functions as a manufacturer specializing in air bearings catering to industries such as semiconductor manufacturing, aerospace, machine tool, medical devices, and metrology.  Air bearings are devices that use compressed air to create a thin film of load bearing air between two surfaces allowing for frictionless motion and precise positioning.

8.      Originally conceived as a solution for frictionless motion, the Debtor's business has since evolved into a mainstream manufacturer of machine components serving diverse sectors.

9.      The Debtor offers a range of products including flat round air bearings, linear air bearings, and rotary air bearings. These products provide advantages such as high precision, low friction, maintenance-free operation, and vibration isolation.

10.     The Debtor is known for its innovative approach to air bearing design, often incorporating advanced materials and engineering techniques to improve performance and reliability.  Industries that rely on high-precision motion control and manufacturing processes, such as semiconductor fabrication, aerospace, machine tool, medical devices, automotive testing, and flat panel display handling, are key drivers for the demand of air bearing technology.

11.     The Debtor's principal place of business is located at 50 McDonald Boulevard, Aston, PA 19014.  The Debtor also leases space at 30 McDonald Boulevard, Aston, PA 19014.

**B.     The Debtor's Corporate Structure**

12.     The Debtor, New Way Machine Components, Inc., is a privately held for profit Pennsylvania corporation that I founded and incorporated on January 6, 1994.[1]  The Debtor also trades as New Way Air Bearings, one of two fictitious names that it has registered with the Pennsylvania State Corporation Bureau.[2]

13.     As of the Petition Date, there are 100,000 shares of common stock authorized of which 7,500 shares are issued, comprised of 6,038 shares outstanding, and 1,462 shares held by the Debtor as treasury stock.

**C.     The Employment and Termination of Hackett and Redemption of his Stock**

14.     On or about June 24, 2002, the Debtor entered into an employment agreement with Nicholas R. Hackett ("Hackett"), in the capacity as vice president of business development (the "Employment Agreement") which contained, *inter alia*, a certain stock option grant of the Debtor's common stock in favor of Hackett (the "Stock Option Grant").

---

[1]  The original name of the corporation was "*New Age Machine Components, Inc.*" On May 24, 1994, the articles of incorporation were amended and restated to change the name of the corporation to "*New Way Machine Components, Inc.*"

[2]   On or about May 15, 2003, the Debtor filed an application with Pennsylvania Department of State Corporation Bureau for registration of the fictitious name of "*New Way Precision.*"  On or about February 18, 2005, the Debtor filed an application with Pennsylvania Department of State Corporation Bureau for registration of the fictitious name of "*New Way Air Bearings.*"

3

15.     Thereafter, on or about December 20, 2003, the Debtor and Hackett entered into a certain Restricted Stock Award Agreement (the "Restricted Stock Award Agreement"), which, *inter alia*, (a) terminated and replaced the Stock Option Grant, (b) awarded Hackett 1,272 shares of the Debtor's common stock (the "Hackett Original Shares") subject to a certain Stock Restriction Agreement that was entered into by the parties simultaneously therewith (which was attached thereto as an exhibit), (c) contained a certain repurchase option in favor of the Debtor which was exercisable at a certain repurchase price based upon the Debtor's fair market value which, in the absence of an established market for the Debtor's common stock, would be determined at least annually *in good faith* by the Debtor's Board of Directors (the "Fair Market Value") with notice provided to Hackett (the "Fair Market Notice"), (d) provided for the release of the Hackett Original Shares from restricted stock status and (e) granted Hackett the right to sell the Hackett Original Shares to the Debtor at a price equal to the Fair Market Value thereof (the "Put Price") on or after July 24, 2012 *and* within thirty (30) days after Hackett had received a Fair Market Notice (the "Put Right").

16.     Following the financially challenging year of 2020, , Hackett received an additional 190 shares at a value of $171.00 per share based upon an equity valuation of the Debtor or Fair Market Value of $1,500,000, effective as of December 31, 2020.

17.     I agreed to the award of 190 Shares to Hackett in an attempt to keep him aligned with and loyal to the Debtor at a time when he was pressuring for a double digit percentage increase in shares.

18.     The Debtor's Board of Directors did not officially set Fair Market Value again until *March of 2023*, simultaneously for the fiscal years ending December 31, 2021 and December 31, 2022.

19.    Despite continuing financial woes in 2021 and 2022, Hackett insisted that the Board of Directors set Fair Market Value at $15,235,362 and $15,000,000, respectively, *up from $1,500,000*, based upon unreliable and unsupportable factors including three (3) letters of intent/term sheets from interested buyers which were all rejected, but which Hackett characterized as "bona fide offers at valuations that…had an average equity valuation of $15,000,000." In fact, none of the alleged "bona offers" were acceptable to me as the actual cash component of the offers ranged from only a low of $4.0 million to a high of $7.0 million, and were premised upon, in my opinion, very skeptical "earnouts" and/or notes.

20.    Over my strenuous protest to a valuation of $15,000,000, Hackett argued that the Debtor needed to show PNC a $15 million Fair Market Value without which, he threatened, would lead the Debtor's lender to not extend the term of the loan. Hackett had the working relationship with PNC, so I trusted him.

21.    While out to dinner on April 13, 2023, Hackett delivered a Notice of Exercise of Put Right to the Debtor (the "Notice of Exercise of Put Right") pursuant to Section 6(a) of the Restricted Stock Award Agreement whereby he asserted that the Debtor is obligated to purchase *all of his shares of stock* (1,462 shares) in the Debtor based on an inflated and unjustifiable $15,000,000 equity valuation of the Debtor as of December 31, 2022. This valuation equates to $2,000 per share or $2,924,000 for Hackett's 1,462 shares.

22.    After manipulating the Fair Market Value, Hackett used the exercise of his Put Right as leverage to take control of the business and, in the event that I proceeded with a sale of the business, to create a floor as to how much of the sale proceeds he would receive regardless of the actual sale price achieved or net proceeds that may be available to equity holders upon a sale.

23.    When I expressed my dismay over the exercise of the Put Right and how such an obligation would be paid, particularly in light of the fact that Hackett had run up over $2.7 million in debt with PNC following another poor financial performance in 2022, Hackett and his wife threatened that they would sue me if the Debtor failed to honor its contractual obligations.

24.    On April 27, 2023, Hackett delivered a Notice of Suspension of Exercise of Put Right to the Debtor (the "Notice of Suspension of Put Right") based upon an asserted impending sale of the Debtor and the Debtor's recent engagement of EMA Partners, LLC ("EMA") as the investment bank to represent the Debtor for a certain sale transaction (the "Transaction"), and conditioned upon certain terms, including

(a)    the Transaction or any subsequent transaction will be at an enterprise value of at least $18,000,000;

(b)    Hackett will participate in the Transaction as a stockholder holding 19.5% of the Debtor's issued and outstanding common stock;

(c)    the "Net Present Value" of Hackett's 19.5% ownership interest will not be valued at less than $2,925,000;

(d)    Hackett will continue managing the Debtor's business until the consummation of the Transaction and such period of time thereafter as is mutually agreed upon between Hackett and the party that acquires the Debtor pursuant to the Transaction;

(e)    Devitt and Hackett will, together with the Debtor's advisors, including EMA, work in good faith to consummate the Transaction by October 31, 2023;

(f)    Devitt will not participate in the daily management of the Debtor's business and all such daily management will be handled solely by Hackett and the Debtor's management team at Hackett's direction; and

(g)    any amounts Devitt receives in connection with the Transaction for non-compete, person goodwill, employment, consulting, or similar payments that would otherwise be considered purchase price shall be consider purchase price for purposes of determining the amounts to be distributed to Hackett as a shareholder.

6

25.     Under the terms of the Notice of the Suspension of Put Right, the Put Right shall automatically be reinstated and become effective as of the earliest date of the following events: (a) the Transaction is not consummated by October 31, 2023, (b) the Transaction is terminated and the Debtor is not actively pursuing an alternative transaction or (c) any of the conditions in Section 2 of the Notice of Suspension of Put Right (detailed above) cease to be satisfied (the "Put Right Reinstatement Date").

26.     Additionally, under the terms of the Notice of Suspension of Put Right, in the event of a default and the occurrence of the Put Right Reinstatement Date, the (a) the Debtor shall immediately and automatically redeem Hackett's 19.5% ownership interest "on the terms set forth in Redemption Documents," (b) the promissory note contained in the "Redemption Documents" shall be immediately and automatically issued, and (c) notwithstanding anything to the contrary contained in the Notice, the "Exercise Notice," or the "Redemption Documents," the purchase price to be paid by the Debtor to Hackett shall be an amount equal to the greater of (i) $2,925,000, (ii) the greatest Net Present Value of Hackett's 19.5% ownership based upon any terms received in writing by the Debtor or EMA and (iii) an amount equal to 19.5% of 7.5X the sum of the Debtor's EBITDA for the twelve (12) month period immediately preceding the Put Right Reinstatement Date, plus the dollar amount of Devitt and Devitt's personal assistant's employment costs, plus the dollar amount of the Debtor's cash, less the dollar amount of the Debtor's debt as of the Put Right Reinstatement Date.

27.     In other words, Hackett cemented his floor or minimum return of $2,000/share or $2,925,000 for his 19.5% ownership share, regardless of the actual value received, if any, in a transaction.

28.     On May 12, 2023, the Debtor, Hackett and I executed a Standstill Agreement (the

"Standstill Agreement") clarifying the terms of the "Standstill" of rights asserted in the Notice of

Exercise of Put Right and the subsequent Notice of Suspension of Put Right, including our

agreement that (a) the Standstill is not indefinite and applies only to the current effort to secure a

Debtor sale and will end either with the Debtor being sold or with a decision to not sell, but in any

event, no later than December 31, 2023, and (b) at the end of the Standstill, "both parties" will

have all of their rights and obligations which they currently have as of Standstill execution date,

except that Hackett, in his sole discretion, shall have fifteen (15) days from the end of the Standstill

to reinstate his Put Right.

29.    On October 16, 2023 and/or October 17, 2023 (the Debtor has separate versions

signed and counter-signed by Hackett and me), Hackett delivered a Notice of Extension to

Suspension of Exercise of Put Right (the "Notice of Extension of Suspension of Put Right") to the

Debtor for a number of asserted reasons, including that the Transaction had not been completed,

the "front runner potential strategic acquirer's" withdrawal of their interest in the Transaction

"following comments [Devitt] made to them during site visits," and based upon the actions by

PNC (defined below) to reduce the extension of the Debtor's line of credit from February 29, 2024

to October 30, 2023 following Hackett's report to PNC of the "stalled EMA process" and Hackett's

indication of his intention to terminate his relationship with the Debtor by year end, but PNC's

willingness for additional extensions under certain circumstances assuming "continued

satisfactory ongoing management of the [Debtor], and satisfactory progress towards a Transaction

or other event that provides an exit for PNC."

30.    The terms of the Notice of Extension of Suspension of Put Right provided, *inter

alia*, that the Standstill Agreement was terminated and, subject to the terms and conditions set forth

in the notice, the Notice of Exercise of Put Right was suspended, effective as of the date of the

notice (the "Put Right Suspension"), expressly conditioned upon the following terms including (a) Hackett will participate in the Transaction as a stockholder holding 19.5% of the Debtor's issued and outstanding common stock, (b) the "Net Present Value" of Hackett's 19.5% ownership interest will not be valued at less than $2,925,000, (c) Hackett will continue managing the Debtor's business "until at least December 31, 2023, but if on December 31, 2023, the Debtor is a party to a Letter of Interest or agreement of sale pursuant to a Transaction (the "Offer"), Hackett will continue managing the Debtor until the earlier of (i) the termination or expiration of the Offer or (ii) the consummation of the Transaction and for such period of time thereafter as is mutually agreed upon between Hackett and the party that acquires the Debtor; during this period, Hackett will provide Devitt with the Debtor's monthly financial reports, as well as weekly management reports that the Debtor is currently providing to Devitt, (d) Devitt will cease from participating in daily operations of the Debtor and will not interfere with any activities of the Debtor's management team or employees, other than as is necessary to support the process with EMA or to execute a Transaction, or support specific customer interactions as agreed in writing, (e) *Devitt and Hackett will, together with the Debtor's advisors, including EMA, work in good faith to consummate the Transaction as soon as may be possible.*

31.     Under the terms of the Notice of Extension of Suspension of Put Right, the Put Right shall automatically be reinstated and become effective as of the earliest date of the following events: (a) the Transaction is not consummated or an Offer is not executed by December 31, 2023, (b) if the Transaction is terminated, the Debtor is not actively pursuing an alternative transaction or (c) any of the conditions in Section 2 of the Notice of Extension of Suspension of Put Right (detailed above) cease to be satisfied (the "Extended Put Right Reinstatement Date").

32.     Under the terms of the Notice of Extension of Suspension of Put Right, in the event

of a default and the occurrence of the Extended Put Right Reinstatement Date, the (a) the Debtor

shall immediately and automatically redeem Hackett's 19.5% ownership interest "on the terms set

forth in Redemption Documents," including the immediate and automatic issuance of a promissory

note for the purchase price to be paid by the Debtor to Hackett of $2,925,000 and (b) the

"Redemption Documents" shall be revised as necessary to reflect the payment terms contained

therein *and to provide for the subordination to the Debtor's bank lender of the promissory note.*

33.    Notwithstanding the self-serving and onerous terms of the Notice of Extension of

Suspension of Put Right, I countersigned it under duress hoping to buy time so that I could make

the changes necessary to name a new president for the Debtor and restructure its affairs.

34.    Shockingly, one day later, Hackett presented me with a proposed Management Buy

Out, dated October 18, 2023 (the "MBO"), characterizing the MBO as "the best option for all of

us" and "the best opportunity for the [Debtor] to reach its full potential…and to avoid having to

seek after a less than optimal [Private Equity] offer just for an urgent sale to allow PNC to exit."

35.    Specifically, the MBO contained a binding summary term sheet for a proposed

management buyout restructuring of the Debtor upon which Hackett and the Debtor's management

team would be willing to go forward, including (a) Hackett's withdrawal of the Put Right and (b)

the Debtor's redemption of approximately and effectively one-half of my 6,038 shares of the

Debtor's common stock or approximately 3,019 shares in return for a seller note of approximately

$1,200,000 payable over five (5) years at 8.0% interest (which would provide the equivalent after-

tax income or higher than my current $330,000 salary), representing a return of only $397/share

($1,200,000/3,019) on account of selling one-half of my majority 80.5% ownership interest.

36.    Hackett's MBO devalued the $2,000 price per share supporting his Put Right to an

offer of only $397 per share to acquire half of my shares and a controlling interest in the Debtor.

37.     I rejected the MBO upon receipt and, on or about November 8, 2023, I announced my decision, as the Debtor's majority shareholder, to replace Hackett as Debtor's President with Jared Schaffstall ("Schaffstall"), a member of the Debtor's management team.

38.     By e-mail dated November 9, 2023, Hackett asserted that my "recent actions clearly constitute violations of one or more conditions of the Put Right Suspension Agreement resulting in the automatic and immediate purchase of [his] shares and issuing of the promissory note" and that the Debtor "now finds itself instantly burdened with $2.924M additional debt, [Hackett] no longer a shareholder, and [Hackett] terminated from [his] position as President…" Hackett added, for good measure, the Debtor "is now technically insolvent."

39.     Hackett declared that the Extended Put Right Reinstatement Date had been triggered and the Put Right was automatically reinstated and became immediately effective (the "Hackett Stock Redemption").

40.     Effective as of November 2, 2023, Hackett delivered his resignation as a director and as an officer (including as President and Treasurer) of the Debtor.

41.     Thereafter, Hackett continued his employment with the Debtor as a vice-president of finance until such employment was terminated on April 17, 2024.

42.     As a result of the foregoing, I am the sole director of the Debtor and sole shareholder of the Debtor.

43.     The Debtor's new management is focused on restoring profitability through cost reduction initiatives.  The Debtor recalibrated its operations to sustain a conservative $10 million sales forecast, already surpassing expectations in first quarter of 2024. A reduction in workforce, performed in February of 2024, allowed for over $750,000 in annual wage savings while not impeding the Debtor's ability to meet its 2024 expectations. Departmental spending and budgetary

controls have been tightened, reducing average weekly expenditures from $90,000 to under $40,000 while continuing to improve performance.

44.     The Debtor currently employees 52 people and is on track to exceed its original forecast and reach an $11 million revenue target for 2024. Most recently, the Debtor has enacted an eight (8%) percent price increase, doubled its orderbook from $1.5 million to $3 million, and is engaged in negotiating a supplier agreement with one of our largest customers to retain continued business growth in the medical scanning industry.

**D.**     **The Debtor's Capital Structure**

    **(1)**     **Pre-Petition Financing provided to the Debtor by PNC Bank, National Association**

45.     As of the Petition Date, the secured financing debt owed by the Debtor to PNC Bank, National Association ("PNC") was in the approximate amount of $3,200,700.00 as detailed below.  All of the obligations due PNC have a maturity date of April 30, 2024.

46.     On April 19, 2023, PNC extended credit to the Debtor, as borrower, evidenced by an Amended and Restated Loan Agreement dated April 19, 2023 (the "Loan Agreement") and an Amended and Restated Revolving Line of Credit Note in the principal amount of $2,750,000.00 (the "Line of Credit Note") [Loan No. 607959977].  The Loan Agreement and the Line of Credit Note were amended and restated various times over the years.  As of the Petition Date, the balance owed under the Line of Credit Note was in the approximate amount of $2,627,242.40.

47.     On December 28, 2021, PNC extended credit to the Debtor, as borrower, evidenced by a term note in the in the original principal amount of $181,716.31 (the "First Term Note") [Loan No. 610695982].  As of the Petition Date, the balance owed under the First Term Note was in the approximate amount of $104,529.65.

48.     On December 28, 2022, PNC extended credit to the Debtor, as borrower, evidenced by a term note in the original principal amount of $600,607.15 (the "Second Term Note" [Loan No. 611138284], and together with the Line of Credit Note and the First Term Note, the "Notes").  As of the Petition Date, the balance owed under the Second Term Note was in the approximate amount of $468,929.15.

49.     On March 20, 2024, PNC declared a default under the Notes due to, *inter alia* (i) borrower (Debtor) allowing to exist $2,924,000 of indebtedness for amounts owed by borrower (Debtor) to Nick Hackett and (ii) borrower (Debtor) removing Nick Hackett as president.   In addition, PNC permanently suspended the borrower's (Debtor's) ability to draw on the Line of Credit Note.  The maturity date of the Notes is April 30, 2024.

**(2)     Pre-Petition Equipment Financing provided to the Debtor by PNC Bank Equipment Finance, LLC**

50.     As of the Petition Date, the Debtor's secured equipment financing debt owed to PNC Equipment Finance, LLC ("PNC Equipment Finance") was in the approximate amount of $83,375.00.

51.     On July 12, 2019, PNC Equipment Finance extended credit to the Debtor, as borrower, evidenced by an amended and restated equipment line of credit note in the original principal amount of $500,000.00 (the "First Equipment Line of Credit Note") [Loan No. 98984531-4].  As of the Petition Date, the balance owed under the First Equipment Line of Credit Note was in the approximate amount of $41,281.50.

52.     On November 16, 2020, PNC Equipment Finance extended credit to the Debtor, as borrower, evidenced by an equipment line of credit note in the original principal amount of $175,000.00 (the "Second Equipment Line of Credit Note" [Loan No. 98984531-6], and together with the First Equipment Line of Credit Note, the "Equipment Line of Credit Notes").  As of the

Petition Date, the balance owed under the Second Equipment Line of Credit Note was in the approximate amount of $42,093.87.

53.     On March 20, 2024, PNC, in its own capacity and as successor to PNC Equipment Finance, declared a default under the Equipment Line of Credit Notes.  The maturity date of the Equipment Line of Credit Notes is also April 30, 2024.

### (3)     The Debtor's General Unsecured Debt

54.     As of the Petition Date, the Debtor's general unsecured trade debt is in the approximate amount of $490,000.00.  In the ordinary course of business, the Debtor incurred unsecured indebtedness to various trade vendors and service providers, among others.

55.     In addition, as set forth in greater detail above, the Debtor also incurred unsecured obligations to Hackett in the amount of $2,924,000.

56.     As of the Petition Date, the Debtor's cash is approximately $70,000 and accounts receivable are approximately $1,500,000.  In addition, the Debtor has inventory comprised of finished goods and work-in-progress, equipment, office furniture, and intellectual property.

### E.     Circumstances Giving Rise to This Bankruptcy Case

57.     The circumstances leading to this Subchapter V case are as follows:  (i) substantial losses over the last five years arising from mismanagement under Hackett's tenure, (ii) the impact of Hackett's exercise of the Put Right, and (iii) the default under the PNC Notes and Equipment Line of Credit Notes.

58.     The Debtor incurred substantial tax losses in four of the last five years (2019 through 2023) and, in the one year of a reported profit (2021), the Debtor was the recipient of $917,156 in Employee Retention Credits pursuant to the U.S. Federal Government's Coronavirus

Aid Relief and Economic Security Act (the "Cares Act") and the recipient of $977,897 in Paycheck Protection Program loans pursuant to the Cares Act.

59.     In addition, the Debtor was also the recipient of Paycheck Protection Program loan during the 2020 year in the amount $977,800 which masked the loss incurred by the Debtor in 2020.  For 2023, before year-end adjustments and accountant's review, the loss was in excess of $760,000.

60.     The tax return history of the Debtor for the last 5 years (2019 through 2022) is attached as Exhibit "A" to this Declaration and made a part hereof.[3]

61.     Due to the failure to meet profit targets, financial mismanagement and the resulting losses, in October 2022 Hackett terminated the Debtor's COO/CFO.

62.     For the calendar year ending 2022, the Debtor also booked a $1.2 million write-down, characterized by former management as obsolete inventory, discrepancies in work-in-progress, and subpar operational performance.

63.     The mismanagement of prior management, included over-hiring of staff, expanding into a second location, purchasing excessive equipment and materials, and overestimating forecasts all of which positioned the Debtor for the substantial losses that it incurred.

64.     The Debtor's $2,924,000 obligation to Hackett following the Hackett Stock Redemption has resulted in the Debtor becoming insolvent according to Hackett and the Debtor's advisors.  The Debtor struggled to make the first two monthly payments to Hackett ($91,037 on 1/31/24 and $84,786.36 on 2/29/24) and was unable to make the March 2024 monthly payment due Hackett for this obligation.

---

[3] The 2023 tax return is on extension.

65.    On April 1, 2024, Hackett notified the Debtor of its failure to make the March 2024 payment.  On April 15, 2024, Hackett sent a follow up email to remind the Debtor of his April 1st default notice, and to detail the harm that would befall the Debtor if another monthly payment was not immediately made and the breach cured.  On April 17, 2024, Hackett declared the Debtor in default.

66.    All of the Debtor's secured obligations due to PNC come due next week on April 30, 2024 when the Notes and the Equipment Line of Credit Notes mature.

67.    It is in the best interest of the Debtor, its estate, its creditors and its interest holders to avoid and recover the transfers described above pursuant to 11 U.S.C. sections 544, 548 and 550 as fraudulent transfers and, therefore the Debtor intends to file a complaint in this Court against Hackett.

68.    The culmination of the above events caused the Debtor to seek protection under Subchapter V in order to afford the Debtor the opportunity to reorganize its affairs and propose a plan of reorganization.

## SUMMARY OF FIRST DAY MOTIONS

69.    To minimize the adverse effects of the commencement of this case, the Debtor has requested a variety of relief in the First Day Motions filed concurrently herewith.  I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information, and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

## FIRST DAY MOTIONS

**A.    Motion of Debtor for an Order Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001 Authorizing Debtor to Use Cash Collateral and Provide Adequate Protection**

70.    The Debtor requires the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of its business and preserve its value as a going concern. These essential items, however, constitute part of PNC's collateral and, therefore, may not be used in support of the Debtor's ongoing business activities absent compliance with Section 363 of the Bankruptcy Code or the consent of PNC.

71.    In accordance with Section 363 of the Bankruptcy Code, the Debtor requests that the Court authorize the Debtor's use of cash collateral for an interim period, pending a final hearing on the Debtor's use of cash collateral.

72.    The Debtor requests authority to use cash collateral in the amount to be set forth on a budget which will be submitted to the Court on or before the hearing date for the cash collateral Motion.   The use of cash collateral is necessary in order for the Debtor to be able to operate and pay its post-petition obligations as they come due.

**B.    Motion of Debtor for an Order (A) Authorizing the Debtor to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation and (II) Reimbursable Employee Expenses; (B) Confirming that the Debtor may Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

73.    As of the Petition Date, the Debtor employed fifty-two (52) employees (the "Employees").  Forty-nine (49) of the Employees are full-time while three (3) are part-time. Twenty-one (21) Employees are salaried employees while the other thirty-one (31) Employees are hourly employees.

74.    To minimize the personal hardship that the Employees would suffer if pre-petition wages and are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, by this Motion, the Debtor seeks authority to pay

and honor, in its sole discretion, certain pre-petition claims for, wages, salaries and other compensation, expense reimbursement, federal and state withholding taxes, and other amounts withheld (including garnishments), holidays, vacation and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

75.    The Debtor will not pay any prepetition wage claims over the priority limit of 11 U.S.C. § 507(a)(4), presently $15,150.00.

**C.    Motion of Debtor for Entry of an Order Providing Utility Companies with Adequate Assurance of Payment Pursuant to 11 U.S.C. § 366**

76.    In connection with the operation of its business, the Debtor obtains electric, water, telephone, internet and other similar utility services provided by a number of utility companies.

77.    Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's operations.  Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, its enterprise value and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

**D.    Motion of Debtor for an Order Authorizing and Approving Maintenance and Use of Existing Bank Accounts; Use of Existing Books, Records, and Business Forms**

78.    By this Motion, the Debtor seeks entry of an order authorizing the Debtor to maintain and use its existing bank accounts at PNC and Fulton Bank, as well as its existing books, records, and business forms.

79.     The use of the existing accounts at PNC and Fulton Bank are essential to maintaining the Debtor's operations during this case and, therefore, to maximize the value of the Debtor's estate.

80.     The Debtor uses the bank accounts to collect ACH payments from its customers and pay vendors, manage and support business operations, and pay its payroll.

**[SIGNATURE PAGE TO FOLLOW]**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of April, 2024.

_____
Andrew J. Devitt

# EXHIBIT "A"

1100253

| Form **1120-S** | **Tax Return History Report Page 1** | **2022** |

Name
**NEW WAY MACHINE COMPONENTS, INC.**

Employer Identification Number
**23-2749884**

| | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Net receipts | 12,962,948 | 10,397,951 | 8,820,225 | 10,017,792 | 13,163,522 |
| Cost of goods sold | 7,158,858 | 5,734,568 | 5,070,555 | 5,254,026 | 9,320,012 |
| **Gross profit** | 5,804,090 | 4,663,383 | 3,749,670 | 4,763,766 | 3,843,510 |
| **Gross profit percentage** | 44.7745 | 44.8491 | 42.5122 | 47.5531 | 29.1982 |
| Other income (loss) | 777 | 15,481 | 11,529 | 16,648 | 34,728 |
| **Total income (loss)** | 5,804,867 | 4,678,864 | 3,761,199 | 4,780,414 | 3,878,238 |
| Officer compensation | 550,000 | 596,000 | 675,312 | 740,212 | 591,431 |
| Salaries and wages | 2,243,680 | 1,764,369 | 1,775,322 | 1,122,176 | 1,917,201 |
| Bad debts | | | | | |
| Taxes and licenses | 269,365 | 235,181 | 220,808 | 249,042 | 251,912 |
| Interest | 92,011 | 111,142 | 66,694 | 21,473 | 77,655 |
| Depreciation | 51,997 | 77,899 | 34,930 | 30,604 | 196,184 |
| Depletion (other than oil and gas) | | | | | |
| Pension and employee benefits | 867,855 | 814,672 | 876,276 | 931,338 | 916,340 |
| Other deductions | 1,614,577 | 1,189,331 | 922,512 | 1,059,188 | 925,678 |
| **Total deductions** | 5,689,485 | 4,788,594 | 4,571,854 | 4,154,033 | 4,876,401 |
| **Ordinary business income (loss)** | 115,382 | -109,730 | -810,655 | 626,381 | -998,163 |