**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11, Subchapter V** |
| | : | |
| **NEW WAY MACHINE COMPONENTS, INC.** | : | **Case No. 24-11362(AMC)** |
| **t/a NEW WAY AIR BEARINGS,** | : | |
| | : | |
| **Debtor.**[1] | : | |
| | : | |

---

**AMENDED SMALL BUSINESS DEBTOR PLAN OF REORGANIZATION
PROPOSED BY THE DEBTOR AND DEBTOR-IN-POSESSION**

---

**KARALIS PC
Aris J. Karalis
Robert W. Seitzer
Robert M. Greenbaum
1900 Spruce Street
Philadelphia, PA 19103
(215) 546-4500
Attorneys for the Debtor
and Debtor in Possession**

**Dated: October 1, 2024**

---

[1] The last four digits of the Debtor's federal tax identification number are 9884. The Debtor's address is 50 McDonald Boulevard, Aston PA 19014.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.  To assist you in your review, please note that a list of definitions appears in Article 1 of this document.

IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN.  **IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY SEPTEMBER 30, 2024 at 4:00 p.m. (prevailing Eastern Time)**.

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE** <u>**ACTUALLY RECEIVED BY THE DEBTOR'S COUNSEL BY  SEPTEMBER 30, 2024 AT 4:00 P.M. (EASTERN TIME)**</u>**.  THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS:**

<div align="center">

**KARALIS PC**
**ARIS J. KARALIS, EQUIRE**
**1900 SPRUCE STREET**
**PHILADELPHIA, PA 19103.**

</div>

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED TO BEGIN ON OCTOBER 24 2024 AT 10:00 A.M (Eastern Time) BEFORE THE HONORABLE ASHELY M. CHAN, UNITED STATES BANKRUPTCY JUDGE, BY ZOOM (MEETING ID: 161 941 2141 AND PASSCODE: 676117)**.

Your rights may be affected by this Plan.  You should consider discussing this document with your attorney.

# TABLE OF CONTENTS

PAGE NO.

SUMMARY OF PLAN AND DISTRIBUTION TO CREDITORS ..................................................1

ARTICLE 1   DEFINITIONS, RULES OF INTERPRETATION, AND
            COMPUTATION OF TIME AND GOVERNING LAW ......................................9
      A.    Defined Terms .................................................................9
      B.    Rules of Interpretation ......................................................20
      C.    Computation of Time .........................................................20
      D.    Governing Law ...............................................................21
      E.    References to Monetary Figures ..............................................21
      F.    Exhibits ....................................................................21
      G.    Controlling Document ........................................................21

ARTICLE 2   HISTORY OF THE BUSINESS OPERATIONS OF THE
            DEBTOR ......................................................................21
      2.1   Nature of the Debtor's Business .............................................21
      2.2   History of Business Operations of the Debtor ................................21
      2.3   Filing of the Debtor's Chapter 11 Case ......................................22
      2.4   Legal Structure and Ownership ...............................................22
      2.5   Debtor's Assets and Liabilities .............................................22
      2.6   Current and Historical Financial Conditions .................................23
      2.7   Events Leading to the Filing of Chapter 11 Case .............................24
            2.7.1   Continued Losses ....................................................24
            2.7.2   Hackett's Exercise of Put Option ....................................24
      2.8   Default Declared by PNC Bank ................................................25
      2.9   Maturity of PNC Bank Credit Facilities ......................................25
      2.10  Significant Events During the Chapter 11 Case ...............................25
            2.10.1 "First Day Motions" .................................................25
            2.10.2 Cash Collateral Motion ..............................................26
            2.10.3 Retention of Chapter 11 Professionals................................26
            2.10.4 Claims Bar Date .....................................................26
            2.10.5 Motion to Approve Sublease Agreement with HDI LLC and
                   Lease Termination with BKN Real Estate Associates LP .................26
            2.10.6 Motion to Sell Certain Machinery and Office Furnishings .............27
            2.10.7 Settlement Among the Debtor, Hackett and Devitt .....................27
      2.11  Projected Recovery of Avoidable Transfers ...................................28

ARTICLE 3   THE PLAN ....................................................................28
      3.1   Unclassified Claims .........................................................29
            3.1.1   Administrative Expenses .............................................29
            3.1.2   Post-Confirmation Professional Fee Claims and Subchapter
                   V Trustee Fee Claims.................................................31
            3.1.3   Priority Tax Claims..................................................31

3.2    Classes of Claims and Equity Interests ...................................................31
    3.2.1    Class 1.  Other Priority Claims ...........................................31
    3.2.2    Class 2.  Secured Claim of PNC .........................................32
    3.2.3    Class 3.   General Unsecured Claims .....................................36
    3.2.4    Class 4.  Equity Interest Holders........................................37
    3.2.5    Class 5.  Subordinated Claim of Hackett ...............................37
3.3    Special Provisions Governing Unimpaired Claims .............................38
3.4    Elimination of Vacant Classes ....................................................38
3.5    Voting Classes, Presumed Acceptance by Non-Voting Classes.........................39
3.6    Controversy Concerning Impairment .............................................39
3.7    Cramdown and No Unfair Discrimination ........................................39
3.8    Subordinated Claims ...............................................................39
3.9    Procedures for Resolving Contingent, Unliquidated and Disputed
    Claims ...............................................................................40
    3.9.1    Claim Objections ...........................................................40
    3.9.2    Allowance of Claims.......................................................40
    3.9.3    Claims Administration Responsibilities ................................40
    3.9.4    Estimation of Claims.......................................................40
    3.9.5    Adjustment of Claims ....................................................41
    3.9.6    Disallowance of Claims ...................................................41
    3.9.7    Treatment of Untimely Claims .........................................41
    3.9.8    No Distributions Pending Allowance ..................................42
3.10    Treatment of Executory Contracts and Unexpired Leases .....................42
3.11    Means for Implementation of the Plan............................................43
    3.11.1 Funding the Plan ...........................................................43
    3.11.2 General Settlement of Claims and Interests.............................44
    3.11.3 Continued Legal Existence of the Debtor ..............................44
    3.11.4 Operations of the Debtor between Confirmation and the
        Effective Date ...............................................................44
    3.11.5 Effectuating Documents and Further Transactions....................44
    3.11.6 Single Satisfaction of Allowed General Unsecured Claims .....................45
    3.11.7 Exemption from Certain Transfer Taxes and Recording
        Fees ...........................................................................45
    3.11.8 Post-Confirmation Management Compensation........................45
3.12    Payments ............................................................................45
    3.12.1 Responsibility of Making Payments ...................................45
    3.12.2 Disputed Claims ...........................................................46
    3.12.3 Unclaimed Payments .....................................................47
    3.12.4 Payment Date and Location..............................................47
    3.12.5 Undeliverable Distribution Reserve ....................................48
    3.12.6 De Minimis Payments ....................................................48
    3.12.7 Compliance with Tax Requirements....................................48
    3.12.8 Claims Paid or Payable by Third Parties ...............................49
    3.12.9 Preservation of Causes of Action .......................................49
    3.12.10 Tax Consequences of the Plan .......................................49

ARTICLE 4    FEASIBILITY OF PLAN .................................................................50
    4.1    Ability to Initially Fund Plan ..............................................................50
    4.2    Ability to Make Future Plan Payments and Operate Without
        Further Reorganization ........................................................................50

ARTICLE 5    LIQUIDATION ANALYSIS ...........................................................51

ARTICLE 6    CONDITIONS PRECEDENT TO CONFIRMATION AND
            EFFECTIVE DAVE ........................................................................52
    6.1    Conditions Precedent to Confirmation of the Plan ...............................52
    6.2    Conditions Precedent to the Effective Date .........................................52
    6.3    Waiver of Conditions Precedent ..........................................................52
    6.4    *Vacatur* of Confirmation Order; Effect of Failure of Conditions ..........53

ARTICLE 7    EFFECT OF PLAN CONFIRMATION ...........................................53
    7.1    Vesting of Assets in Reorganized Debtor ............................................53
    7.2    Retention of Certain Causes of Action ................................................53
    7.3    Binding Effect .....................................................................................54
    7.4    Post-Confirmation Interim Injunction Stays ........................................54
    7.5    Discharge ............................................................................................54
        7.5.1    If Plan is confirmed under §1191(a) ......................................54
        7.5.2    If Plan is confirmed under §1191(b) ......................................54
    7.6    Discharge Injunction ...........................................................................55
    7.7    Exculpation .........................................................................................55
        7.7.1    Injunction Related to Exculpation .........................................56
    7.8    Disallowed Claims ..............................................................................56
    7.9    No Successor Liability .........................................................................56

ARTICLE 8    GENERAL PROVISIONS ..............................................................56
    8.1    Title to Assets .....................................................................................56
    8.2    Severability .........................................................................................57
    8.3    Retention of Jurisdiction by the Bankruptcy Court .............................57
    8.4    Captions ..............................................................................................58
    8.5    Successors and Assigns........................................................................58
    8.6    Governing Law ....................................................................................58
    8.7    Notices ................................................................................................58
    8.8    Remedies Upon Default .......................................................................59
    8.9    Modification of Plan ............................................................................59
        8.9.1    Pre-Confirmation ..................................................................59
        8.9.2    Post-Confirmation .................................................................59
    8.10    Other Amendments ..............................................................................59
    8.11    Revocation or Withdrawal of Plan .......................................................59
    8.12    Reservation of Rights...........................................................................60
    8.13    Plan Supplement ..................................................................................60
    8.14    Filing of Notice of Effective Date .......................................................60
    8.15    Filing of Notice of Substantial Consummation ....................................60

8.16    Filing of Notice of Completion of Payments Required under the
        Plan ..........................................................................................................60
8.17    Termination of Subchapter V Trustee Services ....................................61
8.18    Effective Date Actions Simultaneous ....................................................61
8.19    Final Decree .........................................................................................61

ARTICLE 9    EXHIBITS ...........................................................................................61

## SUMMARY OF PLAN AND DISTRIBUTION TO CREDITORS

New Way Machine Components, Inc. t/a New Way Air Bearings and t/a New Way Precision, the Debtor and Debtor-in-Possession in the above captioned Chapter 11 Case (the "Debtor") proposes this plan of reorganization (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against, and Equity Interests in, the Debtor pursuant to subchapter V of chapter 11 of the United States Bankruptcy Code.   Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to them in Article 1.A of the Plan.  The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

YOUR RIGHTS MAY BE AFFECTED.  This Plan contemplates discharges, exculpations, and injunctions related thereto as set forth in detail in Article 7 that may impact you.  You should read these papers carefully and discuss them with an attorney, tax advisor, or financial advisor.  You may obtain the Plan from the Debtor's counsel free of charge by: calling the offices of Debtor's counsel at 215-546-4500.  All documents filed in the Chapter 11 Case are also publicly available for a fee on the Bankruptcy Court's website via PACER at http://www.paeb.uscourts.gov.

Except for Administrative Expense Claims, Professional Fee Claims, Subchapter V Trustee Fee Claims, and Priority Tax Claims, which are not required to be classified, all Claims and Equity Interests are divided into Classes under the Plan.  The following chart is a summary of the classification and treatment of Claims and Equity Interests under the Plan.

The summary of the classification and treatment of Claims against and Equity Interests in the Debtor is as follows:

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, shall receive, at the option of the Debtor, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim; (i) payment in full in Cash on the Effective Date, or as soon as reasonably practicable thereafter; or (ii) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired<br><br>**Not Entitled to Vote**<br><br>(Presumed to Accept) | Estimated Amount: $10,000<br><br>Estimated Percentage Recovery: 100% |
| 2 | Secured Claim of PNC | Treatment of Term Loans. After the Effective Date, the Debtor shall continue to make fixed monthly payments to PNC of the monthly principal and interest payments (each at the non-default rate of interest) on the dates provided in the applicable PNC Loan Documents or PNCEF Loan Documents for the 2021 Term Loan ($3,355.43),[4] the 2022 Term Loan ($11,835.34),[5] the First PNCEF Loan ($2,603.52),[6] and the Second | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $3,316,450<br><br>Estimated Percentage Recovery: 100% |

[2] The Debtor reserves the right to eliminate any Class of Claims in the event it determines that there are no Claims in such Class.

[3] Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtor's estimates of such Claims as of the date of this Plan. These estimates are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are based on certain assumptions, the realization of which are beyond the Debtor's control.

[4] The 2021 Term Loan shall accrue interest at a fixed rate of 4.05% per annum and mature on December 27, 2026.

[5] The 2022 Term Loan shall accrue interest at the fixed rate of 6.7% per annum and mature on December 28, 2027.

[6] The First PNCEF Loan shall accrue interest at the fixed rate of 3.42% per annum and mature on August 4, 2025.

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | PNCEF Loan ($1,403.06)[7] until each of these loans is paid in full on their respective maturity date as set forth herein.<br><br>PNC has agreed: (i) to the principal and interest payments for the Term Loans set forth above, (ii) to the non-default interest rates for the Term Loans set forth in footnotes 4, 5, 6, and 7 below, (iii) to waive all default interest with respect to the Term Loans that accrued as of the Effective Date, (iv) to vote in favor of the Plan, (v) to not object to confirmation of the Plan; and (vi) to confirmation of the Plan under § 1191(a) of the Bankruptcy Code.<br><br>Treatment of Line of Credit.  After the Effective Date, the Debtor shall make on or before the 5th day of each month fifty-nine (59) consecutive monthly interest-only payments to PNC based on the non-default rate of interest in the LOC Note, except that as of the Effective Date (unless an earlier date is agreed upon by PNC and the Debtor), the daily BSBY benchmark[8] plus 2.75% in the LOC Note shall be replaced with daily SOFR plus 3.35%.  Interest will | | |

[7] The Second PNCEF Loan shall accrue interest at the fixed rate of 3.47% per annum and mature on October 26, 2026.

[8] On November 15, 2023, the administrator of the Bloomberg Short-Term Bank Yield Index ("BSBY") announced the permanent cessation of the BSBY index effective November 15, 2024.

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | continue to be calculated based on the actual number of days that principal is outstanding over a year of 360 days.  The Maturity Date of the Line of Credit Note shall be the 60th month after the Effective Date of the Plan. On March 20, 2024, PNC permanently suspended the Debtor's right to draw on the Line of Credit which suspension shall continue after the Effective Date.<br><br>Additional Payments for Line of Credit.  In addition to the interest-only payments for the Line of Credit set forth above, the Debtor shall also make the below-stated payments to PNC to be applied on account of the outstanding principal balance of the Line of Credit:<br><br>a.  the purchase price from the HDI Sale, approved by Bankruptcy Court Order dated July 25, 2024 [D.I. 97] shall be paid to PNC and applied by PNC, as collected, on account of the outstanding principal balance of the Line of Credit.  The $30,000 payment to PNC from the HDI Sale shall be the first monthly principal reduction payment under this Plan on account of the Line of Credit. If the HDI Sale has not closed by the Effective Date, the Debtor shall still be obligated to make a $30,000 initial principal | | |

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | payment to PNC (in which case the Debtor may retain the proceeds of the HDI Sale upon closing); | | |
| | | b.  additionally, after each of the Term Loans is paid in full, the monthly payment that was otherwise being paid on account of said Term Loan shall thereafter continue to be paid to PNC on each consecutive month thereafter until the 59th month after the Effective Date of the Plan (as reflected on the PNC Payment Schedule) which payments shall be applied by PNC, as collected, on account of the outstanding principal balance of the Line of Credit; | | |
| | | c.  the Debtor shall also make additional supplemental monthly principal reduction payments during the 2nd through 60th months after the Effective Date as reflected on the PNC Payment Schedule attached to the Plan as **Exhibit G** and made a part hereof; and | | |
| | | d.  any outstanding principal and accrued interest based on the non-default rate of interest with respect to the Line of Credit shall be due and payable on the 60th month after the Effective Date of the Plan. | | |

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | e. PNC has agreed: (i) to the principal and interest payments for the Line of Credit set forth above, (ii) to the non-default interest rate for the Line of Credit set forth above, (iii) to waive all default interest with respect to the Line of Credit that accrued as of the Effective Date, (iv) to vote in favor of the Plan, (v) to not object to confirmation of the Plan; and (vi) to confirmation of the Plan under § 1191(a) of the Bankruptcy Code. | | |
| 3 | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim and the Debtor agree to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for its Claim, after payment in full of all Allowed Administrative Claims including Professional Fee Claims and Subchapter V Trustee Fee Claims, all Allowed Priority Tax Claims in full, all Allowed Other Priority Claims in full, and for each year after the Effective Date (for a five (5) year period after the Effective Date), subject to the payments each year having been made on account of the Allowed Class 2 Secured Claim of PNC on the dates and in the amounts set forth in Class 2 and the PNC Payment Schedule, and further, subject to a Pro Rata reserve on | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $585,000<br><br>Estimate Percentage Recovery: 100% |

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | account of Disputed Claims, if any, a distribution in the amount of $116,875 shall be made on a Pro Rata basis. The first distribution to be made twelve (12) months after the Effective Date, the second Distribution to be made twenty-four (24) months after the Effective Date, the third Distribution to be made thirty-six (36) month after the Effective Date, the fourth Distribution to be made forty-eight (48) months after the Effective Date and the fifth Distribution to be made on the sixtieth (60) month after the Effective Date. | | |
| 4 | Equity Interests in Debtor | As of the Effective Date, the Equity Interests in the Debtor shall remain unchanged and equal to the structure that existed on the Petition Date. | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Estimated Amount: N/A Estimated Percentage Recovery: N/A |
| 5 | Subordinated Claims | Subject to the approval of the Hackett/Debtor/Devitt Settlement Agreements Hackett, as the Holder of the Hackett Subordinated Claim, shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for the Hackett Subordinated Claim, five (5) equal annual payments of $80,000, with the first payment to be made twelve (12) months after the Effective Date of the Plan, the second payment to be made twenty-four (24) months after the Effective Date, the third payment to be made thirty-six (36) months after the Effective Date, the fourth payment to be made forty-eight (48) | Impaired **Entitled to Vote** | Estimated Amount: $400,000 Estimated Percentage Recovery: 100% |

| Class | Designation[2] | Treatment under the Plan | Impairment and Entitlement | Estimated Amount and Approximate Percentage Recovery[3] |
|---|---|---|---|---|
| | | months after the Effective Date and the fifth payment to be made on the sixtieth (60) month after the Effective Date, and in each case, subject to the Debtor having made the projected annual distribution of $116,875 for said year to Holders of Allowed Class 3 General Unsecured Claims as set forth above in Class 3 (General Unsecured Claims). | | |
| | | Discounted Payoff: At any time on or within sixty (60) days after the occurrence of the Effective Date, the Debtor or its nominee shall have the option to satisfy the Hackett Subordinated Claim for a lump sum payment of One Hundred Thousand ($100,000) Dollars payable in immediately available funds to Hackett (the "Discounted Payoff"). Upon the payment of the Discounted Payoff to Hackett and receipt by Hackett, the Hackett Subordinated Claim shall be deemed paid in full and, assuming that the Hackett Priority Claim has also been paid to Hackett, there shall be no remaining obligations to Hackett under the Hackett/Debtor/Devitt Settlement Agreement, or the Plan, or any Conforming Chapter 11 Plan. If the Debtor does not exercise the Discounted Payoff option within the time period specified herein, then the Hackett Subordinated Claim will be paid in accordance with Section 4.2 of the Hackett/Debtor/Devitt Settlement Agreement (as also set forth above). | | |

## ARTICLE 1
## DEFINITIONS, RULES OF INTERPRETATION,
## AND COMPUTATION OF TIME AND GOVERNING LAW

A.    <u>Defined Terms</u>.

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "<u>2021 Term Loan</u>" means the term note executed by the Debtor on or about December 28, 2021 in favor of PNC Bank in the principal amount of $181,716.31 (Loan No. xxx5982).

2.    "<u>2022 Term Loan</u>" means the term note executed by the Debtor on or about December 28, 2022 in favor of PNC Bank in the principal amount of $600,607.15 (Loan No. xxx8284).

3.    "<u>Accrued Professional Fees</u>" means, as of any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued fees and reimbursable expenses for services rendered in the Chapter 11 Case up to and including such date, whether or not such Professional has then filed an application for the Allowance and payment of such fees and expenses: (a) to the extent that any such fees and expenses have not been previously paid by the Debtor; and (b) after each Professional has applied to such accrued fees and expenses the balance of any retainer that has been provided by the Debtor to such Professional, if applicable.   No amount of a Professional's fees or expenses denied by a Final Order of the Bankruptcy Court shall constitute Accrued Professional Fees.

4.    "<u>Adequate Protection Payments</u>" shall mean the payments made by the Debtor to PNC during the period from the Petition Date to the Effective Date of the Plan that were authorized by interim Bankruptcy Court orders authorizing the use of cash collateral dated April 25, 2024 and May 23, 2024, and the Final Cash Collateral Order.

5.    "<u>Administrative Expense Claim Bar Date</u>" means the deadline for filing requests for payment of Administrative Expense Claims, which shall be the later of (a) 30 days after the Effective Date or (b) in the event an Executory Contract is rejected following the Effective Date, solely as to the Administrative Expense Claim related to such rejected Executory Contract, 30 days after notice to the counterparty to such rejected Executory Contract.

6.    "<u>Administrative Expense Claim Objection Bar Date</u>" means the deadline for filing objections to requests for payment of Administrative Expense Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 75 days following the Effective Date; provided that the Administrative Expense Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and hearing.

7.    "<u>Administrative Expense Claim</u>"  means any right to payment from the Debtor that constitutes a cost or expense of administration incurred during the Chapter 11 Case of the kind

9

specified under 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estate or continuing the operations of the Debtor incurred during the period from the Petition Date to the Effective Date; (b) Professional Fee Claims; and (c) Subchapter V Trustee Fee Claims.

8.      "Affiliate" has the meaning with respect to any person, or any other person, which directly or indirectly controls, or is under common control with, or is controlled by, such Person and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.

9.      "Allowed" means

a.      with respect to any Claim that is asserted to constitute an Administrative Expense Claim: (i) a Claim that represents an actual and necessary cost or expense of preserving the Estate or continuing the operations of the Debtor incurred during the period from the Petition Date to the Effective Date for which a request for payment is filed, (A) to the extent such Claim is determined by the Debtor to constitute an Administrative Expense Claim or allowed by a Final Order of the Bankruptcy Court or (B) as to which no objection to allowance has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law; (ii) other than with respect to a Professional Fee Claim, a Claim that arises during the period from the Petition Date to the Effective Date for which a request for payment is filed that is Disputed by the Debtor, which Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court to the extent that such allowed portion is determined by a Final Order to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; (iii) a Claim that arises during the period from the Petition Date to the Effective Date in the ordinary course of the Debtor's operations that is determined by the Debtor to constitute an Administrative Expense Claim; (iv) a Professional Fee Claim or a Subchapter V Trustee Fee Claim, to the extent allowed by a Final Order of the Bankruptcy Court; or (v) any Claim that is expressly allowed by the Plan; and

b.      with respect to any Priority Tax Claim, Other Priority Claim, Secured Claim, General Unsecured Claim, or any portion of any of the foregoing, a Claim that is: (i) listed in the Schedules as not being disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed, and that has not been paid pursuant to an order of the Bankruptcy Court prior to the Effective Date; (ii) evidenced by a Proof of Claim filed on or before the applicable Bar Date, and as to which no objection has been filed on or before the Claims Objection Deadline; (iii) not the subject of any objection to Allowance, which Claim (A) was filed on or before the Claims Objection Deadline and (B) has not been settled, waived, withdrawn or Disallowed pursuant to a Final Order; or (iv) expressly Allowed (x) pursuant to a Final Order, (y) pursuant to an agreement between the holder of such Claim and the Debtor or Reorganized Debtor, as applicable, or (z) pursuant to the terms of the Plan.  For the avoidance of doubt, the holder of a Claim evidenced by a Proof of Claim filed after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.  "Allowance" and "Allowing" have correlative meanings.

10.     "Avoidance Actions" means any and all avoidance, recovery, subordination or other Claims, actions, or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date.

11.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 1532, as in effect on the Petition Date.

12.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania or such other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the District Court.

13.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

14.     "Bar Date" means (a) June 21, 2024 for any Claim (other than an Administrative Expense Claim or a Claim of a Governmental Unit), or (b) October 21, 2024 for any Claim of a Governmental Unit, in each case as established by the Bar Date Order.

15.     "Bar Date Order" means the *Order, Pursuant to 11 U.S.C. §§ 502, Bankruptcy Rules 2002(a)(7) and 3003(c)(3), and Local Rule 9014-2 (7), (I) Establishing Deadlines for Filing Proofs of Claim, and (II) Establishing the Form and Manner of Notice Thereof.*

16.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a), on which commercial banks in Philadelphia, Pennsylvania are required or authorized by law to close.

17.     "Cash" means legal tender of the United States of America.

18.     "Cash Collateral Stipulation" means the Stipulation Authorizing the Debtor to Use Cash Collateral pursuant to 11 U.S.C. § 363(c)(2)(B) and Provide Adequate Protection, as may be amended, between the Debtor and PNC [D.I. 79].   A copy of the Cash Collateral Stipulation is attached as Exhibit 1 to the Final Cash Collateral Order.

19.     "Cause of Action" or "Causes of Action" means any Claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or

unliquidated, choate or inchoate, Secured or unsecured, capable of being asserted, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, whether arising before, on, or after the Petition Date.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) Claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal or foreign law, including any fraudulent transfer laws.

20.    "Chapter 11 Case" means this case under chapter 11 of the Bankruptcy Code, in which the Debtor is the Debtor-in-Possession, Case No. 24-11362(AMC).

21.    "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code.

22.    "Claims Objection Deadline" means the deadline for filing an objection to any Claim (other than a Professional Fee Claim), which deadline shall be: (a) 90 days following the Effective Date with respect to all such Claims and Interests, subject to any extensions approved by an order of the Bankruptcy Court; provided, however, that the Debtor shall not be bound by the Claims Objection Deadline with respect to any Claim filed after the Bar Date.

23.    "Claims Record Date" means the Voting Deadline, which is the date on which the transfer register for each Class of Claims, or Interests in the Debtor, as such register is maintained by the Debtor, shall be deemed closed.

24.    "Claims Register" means the official Claims register maintained by the Clerk of the Bankruptcy Court for the Chapter 11 Case.

25.    "Class" means each category of holders of Claims or Interests as set forth in Article 3.2 pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

26.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Case. Confirm, Confirmed and Confirmability shall have correlative meanings.

27.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

28.    "Confirmation Hearing" means the hearing(s) held by the Bankruptcy Court pursuant to sections 1128, 1129 and 1191 of the Bankruptcy Code at which the Debtor seek entry of the Confirmation Order.

29.     "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

30.     "<u>Creditor</u>" means any Person or Entity that has a Claim that arose on or before the Petition Date.

31.     "<u>Cure Amount</u>" means, with respect to any Executory Contract or Unexpired Lease sought to be assumed or assumed and assigned by the Debtor, the monetary amount, if any, required to cure the Debtor's defaults under any such Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the non-Debtor party to an Executory Contract or Unexpired Lease) at the time such Executory Contract or Unexpired Lease is assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

32.     "<u>Debtor</u>" and "<u>Debtor-in-Possession</u>" means New Way Machine Components, Inc. t/a New Way Air Bearings and New Way Precision, a Pennsylvania Corporation that is a debtor and debtor-in-possession in this Chapter 11 Case.

33.     "<u>Deficiency Claim</u>" means, with reference to a Creditor having an Allowed Secured Claim, that portion of the Creditor's Allowed Claim that is partially secured because (a) the monetary benefit derived from the exercise of any available right of setoff and the application to the Claim of the net proceeds available from disposition of the Collateral securing the Creditor's Allowed Claim is insufficient to permit payment in full of the Allowed Claim, or (b) a final order entered in a proceeding to determine the extent of the Secured Claim provides that part of the Creditor's Allowed Claim is not an Allowed Secured Claim based on a valuation of the Creditor's interest in the Debtor's estate's interest in the Collateral securing the Claim.

34.     "<u>Devitt</u>" means Andrew J. Devitt.

35.     "<u>Disallowed</u>" means, as to any Claim, a Claim or any portion thereof that: (a) has been disallowed, denied, dismissed, expunged, or overruled pursuant to the terms of the Plan or a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or by a settlement; (b) has been listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Bar Date has been established, but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law; or (c) has not been scheduled and as to which a Bar Date has been established, but no Proof of Claim has been timely filed, such that the creditor holding such Claim shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution. "Disallowance" and "Disallowing" have correlative meanings.

36.     "<u>Discharge</u>" means the discharge set forth in <u>Article 7.5</u>.

37.     "<u>Discharge Injunction</u>" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in <u>Article 7.6</u>.

38.    "Disposable Income" means "disposable income" as defined in section 1191(d) of the Bankruptcy Code.

39.    "Disputed" means, with respect to any Claim or Equity Interest (or portion thereof) (a) that is neither Allowed nor Disallowed, (b) that is listed on the Schedules a "disputed," "contingent," or "unliquidated" or (c) for which a Proof of Claim has been filed or a written request for payment has been made to the extent that any party in interest has interposed a timely objection to such Claim, which objection has not been withdrawn or adjudicated pursuant to a Final Order.

40.    "Disputed Claims Reserve" means the reserve of Cash to be Distributed to Holders of Allowed Class 3 Claims, if and when such Disputed Claims become Allowed.

41.    "Distribution" means the payment or delivery of Cash, property, or interests in property, as applicable, to Holders of Allowed Claims under the terms of the Plan. "Distributed" and "Distribution" have correlative meanings.

42.    "Distribution Date" means the dates on which the Debtor makes a Distribution, or causes a Distribution to be made under the Plan.

43.    "Distribution Record Date" means the date the Solicitation Order is entered.

44.    "District Court" means the United States District Court for the Eastern District of Pennsylvania.

45.    "Effective Date" means the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date set forth in Article 6.2 shall have been satisfied or waived pursuant to Article 6.3. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter. Within five (5) Business Days of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date, identifying the Effective Date and that it has occurred.

46.    "Encumbrance" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

47.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

48.    "Equity Interest" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code.

49.    "Equity Security Holder" means Devitt who owns all the Equity Interest in the Debtor.

50. "Equity Security Interest" also means any "equity security" in the Debtor as defined in in section 101(16) of the Bankruptcy Code.

51. "Estate" means the estate created for the Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Case.

52. "Exculpated Parties" means, collectively, the following: (a) the Debtor; (b) the directors, officers, and managers of the Debtor that served during the Chapter 11 Case, (c) all Professionals retained by the Debtor in the Chapter 11 Case, and in each such instance of (a) through (c) acting in their capacity as such.

53. "Executory Contract" means any executory contract to which the Debtor is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

54. "Final Cash Collateral Order" means the Order dated June 26, 2024 approving the Cash Collateral Stipulation [D.I. 81]. A copy of the Cash Collateral Stipulation is attached as Exhibit 1 to the Final Cash Collateral Order.

55. "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated, stayed, modified or amended, and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument, reconsideration, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, reconsideration, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument, reconsideration, or rehearing shall have been denied with prejudice or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, reconsideration, or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment to not be a Final Order.

56. "First PNCEF Loan" means the notice of conversion signed by the Debtor and PNCEF on or about July 8, 2020 which set forth the terms and conditions for repayment of the 2019 advances in the amounts of $128,902.89 and $14,495.00 as a term loan (Loan No. xxx531-4).

57. "General Unsecured Claim" means all Claims that are not a Secured Claim, Priority Tax Claim, Other Priority Claim, Professional Fee Claim, or an Administrative Expense Claim.

58.     "Governmental Unit" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

59.     "Hackett" means Nicholas R. Hackett.

60.     "Hackett/Debtor/Devitt Settlement Agreement" means that certain settlement agreement entered into by and among the Debtor, Devitt and Hackett dated July 18, 2024 and approved by Order of the Bankruptcy Court dated August 22, 2024 [D.I. 118].

61.     "Hackett Priority Claim" means Hackett's Allowed unsecured priority claim pursuant to 11 U.S.C. § 507(a)(4) in the amount of $10,000 for unpaid wages as set forth in the Hackett Proof of Claim.

62.     "Hackett Proof of Claim" means the unsecured claim of Nicholas R. Hackett filed on June 19, 2024 in the amount of $2,832,939.38 wherein: (i) $2,822,939.38 is designated as a general unsecured claim itemized as $2,748,176.84 of principal on his put option and $74,762.54 as accrued interest on his put option, and (ii) $10,000 is designated as a priority wage claim pursuant to 11 U.S.C. § 507(a)(4) (Claim No. 18, Claims Register).

63.     "Hackett Put Claim" means his general unsecured claim in the amount of $2,822,939.38 itemized as $2,748,176.84 of principal on his put option and $74,762.54 as accrued interest on his put option as set forth in the Hackett Proof of Claim.

64.     "Hackett Subordinated Claim" means the Hackett Put Claim which by the terms of the Hackett/Debtor/Devitt Settlement Agreement has been reduced and allowed in the amount of $400,000 and subordinated to all other holders of general unsecured claims.

65.     "Holder" means any holder of an Allowed Claim or Equity Interest.

66.     "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

67.     "Injunctions" means the Discharge Injunction, Exculpation Injunction, and any other injunctions entered by the Bankruptcy Court in connection with Confirmation of the Plan.

68.     "Insider" means any "insider" as that term is defined in paragraphs (B), (C), (E) or (F) of § 101(31) of the Bankruptcy Code.

69.     "Insurance Policy" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtor, and/or any other Entity, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtor and/or any other Entity, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtor, and/or any other Entity insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Claim.

70.    "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

71.    "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

72.    "Line of Credit" means the Amended and Restated Revolving Line of Credit Note executed by the Debtor on or about April 19, 2023 in favor of PNC Bank for a line of credit with a maximum principal amount of $2,750,000.00, as amended (Loan No. xxx9977).

73.    "Other Priority Claim" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Expense Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Case.

74.    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

75.    "Petition Date" means April 22, 2024.

76.    "Plan" means this *Plan of Reorganization proposed by the* Debtor, and Debtor-in-Possession, including the Exhibits thereto, as the same may be amended or modified from time to time pursuant to section 1193 of the Bankruptcy Code.

77.    "Plan Documents" means, collectively, the Plan, the Solicitation Order, each of the documents that comprises the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing.

78.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, which the Debtor may file no later than seven (7) days before the Voting Deadline, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement.

79.    "PNC" means collectively, PNC Bank and PNC Equipment Finance.

80.    "PNC Bank" means PNC Bank, N.A.

81.    "PNC Equipment Finance" means PNC Equipment Finance, LLC.

82.    "PNC Purchase Card" means the purchase card issued by PNC Bank to the Debtor.

83.     "Priority Tax Claim" means any Claim of a Governmental Unit against the Debtor that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

84.     "Pro Rata" means, at any time, with respect to any Claim, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise.

85.     "Pro Rata Share" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

86.     "Professional" means any Person retained by the Debtor pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 363, or 1103 of the Bankruptcy Code.

87.     "Professional Fee Claim" means any Claim of a Professional or other Person for Allowance by the Bankruptcy Court and payment by the Debtor of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Case for the period from the Petition Date to and including the Effective Date under sections 328, 330, 331, or 503(b) of the Bankruptcy Code.

88.     "Proof of Claim" means any proof of claim filed with the Bankruptcy Court pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against the Debtor.

89.     "Reinstate," "Reinstated," or "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation, compensating the holder of such Claim (other than the Debtor or an "insider" of the Debtor within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof.  For the avoidance of doubt, Reinstate, Reinstated, or Reinstatement means with respect to Claims and Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

90.     "Reorganized Debtor" means the Debtor, as reorganized pursuant to and under the Plan on or after the Effective Date.

91.     "Schedules" means, with respect to the Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor with the Bankruptcy Court

pursuant to sections 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

92. "Second PNCEF Loan" means the notice of conversion signed by the Debtor and PNCEF on or about July 26, 2021 which set forth the terms and conditions for repayment of the 2020 advances in the amount of $77,183.05 as a term loan (Loan No. xxx531-4).

93. "Secured" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a Lien on property of a Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtor, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

94. "SOFR" means with respect to any day the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

95. "Solicitation Materials" means materials used in connection with the solicitation of votes on the Plan, including the Solicitation Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

96. "Solicitation Order" means one or more orders entered by the Bankruptcy Court: (i) authorizing solicitation of the Plan, (ii) approving the Voting Procedures; and (iii) fixing the amounts of Claims solely for voting purposes and not for purposes of Distributions.

97. "Subchapter V Trustee" means Holly Smith Miller, Esquire appointed in the Chapter 11 Case by the United States Trustee pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the Confirmation Order.

98. "Subchapter V Trustee Fee Claim" means compensation awarded to the Subchapter V Trustee for services rendered in this Chapter 11 Case pursuant to 11 U.S.C. § 330 at an hourly rate of $425.00, in addition to reimbursement of any actual and necessary expenses incurred.

99. "Term Loans" means the 2021 Term Loan, the 2022 Term Loan, the First PNCEF Loan, and the Second PNCEF Loan.

100. "Unexpired Lease" means a lease to which either Debtor is a party, including any and all pre- and postpetition amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

101.    "<u>Unimpaired</u>" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, including any Claim that is Reinstated.

102.    "<u>United States Trustee</u>" means the Office of the United States Trustee for the Eastern District of Pennsylvania.

103.    "<u>Unsecured Claim</u>" means any Claim, including a Rejection Claim or a Deficiency Claim, arising out of any default of the Debtor under a contract entered into prior to the Petition Date, other than an Administrative Claim, Other Priority Claim, Priority Tax Claim or Secured Claim.

104.    "<u>Voting Deadline</u>" means the date and time as may be set by the Bankruptcy Court pursuant to the Solicitation Materials.

105.    "<u>Voting Procedures</u>" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against the Debtor entitled to vote on the Plan.

B.    <u>Rules of Interpretation</u>.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release or other agreement or document being in particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (d) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (e) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (f) all references in this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan; (g) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) subject to the provisions of any contract, Articles of Incorporation, Bylaws, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with federal law, including the Bankruptcy Code and Bankruptcy Rules; and (j) the rules of construction set forth in §102 of the Bankruptcy Code will apply.

C.    <u>Computation of Time</u>.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

E.    <u>References to Monetary Figures</u>. All references in the Plan to monetary figures shall refer to United States of America currency, unless otherwise expressly provided.

F.    <u>Exhibits</u>.  All Exhibits are incorporated into and are a part of the Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court with the Plan Supplement.

G.    <u>Controlling Document</u>. In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement), on the one hand, and the terms and provisions in any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), on the other hand, the Plan (without reference to the Plan Supplement) shall govern and control.  In the event of any inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control; <u>provided</u>, <u>however</u>, that in the event of a conflict between Confirmation Order, on the one hand, and the Plan or Plan Supplement or any of the other Plan Document, on the other hand, the Confirmation Order shall govern, control and take precedence in all respects.

## ARTICLE 2
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

2.1    <u>Nature of the Debtor's Business</u>.

The Debtor is a privately held for profit Pennsylvania corporation that was founded and incorporated on January 6, 1994 by Devitt.  It is one of the world's leading independent designer and manufacturer of modular air bearing products and a recognized provider of porous media air bearing solutions with sales in over thirty (30) countries worldwide.  Over the years, Devitt invented and designed many of the products sold by the Debtor for which he has filed domestically and internationally for over 100 patents for his inventions.

2.2    <u>History of Business Operations of the Debtor.</u>

The Debtor functions as a manufacturer specializing in air bearings catering to industries such as semiconductor manufacturing, aerospace, machine tool, medical devices and metrology. Air bearings are devices that use compressed air to create a thin film of load bearing air between two surfaces allowing for frictionless motion and precise positioning.  Originally conceived as a

solution for frictionless motion, the Debtor's business has since evolved into a mainstream manufacturer of machine components serving diverse sectors.

The Debtor offers a range of products including flat round air bearings, linear air bearings, and rotary air bearings. These products provide advantages such as high precision, low friction, maintenance-free operation, and vibration isolation. The Debtor is known for its innovative approach to air bearing design, often incorporating advanced materials and engineering techniques to improve performance and reliability. Industries that rely on high-precision motion control and manufacturing processes, such as semiconductor fabrication, aerospace, machine tool, medical devices, automotive testing, and flat panel display handling, are key drivers for the demand of air bearing technology.

The Debtor's principal place of business is located at 50 McDonald Boulevard, Aston, PA 19014. The Debtor also leases space at 30 McDonald Boulevard, Aston, PA 19014. As of the Petition Date, the Debtor employed 52 people. The tax return history of the Debtor for the last 5 years (2019 through 2022) is attached to the Plan as **Exhibit A** and made a part hereof.

### 2.3    Filing of the Debtor's Chapter 11 Case

On April 22, 2024, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code. The Chapter 11 Case is pending before the Bankruptcy Court in the Eastern District of Pennsylvania. On the Petition Date, the Debtor filed the Declaration of Devitt, chairman and chief executive officer of the Debtor in support of the Chapter 11 Petition and First Day Motions [D.I. 18] which is incorporated as if fully set forth herein.[9]

On April 23, 2024, Holly Smith Miller was appointed as the Subchapter V Trustee in the Chapter 11 Case.

### 2.4    Legal Structure and Ownership.

The Debtor is a corporation organized under the laws of the Commonwealth of Pennsylvania. All of the Debtor's common stock is owned 100% by Devitt.

### 2.5    Debtor's Assets and Liabilities.

The Debtor's assets and liabilities are detailed in the Schedules filed on May 23, 2024 [D.I. 60]. The Schedules set forth the Debtor's assets and liabilities as of the Petition Date. The Debtor's assets include cash, accounts receivable, inventory, furniture, fixtures, equipment, and intellectual property.

As of the Petition Date, the Debtor had a secured debt obligation to PNC with respect to (i) the Line of Credit in the amount of approximately $2,627,242, (ii) the Term Loans in the aggregate amount of approximately $656,834, and (iii) the PNC Purchase Card in the approximate amount of $4,439.95. Additionally, the Debtor had (a) priority claim of $10,000, (b) unsecured trade debt in the amount of $585,000 and (c) a contingent, unliquidated, and disputed

---

[9] A copy of all pleadings in the Chapter 11 Case are available for a fee on the Bankruptcy Court's website, via PACER at http://www.paeb.uscourts.gov.

debt in the amount of $2,924,000 arising from the Debtor's redemption of the stock of a former minority shareholder and insider, Nicholas Hackett. A copy of the Debtor's Balance Sheet for the year ending December 31, 2023 is attached to the Plan as **Exhibit B**.

On June 19, 2024, Nicholas Hackett, filed the Hackett Proof of Claim. The Debtor disputes the portion of the Hackett Proof of Claim that relates to the Hackett Put Claim. As part of the Hackett/Debtor/Devitt Settlement Agreement, the Hackett Priority Claim shall be an Allowed Claim under Class 1 of the Plan and the Hackett Put Claim shall be Allowed in the amount of $400,000 and subordinated to all other holders of general unsecured claims (defined therein and herein as the Hackett Subordinated Claim), which will be treated as an Allowed Claim under Class 5 of the Plan.

As of the date of the Plan, the General Claims Bar Date has run, but the Governmental Claims Bar Date has not. However, the Debtor does not expect any claims to be filed by any governmental agency.

2.6    <u>Current and Historical Financial Conditions</u>.

The Debtor's historical financial performance is as follows:

- In 2019, the Debtor's gross revenues were $10,397,951 with a net operating income of $226,227 and net income of $113,431.

- In 2020, the Debtor's gross revenues were $8,820,225 with a net operating loss of ($887,596), and net income of $39,989. The net income resulted from the receipt during 2020 of a Paycheck Protection Program ("PPP") loan pursuant to the U.S. Federal Government's Coronavirus Aid Relief and Economic Security Act (the "Cares Act") in the amount of $977,800 that was forgiven. A copy of the Debtor's 2019 and 2020 Income Statement is attached to the Plan as **Exhibit C**.

- In 2021, the Debtor's gross revenues were $10,017,792 with a net operating loss of ($171,774), and net income of $1,718,454. The net income resulted from the receipt during 2021 of monies under the pursuant to the Cares Act totaling $1,895,053 (a PPP loan in the amount of $977,897 which was forgiven and an Employee Retention Credit in the amount of $917,156).

- In 2022, the Debtor's gross revenues were $13,163,522 with a net operating income of $499,304, and net loss of ($736,439). The net loss was the result of the write-off of obsolete inventory in the amount of $1,192,816. A copy of the Debtor's 2021 and 2022 Income Statement is attached to the Plan as **Exhibit D**.

- In 2023, the Debtor's gross revenues were $12,038,002 with a net operating loss of ($1,620,281), and net loss of ($2,134,345) (including the write-off of obsolete inventory in the amount of $1,364,361). A copy of the Debtor's 2023 Income Statement is attached to the Plan as **Exhibit E**.

Since the Petition Date, the Debtor has filed periodic monthly operating reports reflecting the Debtor's finances [D.I. 61 and 78]. You may obtain the monthly operating reports from the Debtor's counsel free of charge by: calling the offices of Debtor's counsel at 215-546-4500. These reports are also publicly available for a fee on the Bankruptcy Court's website via PACER at http://www.paeb.uscourts.gov.

The Debtor's projected financial performance is explained in Article 4 of this Plan.

2.7    Events Leading to the Filing of Chapter 11 Case.

2.7.1    Continued Losses.

As set forth above, the Debtor incurred substantial losses in four of the last five years. Absent the over $2,872,000 received during 2020 and 2021 under the Cares Act from the Federal Government, this Chapter 11 Case may have happened as early as 2020,

Due to the failure to meet profit targets, financial mismanagement and the resulting losses, in October 2022, Hackett terminated the Debtor's COO/CFO. For the calendar year ending 2022, the Debtor also booked a $1,192,361 write-down, characterized by former management as obsolete inventory, discrepancies in work-in-progress, and subpar operational performance. The mismanagement of prior management, included over-hiring of staff, expanding into a second location, purchasing excessive equipment and materials, and overestimating forecasts all of which positioned the Debtor for the substantial losses that it incurred. For the calendar year ending 2023, the Debtor also booked an additional $1,364,361 write-down of obsolete inventory, and work-in-progress.

2.7.2    Hackett's Exercise of Put Option.

On April 13, 2023, Hackett hand delivered to Devitt the below stated letter (the "**Notice of Exercise of Put Option**"):

**Re:  Notice of Exercise of Put Right**

Dear President:

Pursuant to Section 6(a) of that certain Restricted Stock Award Agreement dated December 30, 2003 by and between New Way Machine Components Incorporated (the "*Company*") and Hackett (the "*Agreement*"), this letter (this "*Letter*") constitutes notice of my intention to exercise my right under Section 6(a) of the Agreement to sell to the Company all of the shares of common stock in the Company owned by me as of the date hereof (the "*Shares*"). Capitalized terms used but not defined in this Letter shall have the meaning ascribed to such terms in the Agreement.

As set forth in that certain Consent in Lieu of the Annual Meeting of the Board of Directors of the Company (the "*Board*") dated as of March 21, 2023 (the "*Consent*"), and as required by Section 4(b)(i) of the Stock Award Agreement, the Board

24

determined the Fair Market Value of the Company's common stock for purposes of the Stock Award Agreement was $15,000,000 as of December 31, 2022. The Consent constitutes a Fair Market Value under the Agreement. Accordingly, this Letter is being delivered to you within thirty (30) days of the Consent in accordance with Section 6 of the Stock Award Agreement.

Pursuant to Section 6(c) of the Agreement, the sale of the Shares to the Company must take place within thirty (30) days after the Company's receipt of this Letter. To expedite the process, I have prepared copies of the applicable legal documentation needed to consummate such sale process based on the forms used by the Company in the past for similar transactions.

Very truly yours,
Nicholas R. Hackett

As set forth in the Hackett/Debtor/Devitt Settlement Agreement, the Debtor disputes this valuation and asserts the value is substantially less than a Fair Market Value of the Company's common stock at $15,000,000 ($2,000 per share ($15,000,000/7,500 = $2,000) as of December 31, 2022. As part of the Hackett/Debtor/Devitt Settlement Agreement, the Settling Parties (as that term is defined therein) agreed, among other things, to the Hackett Priority Claim, the Hackett Subordinated Claim and mutual releases.

2.8     Default Declared by PNC Bank.

On March 20, 2024, PNC declared a default under its credit facilities with the Debtor due to, *inter alia*, (i) borrower (Debtor) allowing to exist $2,924,000 of indebtedness for amounts owed by borrower (Debtor) to Hackett and (ii) borrower (Debtor) removing Hackett as president.

2.9     Maturity of PNC Bank Credit Facilities.

The maturity date of the Term Loans and the Line of Credit Note occurred on April 30, 2024.

2.10     Significant Events During the Chapter 11 Case.

2.10.1 "First Day" Motions.

On the Petition Date, the Debtor filed a number of motions seeking typical "first day" relief in chapter 11 cases authorizing the Debtor to maintain its operations in the ordinary course. This relief was designed to ensure a seamless transition into the chapter 11 process and allow the Debtor to maintain its operations in the ordinary course so as to function smoothly while its case progressed. The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtor to, among other things:

(a)     continue paying employee wages, benefits and reimbursable expenses [D.I. 37];

(b)     continue the use of the Debtor's bank accounts and use of existing business forms [D.I. 35]; and

(c)     pay adequate assurance of payment deposits to utility companies [D.I. 36].

2.10.2  <u>Cash Collateral Motion</u>.

On the Petition Date, the Debtor filed a motion for authority to use cash collateral and provide adequate protection [D.I. 8].  By interim Orders dated April 25, 2024 [D.I. 38], May 23, 2024 [D.I. 64] and the Final Cash Collateral Order [D.I. 79] (collectively, the "Cash Collateral Orders", the Debtor is authorized to use the cash collateral of PNC and to make the Adequate Protection Payments.

2.10.3  <u>Retention of Chapter 11 Professionals</u>.

On the Petition Date, the Debtor filed an application to retain Karalis PC as bankruptcy counsel [D.I. 16].  On May 10, 2024, the Bankruptcy Court entered an Order approving the retention of Karalis PC as bankruptcy counsel [D.I. 52].  On the Petition Date, the Debtor filed an application to retain Asterion, Inc. as financial advisors [D.I. 17].  On May 10, 2024, the Bankruptcy Court entered an Order approving the retention of Asterion, Inc. as financial advisors [D.I. 54].  On May 17, 2024, the Debtor filed an application to retain Volpe and Koenig, P.C. as intellectual property counsel in the ordinary course of business [D.I. 57].  On May 31, 2024, the Bankruptcy Court entered an Order approving the retention of Volpe and Koenig, P.C. as intellectual property counsel in the ordinary course of business [D.I. 71].

2.10.4  <u>Claims Bar Date</u>.

The Bankruptcy Court established a Bar Date to file Proofs of Claim in this Chapter 11 Case.  The Bar Date fixed by Order of the Court was June 21, 2024 [D.I. 63].  For Claims of Governmental Units, and in accordance with § 502(b)(9) of the Bankruptcy Code, the Bar Date is 180 days from the date of the Order for relief or October 21, 2024.

2.10.5  <u>Motion to Approve Sublease Agreement with HDI LLC and Lease Termination with BKN Real Estate Associates LP</u>.

On June 20, 2024, the Debtor filed the Motion of Debtor for Entry of an Order (I) Approving Sublease Agreement with HDI LLC and (II) Approving Lease Termination Agreement with BKN Real Estate Associates, LP Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 [D.I. 76].  As set forth in this Motion, the Debtor seeks the entry of an Order authorizing, *inter alia*, (i) it to sublease certain non-residential real property located at 30 McDonald Boulevard, Aston, PA 19014 to HDI LLC from June 1, 2024 through August 31, 2024 and (ii) it to terminate the non-residential real property lease for the real property located at 30 McDonald Boulevard, Aston, PA 19014 with BKN Real Estate Associates, LP effective as of August 31, 2024.  On July 8, 2024, the Debtor filed with the Bankruptcy Court a certificate of no answer, objection or other

26

responsive pleading to this motion [D.I. 86].  The hearing on this Motion is scheduled to be held on July 24, 2024.

### 2.10.6  Motion to Sell Certain Machinery and Office Furnishings.

On June 20, 2024, the Debtor filed the Motion of Debtor for entry of an Order Authorizing the Sale of Certain Machinery and Office Furnishings Free and Clear of all Liens, Claims and Encumbrances Pursuant to 11 U.S.C. § 363 [D.I. 75].  As set forth in this Motion, the Debtor seeks authority to sell the following personal property to HDI LLC for the sum of $30,000.00 (the "HDI Sale"): one (1) Ingersoll Rand UP6-15c 150 psi 'TAS' Rotary Screw Compressor [Serial Number CBV862821]; one (1) Kearney and Trecker 307 S-12 Mill [Serial Number 22/9928]; one (1) MSC Model Number 951682 Mill [Serial Number 783255]; six (6) desks; one (1) round table; twenty-eight (28) chairs; four (4) workstations; one (1) conference table; six (6) training tables and three (3) televisions.  An informal response to this motion was received from PNC which was resolved by a revised proposed order with respect to this motion.  On July 8, 2024, the Debtor filed with the Bankruptcy Court a certificate of no answer, objection or other responsive pleading to this motion explaining the PNC response and its resolution by a revised proposed order attached thereto [D.I. 87].  The hearing on this Motion is scheduled to be held on July 24, 2024.

### 2.10.7  Settlement Among the Debtor, Hackett and Devitt.

The Hackett/Debtor/Devitt Settlement Agreement was entered into by the Debtor, Hackett and Devitt (collectively, defined therein as the "Settling Parties") compromising, settling forever, resolving and finally disposing of any and all claims among the Settling Parties, including any claims asserted, or which could have been asserted by any of the Settling Parties against each other or any officer, director, or shareholder of the Debtor, relating in any way to the Put Option exercised by Hackett, the Transfers (as defined therein), the Hackett Put Claim, the Hackett Priority Claim, the Hackett Proof of Claim, the Debtor and the Debtor's bankruptcy estate, the Avoidance, Objection, Reduction and Subordination Action, and the Counterclaims (as defined therein).  The Hackett/Debtor/Devitt Settlement Agreement provides, *inter alia,* that: (i) the Hackett Priority Claim shall be Allowed and treated and paid on the Effective Date of the Plan in the same fashion as all other Class 1 priority unsecured claims; (ii) the Hackett Subordinated Claim shall be an Allowed Class 5 Claim and shall be paid by the Debtor in five (5) equal annual payments of $80,000 with the first payment to be made twelve (12) months after the Effective Date of the Plan, and each subsequent payment on each annual anniversary of the Effective Date thereafter (i.e. 24th month after the Effective Date, 36th month after the Effective Date, 48th month after the Effective Date and the final payment on the 60th month after the Effective Date); (iii) at any time on or within sixty (60) days after the occurrence of the Effective Date of the Plan, the Debtor or its nominee shall have the option to satisfy the Hackett Subordinated Claim for a lump sum payment of One Hundred Thousand ($100,000) Dollars payable in immediately available funds to Hackett (the "Discounted Payoff").  Upon the payment of the Discounted Payoff to Hackett and receipt by Hackett, the Hackett Subordinated Claim shall be deemed paid in full and, assuming that the Hackett Priority Claim has also been paid to Hackett, there shall be no remaining obligations to Hackett under the Hackett/Debtor/Devitt Settlement Agreement, or the Plan, or any Conforming Chapter 11 Plan.  If the Debtor does not exercise the Discounted Payoff option within the time period specified herein, then the Hackett Subordinated Claim will be paid in accordance with Section 4.2 of the Hackett/Debtor/Devitt Settlement Agreement; (iv)  Hackett agrees to: (a)

27

support and vote to accept the Plan to the extent it is a Conforming Chapter 11 Plan; (b) support entry of the Confirmation Order as long as (y) such order and the Plan are consistent in all material respects with the terms of the Agreement (as defined therein) and (z) the Plan is a Conforming Chapter 11 Plan (as defined therein), and not: (x) object to, delay, impede, or take any other action to interfere with acceptance, confirmation or implementation of the Plan, as long as it is a Conforming Chapter 11 Plan; or (y) otherwise take any action that would interfere with, delay, impede, or postpone (a) the solicitation of acceptances, consummation or implementation of the Plan, as long as it is a Conforming Chapter 11 Plan, or (b) the Effective Date of the Plan, and mutual releases among the Settling Parties. On July 18, 2024 the Debtor filed a motion with the Bankruptcy Court requesting approval of the Hackett/Debtor/Devitt Settlement Agreement which was pending as of the date of this Plan.

2.11    <u>Projected Recovery of Avoidable Transfers</u>.

Assuming the Hackett/Debtor/Settlement Agreement is approved by Final Order, the Estate has no other fraudulent, preferential or other avoidable transfers that it expects to recover.

**ARTICLE 3**
**THE PLAN**

The Debtor's Plan must describe how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses including, Professional Fee Claims and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest falls within the description of such other Class or Classes. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Creditors are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan. Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Claim or Equity Interest that is not an Allowed Claim or Allowed Equity Interest.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claim may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

Pursuant to § 1191(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even if no impaired Class of Claims votes to accept the Plan. Specifically, § 1191(b) of the Bankruptcy Code provides that the Plan may be confirmed if the applicable requirements of §

1129(a) are satisfied, other than §§ 1129(a)(8), (10), and (15), if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. Thus, the Plan may be confirmed.

      3.1    <u>Unclassified Claims</u>.

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any class:

      3.1.1    <u>Administrative Expenses</u>.

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Effective Date will be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Creditor or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

      (a)    If the Debtor continues to operate in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

      (b)    If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

      (c)    Administrative Expenses also include the Professional Fee Claims for post-petition fees and expenses allowed to Professionals for services rendered to the Debtor during the course of the Chapter 11 Case, including the Subchapter V Trustee Fee Claims for fees and expenses allowed by the Bankruptcy Court. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

(d)    All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be filed no later than thirty (30) days after the Effective Date, and with the exception that the Subchapter V Trustee may file one or more requests for payment of fees and expenses incurred prior to or after the Effective Date, and which such requests for payment may be filed no later than thirty (30) days after the Effective Date. All final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior order of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid up to the full amount.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
| --- | --- | --- |
| Expenses arising in the ordinary course of business after the Petition Date | Per the Financial Projections (All amounts paid on ongoing basis) | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Administrative Tax Claims | $0.00 | The Debtor does not expect any, but if there are any administrative tax claims, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | $0.00 | The Debtor does not expect any, but if any are allowed, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| Professional Fee Claims, as approved by the Bankruptcy Court | $TBD | After Bankruptcy Court approval, Payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| Subchapter V Trustee | $TBD | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: |

| Type | Estimated Amount Owed | Proposed Treatment |
|------|------|------|
|  |  | Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Subchapter V Trustee. |
| TOTAL | $TBD |  |

    3.1.2   Post-Confirmation Professional Fee Claims and Subchapter V Trustee Fee Claims.

Except as otherwise specified provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals and the Subchapter V Trustee for services rendered after the Effective Date. Upon the Effective Date, any requirement that Professionals comply with §§ 327 and 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

    3.1.3   Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Bankruptcy Code. Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agrees to a less favorable treatment, pursuant to § 1129(a)(9) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter). The Debtor does not expect any priority tax claims.

    3.2   Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

    3.2.1   Class 1 Other Priority Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

Class 1.  <u>Other Priority Claims</u>**.**

      a.      <u>Classification</u>:  Class 1 consists of all Other Priority Claims.

      b.      <u>Treatment</u>:  Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, shall receive, at the option of the Debtor, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim;

           i.      Payment in full in Cash on the Effective Date, or as soon as reasonably practicable thereafter; or

           ii.      such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

For the avoidance of doubt, Class 1 includes the Hackett Priority Claim.

      c.      <u>Voting</u>:  Class 1 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

      3.2.2   <u>Class 2 Secured Claim of PNC</u>.

Allowed Secured Claims are Claims secured by property of the Estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Bankruptcy Code.  If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

Class 2.  <u>Secured Claim of PNC</u>.  The treatment and consideration to be received by PNC on account of its Allowed Secured Claim shall be in full settlement, satisfaction, release and discharge of all of its respective Claims and Liens.  Any provisions in the PNC Loan Documents[10] or PNCEF Loan Documents that are inconsistent with the treatment and consideration provided to PNC on account of its Class 2 Secured Claim under this Plan are hereby modified to make them consistent with the provisions of this Plan.  As of the Petition Date, the amounts owed to PNC on account of the PNC Bank Obligations ($3,232,745.16) and the PNCEF Obligations ($83,704.58) are set forth in paragraph 34(c) and (d) respectively of the Cash Collateral Stipulation approved by the Final Cash Collateral Order (the Cash Collateral Stipulation is Exhibit 1 to the Final Cash Collateral Order) which is attached to the Plan as **<u>Exhibit F</u>** and made a part hereof.

---

[10] Any defined term in Class 2 Secured Claim of PNC not otherwise defined in the Plan shall have the meanings set forth in the Cash Collateral Stipulation.

2.      Treatment of Term Loans.   After the Effective Date, the Debtor shall
continue to make fixed monthly payments to PNC of the monthly principal
and interest payments (each at the non-default rate of interest) on the dates
provided in the applicable PNC Loan Documents or PNCEF Loan
Documents for the 2021 Term Loan ($3,355.43),[11] the 2022 Term Loan
($11,835.34),[12] the First PNCEF Loan ($2,603.52),[13] and the Second
PNCEF Loan ($1,403.06)[14] until the outstanding balance each of these loans
is paid in full on their respective maturity date as set forth herein.  PNC has
agreed: (i) to the principal and interest payments for the Term Loans set
forth above, (ii) to the non-default interest rates for the Term Loans set forth
in footnotes 13, 14, 15, and 16, (iii) to waive all default interest with respect
to the Term Loans that accrued as of the Effective Date, (iv) to vote in favor
of the Plan, (v) to not object to confirmation of the Plan; and (vi) to
confirmation of the Plan under § 1191(a) of the Bankruptcy Code.

3.      Treatment of Line of Credit.   After the Effective Date, the Debtor shall make
on or before the 5th day of each month fifty-nine (59) consecutive monthly
interest-only payments to PNC based on the non-default rate of interest in
the LOC Note, except that as of the Effective Date (unless an earlier date is
agreed upon by PNC and the Debtor), the daily BSBY benchmark[15] plus
2.75% in the LOC Note shall be replaced with daily SOFR plus 3.35%.
Interest will continue to be calculated based on the actual number of days
that principal is outstanding over a year of 360 days.  The Maturity Date of
the Line of Credit Note shall be the 60th month after the Effective Date of
the Plan.  On March 20, 2024, PNC permanently suspended the Debtor's
right to draw on the Line of Credit which suspension shall continue after
the Effective Date.

4.      Additional Payments for Line of Credit.   In addition to the interest-only
payments for the Line of Credit set forth in paragraph 3 above, the Debtor
shall also make the below-stated payments to PNC to be applied on account
of the outstanding principal balance of the Line of Credit:

---

[11] The 2021 Term Loan shall accrue interest at a fixed rate of 4.05% per annum and mature on December 27, 2026.

[12] The 2022 Term Loan shall accrue interest at the fixed rate of 6.7% per annum and mature on December 28, 2027.

[13] The First PNCEF Loan shall accrue interest at the fixed rate of 3.42% per annum and mature on August 4, 2025.

[14] The Second PNCEF Loan shall accrue interest at the fixed rate of 3.47% per annum and mature on October 26, 2026.

[15] On November 15, 2023, the administrator of the Bloomberg Short-Term Bank Yield Index ("BSBY") announced the permanent cessation of the BSBY index effective November 15, 2024.

a.   the purchase price from the HDI Sale, approved by Bankruptcy Court Order dated July 25, 2024 [D.I. 97] shall be paid to PNC and applied by PNC, as collected, on account of the outstanding principal balance of the Line of Credit.  The $30,000 payment to PNC from the HDI Sale shall be the first monthly principal reduction payment under this Plan on account of the Line of Credit. If the HDI Sale has not closed by the Effective Date, the Debtor shall still be obligated to make a $30,000 initial principal payment to PNC (in which case the Debtor may retain the proceeds of the HDI Sale upon closing);

b.   additionally, after each of the Term Loans is paid in full, the monthly payment that was otherwise being paid on account of said Term Loan shall thereafter continue to be paid to PNC on each consecutive month thereafter until the 59th month after the Effective Date of the Plan (as reflected on the PNC Payment Schedule) which payments shall be applied by PNC, as collected, on account of the outstanding principal balance of the Line of Credit;

c.   the Debtor shall also make additional supplemental monthly principal reduction payments during the 2nd through 60th months after the Effective Date as reflected on the PNC Payment Schedule attached to the Plan as **Exhibit G** and made a part hereof;

d.   any outstanding principal and accrued interest based on the non-default rate of interest with respect to the Line of Credit shall be due and payable on the 60th month after the Effective Date of the Plan; and

e.   PNC has agreed: (i) to the principal and interest payments for the Line of Credit set forth above, (ii) to the non-default interest rate for the Line of Credit set forth above, (iii) to waive all default interest with respect to the Line of Credit that accrued as of the Effective Date, (iv) to vote in favor of the Plan, (v) to not object to confirmation of the Plan; and (vi) to confirmation of the Plan under § 1191(a) of the Bankruptcy Code.

5.   <u>PNC Purchase Card</u>.  The amount of $4,439.95 due PNC on the PNC Purchase Card will be paid in full on the Effective Date of the Plan.

6.   <u>Defaults Cured or Waived</u>.  All requirements or covenants in the PNC Bank Loan Documents or the PNCEF Loan Documents requiring (a) compliance with any financial covenant or reporting requirement, (b) payment of any

fee, cost or other charge assessed or relating to the period prior to the Effective Date (excluding the fees and costs specifically identified in the Cash Collateral Stipulation) shall be of no further force or effect.  As of the Effective Date of the Plan, all defaults that occurred or may have occurred under the PNC Bank Loan Documents or the PNCEF Loan Documents, whether declared by PNC or not, shall be deemed cured by the treatment and consideration to be received by PNC under the Plan on account of its Allowed Secured Claim.

7.    <u>Retention of Liens</u>.  PNC shall retain its liens in the same priority, extent and validity as existed on the Petition Date in the collateral the secures the applicable PNC Bank Obligations and PNCEF Obligations until these obligations are paid, provided that PNC also retains to the extent applicable, the replacement liens provided in the Cash Collateral Orders and the Cash Collateral Stipulation.

8.    <u>Deficiency Claim</u>.  The PNC Allowed Secured Claim is treated as a fully secured claim and therefore PNC has no Deficiency Claim.

9.    <u>Extinguishment of Liens</u>.  Upon payment of the PNC Allowed Secured Claim as provided herein, the Liens of PNC shall be extinguished and shall affect a full and final satisfaction of such claim such that neither the Debtor, nor the Reorganized Debtor, shall have any liability on account of the PNC Secured Claim.

10.    <u>Payment to Hackett</u>.  Other than payment of the Hackett Priority Claim (which will be paid by the Debtor as soon as practicable after the Effective Date), no other payments shall be made to Hackett by the Debtor unless and until PNC Bank's Claims are paid in full, provided that any earlier payment to Hackett (including the Discounted Payoff) may be paid on behalf of the Debtor by Devitt or any other non-Debtor source of funds, as the Debtor's nominee.

11.    <u>PNC Fees and Costs</u>.  As of August 31, 2024, PNC had incurred prepetition and postpetition fees and costs with respect to the Term Loans, Line of Credit and the Chapter 11 Case in the amount of $34,363.34 (the "<u>Initial Section 506(b) Fees</u>").  PNC has requested that the Debtor reimburse the Initial Section 506(b) Fees and the Debtor has agreed to reimburse PNC within ten (10) business days after the Effective Date.  Additionally, no later than thirty (30) days after the Effective Date, PNC shall provide the Debtor with any request under 11 U.S.C. §506(b) (which may be in the form of an invoice) for reimbursement of any reasonable fees and costs it may have incurred for the period from September 1, 2024 through the Effective Date (the "<u>Additional Section 506(b) Fees</u>").  If the Debtor and PNC reach an agreement on the amount of any Additional Section 506(b) Fees, the Debtor

shall pay said Additional Section 506(b) Fees promptly without further order of the Court. Any dispute with respect to the Additional Section 506(b) Fees will be submitted to the Bankruptcy Court for resolution. Thereafter, to the extent allowed by Final Order, the Additional Section 506(b) Fees shall be paid by the Debtor within thirty (30) days of allowance. At the maturity date (or earlier payoff, if applicable) of each Term Loan and Line of Credit as set forth above, the outstanding balance owed to PNC (including PNC's reasonable legal fees and costs incurred after the Effective Date, if any, permitted under the PNC Loan Documents or the PNCEF Loan Documents) shall be paid in full. Any dispute with respect to any PNC legal fees and costs incurred after the Effective Date will be submitted to the Bankruptcy Court for resolution.

12. <u>Controlling Document</u>. In the event of any conflict between the terms and provisions in the Plan with respect to the payment of the Class 2 Secured Claim of PNC, on the one hand, and the terms and provisions in the PNC Loan Documents or the PNCEF Loan Documents, on the other hand, the Plan shall govern and control.

13. <u>Voting</u>: Class 2 is Impaired under the Plan. Therefore, the Holder of the Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

### 3.2.3   Class of General Unsecured Claims.

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

Class 3.      <u>General Unsecured Claims</u>.

a. <u>Classification</u>: Class 3 consists of all General Unsecured Claims.

b. <u>Treatment</u>: Except to the extent that a Holder of a General Unsecured Claim and the Debtor agree to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for its Claim, after payment in full of all Allowed Administrative Claims including Professional Fee Claims and Subchapter V Trustee Fee Claims, all Allowed Priority Tax Claims in full, all Allowed Other Priority Claims in full, and for each year after the Effective Date (for a five (5) year period after the Effective Date), subject to the payments each year having been made on account of the Allowed Class 2 Secured Claim of PNC on the dates and in the amounts set forth in Class 2 and the PNC Payment Schedule, and further, subject to a Pro Rata reserve on account of Disputed Claims, if any, a distribution in the amount of $116,875 shall be made on a Pro Rata basis. The first distribution

to be made twelve (12) months after the Effective Date, the second Distribution to be made twenty-four (24) months after the Effective Date, the third Distribution to be made thirty-six (36) month after the Effective Date, the fourth Distribution to be made forty-eight (48) months after the Effective Date and the fifth Distribution to be made on the sixtieth (60) month after the Effective Date.

    c.    <u>Voting</u>:  Class 3 is Impaired under the Plan.  Therefore, Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

    d.    <u>General Provisions</u>:  No interest or other similar postpetition charges will be paid on account of Allowed Class 3 Claims.

**3.2.4**   <u>Class of Equity Interest Holders</u>.

Class 4.      <u>Equity Interests in Debtor</u>.

    a.    <u>Classification</u>:  Class 4 consists of all Equity Interests in the Debtor.

    b.    <u>Treatment</u>:  As of the Effective Date, the Equity Interests in the Debtor shall remain unchanged and equal to the structure that existed on the Petition Date.

    c.    <u>Voting</u>:  Class 4 is unimpaired.  The sole Holder of Equity Interests in the Debtor is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of Class 4 Equity Interests in the Debtor is not entitled to vote to accept or reject the Plan.

**3.2.5**   <u>Class 5 Subordinated Claim</u>.

    a.    <u>Classification</u>:  Subject to the approval of the Hackett/Debtor/Devitt Settlement Agreement by a Final Order, Class 5 shall consist of the Hackett Subordinated Claim in the Allowed amount of $400,000.  If the Hackett/Debtor/Devitt Settlement Agreement is not approved by a Final Order, there will be no Hackett Subordinated Claim, and the Debtor shall file an amended Plan that will provide a different treatment of the Class 5 Subordinated Claim which, in such circumstance, will be a Disputed Claim.

    b.    <u>Treatment</u>:  Hackett, as the Holder of the  Hackett Subordinated Claim, shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for the Hackett Subordinated Claim, five (5) equal annual payments of $80,000, with the first payment to be made twelve (12) months after

the Effective Date of the Plan, the second payment to be made twenty-four (24) months after the Effective Date, the third payment to be made thirty-six (36) months after the Effective Date, the fourth payment to be made forty-eight (48) months after the Effective Date and the fifth payment to be made on the sixtieth (60) month after the Effective Date, and in each case, subject to the Debtor having made the projected annual distribution of $116,875 for said year to Holders of Allowed Class 3 General Unsecured Claims as set forth above in Class 3 (General Unsecured Claims).

c.     <u>Discounted Payoff</u>:  At any time on or within sixty (60) days after the occurrence of the Effective Date, the Debtor or its nominee shall have the option to satisfy the Hackett Subordinated Claim for a lump sum payment of One Hundred Thousand ($100,000) Dollars payable in immediately available funds to Hackett (the "<u>Discounted Payoff</u>").  Upon the payment of the Discounted Payoff to Hackett and receipt by Hackett, the Hackett Subordinated Claim shall be deemed paid in full and, assuming that the Hackett Priority Claim has also been paid to Hackett, there shall be no remaining obligations to Hackett under the Hackett/Debtor/Devitt Settlement Agreement, or the Plan, or any Conforming Chapter 11 Plan.  If the Debtor does not exercise the Discounted Payoff option within the time period specified herein, then the Hackett Subordinated Claim will be paid in accordance with Section 4.2 of the Hackett/Debtor/Devitt Settlement Agreement as also set forth above in Class 5(b) treatment.

d.     <u>General Provisions</u>:  No interest or other similar postpetition charges will be paid on account of Hackett Subordinated Claim.

3.3     <u>Special Provisions Governing Unimpaired Claims</u>.

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtor's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs of recoupments against any Claims that are Unimpaired.  Unless otherwise Allowed, Disputed Claims that are Unimpaired shall remain Disputed Claims under the Plan.

3.4     <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have at least one Holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1191 of the Bankruptcy Code with respect to such Class.

3.5     Voting Classes, Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

3.6     Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

3.7     Cramdown and No Unfair Discrimination.

The Debtor reserves the right to seek Confirmation pursuant to Bankruptcy Code section 1191(b), which allows the Bankruptcy Court to confirm the Plan even if no Impaired Class votes in favor of the Plan as long as the Plan does not unfairly discriminate and is fair and equitable.

The treatment of Claims and Equity Interests described in the Plan does not discriminate unfairly. Additionally, the Plan is "fair and equitable," within the meaning of Bankruptcy Code section 1191(c). Per Bankruptcy Code section 1191(c)(1), the proposed treatment under the Plan with respect to Class 2 Secured Claim of PNC, meets the requirements of section 1129(b)(2)(A) of the Bankruptcy Code. Per Bankruptcy Code section 1191(c)(2), the Plan provides that, as of the Effective Date, (a) all projected disposable income of the Debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or (b) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor. Per Bankruptcy Code section 1191(c)(3)(A), the Debtor will be able to make all payments under the plan; or (B)(i) there is a reasonable likelihood that the Debtor will be able to make all payments under the Plan; and (ii) the Plan provides appropriate remedies to protect the Holders of Claims or Equity Interests in the event that the payments are not made. Thus, the Plan satisfies the standard for confirmation under Bankruptcy Code section 1191(b).

3.8     Subordinated Claims.

Except as expressly provided herein, the allowance, classification, and treatment of Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.

3.9      Procedures for Resolving Contingent, Unliquidated and Disputed Claims.

3.9.1    Claims Objections.

The Debtor or the Reorganized Debtor, as applicable, may object to the amount or validity of any Claim by the Claims Objection Bar Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance the Plan. The Debtor may request that the Claims Objection Deadline be extended from time to time.

Nothing in this Section shall in any way limit the Debtor's right to object to Claims as provided for in the Bankruptcy Code.

3.9.2    Allowance of Claims.

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.

3.9.3    Claims Administration Responsibilities.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor shall have the authority to file and prosecute objections to Claims, and the Reorganized Debtor shall have the authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; and (2) from and after the Effective Date, all objections respect to Disputed Claims shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any such objection, or the Debtor and the Creditor elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court.

3.9.4    Estimation of Claims.

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to § 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such

objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been disallowed, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceeding, and the Debtor, or the Reorganized Debtor, as applicable, may elect to pursue supplemental proceedings to object to any ultimate distribution on such Claim, unless otherwise ordered by the Bankruptcy Court.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 3.9.5    Adjustment of Claims.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register after the Debtor or the Reorganized Debtor, as applicable, files a notice of satisfaction with the Bankruptcy Court and serves such notice of satisfaction on the affected Claimant on ten (10) days' negative notice if no objection having been filed.  If any objection is filed to the notice of satisfaction, an evidentiary hearing will be scheduled before the Bankruptcy Court.

### 3.9.6    Disallowance of Claims.

Any Claims held by Persons or Entities from which property is recoverable under §§ 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to § 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Person or Entity have been turned over or paid to the Debtor or the Reorganized Debtor.  All Proofs of Claim filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

### 3.9.7    Treatment of Untimely Claims.

Except as provided herein or otherwise agreed, any and all Creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a Creditor with respect to such Claim for the purposes of voting and distribution.  No Distributions shall be made on account of any Proof of Claim filed after the applicable Bar Date.

3.9.8    No Distributions Pending Allowance.

If an objection to a Claim or portion thereof is filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes and Allowed Claim, unless otherwise determined by the Reorganized Debtor.  As explained in Article 3.12.2 below, if any Distribution is scheduled to be made on account of Allowed Class 3 Claims while a Disputed Claim in Class 3 remains unresolved, the amount of the Pro Rata Distribution applicable to said Disputed Claim shall be held in the Disputed Claims Reserve subject to resolution by settlement or Final Order of said Disputed Claim.

3.10    Treatment of Executory Contracts and Unexpired Leases.

3.10.1 Executory Contracts are contracts where significant performance of the contract remains for both Debtor and another party to the contract.  The Debtor has the right to reject, assume (i.e., accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval.  The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contract.

3.10.2 The Executory Contracts shown on **Exhibit H** shall be assumed by the Debtor.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  Exhibit H also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

3.10.3 If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

3.10.4 Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and Executory Contracts related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, right of first refusal, and any other interests, unless any of foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

3.10.5 Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

3.10.6 There are no Executory Contracts or Unexpired Leases that the Debtor intends to reject.

3.10.7  Neither the exclusion nor inclusion of any Executory Contract on Exhibit H, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or Reorganized Debtor has any liability thereunder.

3.10.8  <u>Contracts and Leases Entered into After the Petition Date</u>.

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by Debtor, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

3.10.9  <u>Insurance Policies</u>.

Notwithstanding anything to the contrary herein, all Insurance Policies issued to or entered into by the Debtor prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtor; <u>provided</u>, <u>however</u>, that to the extent any Insurance Policy is determined to be an Executory Contract, then, notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtor, its Estate and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtor on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed.

3.11  <u>Means for Implementation of the Plan</u>.

3.11.1  <u>Funding the Plan</u>.

The Plan provides that all of the Debtor's Disposable Income in the five (5) year period following the Effective Date will be applied to make payments under the Plan in accordance with section 1191(c)(2) of the Bankruptcy Code.  Disposable Income will include any excess disposable income beyond projections and will be less any additional expenses beyond projections.  In addition to the above, the Plan will also be funded by the proceeds from the HDI Sale ($30,000).

The Debtor expects to have approximately $165,000 in Cash on hand and $1,200,000 in accounts receivable on the Effective Date, however the Cash and accounts receivable will not be available for distribution to creditors under the Plan on the Effective Date as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be Administrative Expenses) and are already included in the calculus of Disposable Income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Holders of Allowed Unclassified Claims, Allowed Class 1, Class 2, Class 3, and Class 5 Claims under the Plan.

On the Effective Date of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests, except as provided in the Plan, to the Reorganized Debtor and all funds not expressly provided for in the Plan will remain property of the Reorganized Debtor. The Debtor expects to have sufficient Cash on hand to make the payment required on the Effective Date.

### 3.11.2  General Settlement of Claims and Interests.

Pursuant to 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.

### 3.11.3  Continued Legal Existence of the Debtor.

The Reorganized Debtor shall continue to exist on and after the Effective Date, with all of the powers each is entitled to exercise under applicable law and pursuant to their respective articles of formation and bylaws in effect prior to the Effective Date, except to the extent such articles of formation and bylaws are amended.

### 3.11.4  Operations of the Debtor between Confirmation and the Effective Date.

The Debtor shall continue to operate as debtor and debtor- in-possession during the period from the Confirmation Date to the Effective Date.

### 3.11.5  Effectuating Documents and Further Transactions.

The officers of the Debtor are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such

actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan in the name of and on behalf of Reorganized Debtor, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan. The secretary or any assistant secretary of the Debtor, as applicable, shall be authorized to attest any of the foregoing actions.

3.11.6  <u>Single Satisfaction of Allowed General Unsecured Claims</u>.

In no event shall any Holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim under the Plan, as applicable, and to the extent that the Holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized Debtor, such Holder shall repay, return, or deliver to the Reorganized Debtor, any Distribution held by or transferred to such Holder to the extent the Holder's total recovery on account of its Allowed General Unsecured Claim from the third party and under the Plan exceeds the amount of such Holder's Allowed General Unsecured Claim.

3.11.7   <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.

To the maximum extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, and payments by the Reorganized Debtor to or from the Disputed Claims Reserve, shall constitute "transfers under a plan" within the purview of 1146(a) of the Bankruptcy Code and shall not be taxed under any law imposing a stamp tax or similar tax.

3.11.8  <u>Post-Confirmation Management and Compensation</u>.

Devitt is the sole member of the Board of Directors and shall serve as the initial Board of Directors of the Reorganized Debtor on and after the Effective Date. Mr. Devitt shall serve in accordance with applicable non-bankruptcy law and the Debtor's certificate or articles of incorporation and bylaws, as each of the same may be amended from time to time. The post-Confirmation Officers/Managers of the Debtor, and the compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| Andrew J. Devitt | Sole Director, CEO and CTO | $330,002.40 base annual salary plus benefits |
| Jared Schaffstall | President and COO | $200,000.06 based annual salary plus benefits |

3.12  <u>Payments</u>.

3.12.1  <u>Responsibility for Making Payments</u>.

Except as otherwise provided in the Plan or in the Confirmation Order and regardless if the Plan is confirmed under §1191(a) or §1191(b), the Debtor or the Reorganized Debtor (not the Subchapter V Trustee) shall make all Plan payments to Creditors under the Plan.

The Reorganized Debtor shall only be required to act and make distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Reorganized Debtor shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtor on any date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

Subject to prior payment of Allowed Administrative Expenses, including Allowed Professional Fee Claims and Subchapter V Trustee Fee Claims in full, Allowed Priority Tax Claims and Other Priority Claims in full, and for each year after the Effective Date (for a five (5) year period after the Effective Date):  (a) subject to the payments each year having been made on account of the Allowed Class 2 Secured Claim of PNC on the dates and in the amounts set forth in Class 2 and the PNC Payment Schedule, (b) subject to a Pro Rata reserve on account of Disputed Claims, if any, a payment to the Holders of Allowed Class 3 General Unsecured Claims of $116,875 shall be made on a Pro Rata basis, annually on the dates set forth in Class 3, for a 5-year period after the Effective Date, and (c) subject to the satisfaction of the annual payments to Holders of Allowed Class 3 Claims each year as stated above, payment to Hackett, as the Holder of the Hackett Subordinated Claim of $80,000 each year on the date set forth in Class 5, for a 5-year period after the Effective Date.

Any required payments to the Holders of Allowed Claims or Equity Interests shall be made by the Reorganized Debtor: (a) in U.S. dollars by check drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtor).

3.12.2  Disputed Claims.

No distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim.   If any Distribution is scheduled to be made on account of Allowed Class 3 Claims while a Disputed Claim in Class 3 remains unresolved, the amount of the Pro Rata Distribution applicable to said Disputed Claim shall be held in the Disputed Claims Reserve, subject to resolution by settlement or Final Order of said Disputed Claim.  Upon such resolution, except as otherwise agreed by the parties, to the extent the Disputed Claim is determined by Final Order to be an Allowed Class 3 Claim and not otherwise subordinated to other Holders of Allowed Class 3 Claims, the Reorganized Debtor as soon as reasonably practicable shall release to the Holder of such Claim all money held in the Disputed Claims Reserve necessary for a Pro Rata Distribution on account of such Allowed Class 3 Claim.

If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to Holders of Allowed Class 3 General Unsecured Claims.  If any Cash remains in the Disputed Claims Reserve after all Disputed Claims have been resolved, such Cash shall Distributed Pro Rata

to all Holders of Allowed Class 3 General Unsecured Claims on the next Distribution Date (or, if all Disputed Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

### 3.12.3   Unclaimed Payments.

Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 180 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred or enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets.   In such cases, any Cash or other property held by the Reorganized Debtor in the Undeliverable Distribution Reserve (as hereinafter defined) for distribution on account of such claims for undeliverable or unclaimed distributions shall become property of the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Reorganized Debtor to be distributed according to the priority set forth in the Plan without any further action or order of the Bankruptcy Court.   For the avoidance of doubt, any Distribution to a Holder of an Allowed Claim that is not negotiated for a period of 180 days after a Distribution Date shall be considered an "unclaimed distribution."

### 3.12.4   Payment Date and Location.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules, if no Proof of Claim has been filed and the Debtor or Reorganized Debtor has not received a written notice of a change of address prior to the Effective Date.

The Reorganized Debtor shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein.   The Reorganized Debtor, in its sole discretion, may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions, or otherwise, they shall remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable, and no further distributions shall be made to such Holder unless such Holder notifies the Reorganized Debtor of its then current address.

As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.   The Reorganized Debtor shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.   Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for

all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

Nothing contained in this Plan shall constitute a waiver or release by the Reorganized Debtor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by the applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

### 3.12.5  Undeliverable Distribution Reserve.

If a distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, non-interest bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution become deliverable or is claimed or is deemed to have been forfeited in accordance with Section 3.11.3, above.

### 3.12.6  De Minimis Payments.

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Reorganized Debtor may hold such distribution until the time of a subsequent or final distribution.  If the final distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Reorganized Debtor may cancel such distribution.  Any cancelled distributions pursuant to this Section shall be treated as unclaimed property in accordance with Section 3.11.3, above.

### 3.12.7  Compliance with Tax Requirements.

In connection with Distributions under the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

The Reorganized Debtor reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

### 3.12.8  Claims Paid or Payable by Third Parties.

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any Distribution held by or transferred to such Holder to Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

### 3.12.9  Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, comprised, or settled in the Plan or a Final Order, in accordance with § 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions and the Avoidance, Objection, Reduction and Subordination Action), whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion.  No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it.  The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation.  In accordance with § 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

### 3.12.10  Tax Consequences of the Plan.

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

There may be a number of material income tax considerations, risks and uncertainties associated with the implementation of the Plan.  The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OR OTHER PLAN RECEIPIENTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### ARTICLE 4
### FEASILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

4.1     Ability to Initially Fund Plan.

The Debtor believes that it will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

4.2     Ability to Make Future Plan Payments and Operate Without Further Reorganization.

The Plan is being funded by the Cash on hand, the proceeds from the HDI Sale, and the Debtor's Disposable Income in the five-year period following the Effective Date.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization. *See*, § 1190(1)(C). For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet obligations under the Plan.

The Debtor has prepared projected financial information attached as **Exhibit I** (the "Financial Projections").  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. Accordingly, the Debtor believes that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

**You should consult with your accountant or other financial advisor if you have any questions regarding the Financial Projections.**

# ARTICLE 5
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest holders would receive in a Chapter 7 liquidation.  A liquidation analysis is attached to the Plan as **Exhibit J**.

In accordance with section 1129(a)(7)(A) of the Bankruptcy Code, under the Plan, each Holder of a Claim or Equity Interest will either accept the Plan or will receive or retain property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtor's assets consist primarily of (i) Cash on hand, (ii) accounts receivable, (iii) inventory, (iv) machinery and equipment, (v) intellectual property, and (vi) the Avoidance, Objection, Reduction and Subordination Action.  The proposed reorganization of the Debtor will necessarily provide more value to the Holders of Allowed Claims and Equity Interests than would be distributed to such parties in a chapter 7 liquidation.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtor was liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if the Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the chapter 7 trustee, asset disposition expenses, all unpaid administrative expenses incurred by the Debtor in the Chapter 11 Case that are allowed, litigation costs and claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case.  The liquidation itself may also trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distribution to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained herein provide for a greater recovery to holders of Allowed Claims than the recovery available in a chapter 7 liquidation.

## ARTICLE 6
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

6.1     Conditions Precedent to Confirmation of the Plan.

Confirmation of the Plan shall not occur unless each of the following conditions precedent has been satisfied or waived in accordance with Article 6.3.

6.1.1   The Plan and Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

6.2     Conditions Precedent to the Effective Date.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date shall occur on the first Business Day after each of the following conditions precedent has been satisfied or waived pursuant to Article 6.3:

6.2.1   All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

6.2.2    The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtor confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

6.2.3   all authorizations, consents, and regulatory approval required, if any, in connection with the Plan's effectiveness shall have been obtained.

6.2.4   No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

6.2.5    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with the applicable laws, and are in form and substance acceptable to the Debtor.

6.2.6    The Debtor has filed a notice of occurrence of the Effective Date.

6.3     Waiver of Conditions Precedent.

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in Article 6.1 and 6.2 respectively, may be waived or modified, in whole or in part, at any time

by the Debtor. Any waiver or modification of a condition precedent which is permitted under this Article 6.3 may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court, and without any other formal action other than proceeding to confirm or consummate the Plan.

6.4    *Vacatur* of Confirmation Order; Effect of Failure of Conditions.

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtor in its sole discretion), the Plan shall be null and void in all respects, and nothing contained in the Plan shall (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of a Claim or Equity Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders of a Claim or Equity Interest, or any other Entity in any respect.

## ARTICLE 7
## EFFECT OF PLAN CONFIRMATION

7.1    Vesting of Assets in Reorganized Debtor.

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estate shall vest in Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind. On and after the Effective Date, Reorganized Debtor may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

7.2    Retention of Certain Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, all Causes of Action that the Debtor may hold against any Person shall vest in Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Person may rely on the absence of a specific reference in the Plan to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

7.3    <u>Binding Effect</u>.

As of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents entered into in connection with the Plan by the Debtor or Reorganized Debtor, shall be binding upon the Debtor, the Estate, Reorganized Debtor, all holders of Claims against and Interests in the Debtor, each such holder's respective successors and assigns, and all other Persons that are affected in any manner by the Plan, regardless of whether the Claim or Equity Interest of such holder is Impaired under the Plan or whether such holder has accepted the Plan. Except as otherwise expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect and shall bind all Persons referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered or recorded on or after the Effective Date and whether or not such Persons have actually executed such agreement.

7.4    <u>Post-Confirmation Interim Injunction and Stays</u>.

All Injunctions and stays arising under or entered during the Chapter 11 Case, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

7.5    <u>Discharge</u>.

7.5.1    **If the Plan is confirmed under § 1191(a)**, on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before the Confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, and all other debts allowed under 503 of the Bankruptcy Code and provided for in the Plan.  Pursuant to § 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, in the Confirmation Order, or in § 1141(d)(6) of the Bankruptcy Code, the confirmation of the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete discharge effective as of the Effective Date, of all Claims against, and Equity Interests in, the Debtor or any of its assets or properties, that arose before the Effective Date, and all debts of the kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to § 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to § 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Equity Interest has accepted the Plan. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

7.5.2    **If the Plan is confirmed under § 1191(b)**, as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Bankruptcy Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Bankruptcy Court shall grant the Debtor a discharge of all debts provided in § 1141(d)(1)(A) of this title, and all other debts allowed under § 503 of this title provided for in this Plan, except any debt-

7.5.2.1 on which the last payment is due after the first three years of the Plan, or such other time not to exceed five years fixed by the Court; or

7.5.2.2 if applicable, of the kind specified in § 523 of this title.

This Plan constitutes the Debtor's request that, if the Plan is confirmed under § 1191(b), the discharge applies to all debts on which the last payment is due on or before the Final Distribution Date.

     7.6    <u>Discharge Injunction</u>.

From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests: (a) commencing or continuing any action or other proceeding of any kind against the Debtor, Reorganized Debtor, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtor, Reorganized Debtor, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtor, Reorganized Debtor, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors and assigns of the Debtor (including Reorganized Debtor) and its and their respective properties and interests in property. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtor pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time to the extent such judgment relates to a discharged Claim or Equity Interest.

     7.7    **Exculpation.**

**From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or after the Petition Date up to and including the Effective Date in connection with, relating to or arising out of the Chapter 11 Case, the negotiation of the Plan Documents, and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtor (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith, willful misconduct, or fraud). In all respects, each and all such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.**

7.7.1  **Injunction Related to Exculpation**.

**As of the Effective Date, all holders of Claims that are the subject of <u>Article 7.7</u>, are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article 7.5</u> or exculpated under <u>Article 7.7</u>; <u>provided</u>, <u>however</u>, that the injunctions set forth in this <u>Article 7.7.1</u> shall not, and shall not be construed to, enjoin any Person that is the subject of <u>Article 7.7</u> from taking any action arising out of, or related to, any act or omission of a Exculpated Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.**

7.8    <u>Disallowed Claims</u>.

On and after the Effective Date, the Debtor and Reorganized Debtor shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

7.9    <u>No Successor Liability</u>.

Except as otherwise expressly provided in the Plan, Reorganized Debtor does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, on or after the Effective Date.  Neither the Debtor, nor the Reorganized Debtor, is, or shall be deemed to be, a successor to any of the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character; <u>provided</u>, <u>however</u>, that Reorganized Debtor shall assume and remain liable for its respective obligations specified in the Plan and the Confirmation Order.

### ARTICLE 8
### GENERAL PROVISIONS

8.1    <u>Title to Assets</u>.

8.1.1  If a plan is confirmed under § 1191(a), except as otherwise provided in the

Plan or in the Confirmation Order, (i) confirmation of the Plan vests all of the property of the Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Interests of Creditors, and Equity Security Holders in the Debtor.

8.1.2   If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541 of the Bankruptcy Code, (1) all property of the kind specified in that section that the Debtor acquires after the date of commencement of the case, but before the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; and (2) earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code, whichever occurs first.  Except as provided in § 1185 of the Bankruptcy Code, the Plan or Confirmation Order, the Debtor shall remain in possession of all property of the Estate.

8.2     Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.3     Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan and to remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest; (v) to allow, disallow, or determine all issues regarding Claims objections, (vi) to determine all issues arising from the assumption/rejection or assignment of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor for the Debtor, including any preference and fraudulent transfer causes of action;  (vi) to determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including, without limitation, any motions for the rejection, assumption or assumption and assignment of any Executory Contract; (vii) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any entity's obligations in connection with the Plan, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor and the Estate; (ix) to decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending on the Effective Date or that may be brought by the Debtor, or the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing; (x) to interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; (xi) to enforce the discharge, exculpation and injunction provisions contained in this Plan; and (xii) to enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

8.4    <u>Captions</u>.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.5    <u>Successors and Assigns</u>.

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Entity.

8.6    <u>Governing Law</u>.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflict of laws thereof.  However, Legal Compliance shall be construed and enforced in accordance with the laws of the applicable Governmental Unit.

8.7    <u>Notices</u>.

All notices, requests, and demands to or upon the Debtor or Reorganized Debtor to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

If to the Debtor, addressed to:

New Way Machine Components, Inc.
t/a New Way Air Bearings
Attn: Andrew J. Devitt, CEO
50 McDonald Boulevard
Aston, PA  19014
ddevitt@newwayairbearings.com


With a copy to counsel:

Karalis PC
Attention:  Aris J. Karalis, Esquire
1900 Spruce Street
Philadelphia, PA 19103
akaralis@karalislaw.com

8.8    <u>Remedies Upon Default</u>.

The Debtor expects to be able to make all payments under the Plan.  In the event of a default, however, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default.  If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Bankruptcy Court and request a hearing to consider appropriate remedies.

8.9    <u>Modification of Plan</u>.

8.9.1    <u>Pre-Confirmation</u>.

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to §1193(a).  However, the Bankruptcy Court may require additional items, including re-voting on the Plan.

8.9.2    <u>Post Confirmation</u>.

8.9.2.1    If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

8.9.2.2    If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Effective Date, or such longer time not to exceed 5 years as fixed by the Bankruptcy Court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

8.10    <u>Other Amendments</u>.

Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; provided that notice of such proposed adjustments or modifications is filed on the docket at least five (5) days before the Effective Date and no creditor objects to such adjustments or modifications before the Effective Date.  In the event such an objection is filed, the Bankruptcy Court shall rule on the objection.

8.11    <u>Revocation or Withdrawal of Plan</u>.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement

executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Equity Interest in, the Debtor or any other Person; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission of any sort by the Debtor or any other Person.

8.12    Reservation of Rights.

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holder of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

8.13    Plan Supplement.

Any and all exhibits, lists, or schedules referred to herein, but not filed with the Plan, shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein. The Plan Supplement is available for inspection for inspection at the Bankruptcy Court's website (http://ecf.paeb.uscourts.gov) or in the office of the Clerk of the Bankruptcy Court during normal business hours.

8.14    Filing of Notice of Effective Date.

On the Effective Date or as reasonably practicable thereafter, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

8.15    Filing of Notice of Substantial Consummation.

No later than fourteen (14) days after the Debtor has substantially consummated this Plan, the Debtor shall file with the Court and serve on the Subchapter V Trustee, the United States Trustee, and all parties in interest, notice of such substantial consummation.

8.16    Filing of Notice of Completion of Payments Required under the Plan.

No later than thirty (30) days after the Debtor has made the last payment required under the Plan during the first three (3) years after the Effective Date, or such longer period not to exceed five (5) years after the Effective Date that the Bankruptcy Court may fix (the "Notice of Completion of Payments"), the Debtor shall file with the Court and serve on the Subchapter V Trustee, the United States Trustee, and all parties in interest, notice that it has made the last payment required under the Plan.

8.17    <u>Termination of Subchapter V Trustee Services</u>.

8.17.1  If the Plan is confirmed under §1191(a) of the Bankruptcy Code, the service of the Subchapter V Trustee shall terminate when the Plan has been substantially consummated, except that the United States Trustee may reappoint the Subchapter V Trustee as needed for performance of duties under subsection (b)(3)(C) of section 1183 and section 1185(a) of the Bankruptcy Code.

8.17.2  If the Plan is confirmed under §1191(b) of the Bankruptcy Code, the service of the Subchapter V Trustee shall terminate when the Debtor has made all the payments required under the Plan during the first three (3) years after the Effective Date, or such longer period not to exceed five (5) years after the Effective Date that the Bankruptcy Court may fix. The Subchapter V Trustee shall submit her final request for payment of post-petition services within thirty (30) days after the Debtor has filed and served the Notice of Completion of Payments.

8.18    <u>Effective Date Actions Simultaneous</u>.

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

8.19    <u>Final Decree</u>.

Unless otherwise ordered by the Bankruptcy Court, once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Case.

<div align="center">

**ARTICLE 9**
**EXHIBITS**

</div>

The following exhibits are attached to this Plan:

| | |
|---|---|
| Exhibit A | Tax Return History (2019 through 2022) |
| Exhibit B | 2023 Balance Sheet |
| Exhibit C | 2019 and 2020 Income Statement |
| Exhibit D | 2021 and 2022 Income Statement |
| Exhibit E | 2023 Income Statement |
| Exhibit F | Final Cash Collateral Order<br>(Cash Collateral Stipulation is Exhibit 1 to Final Cash Collateral Order) |

Exhibit G       PNC Payment Schedule

Exhibit H       Executory Contracts

Exhibit I       Financial Projections

Exhibit J       Liquidation Analysis

[SIGNATURE PAGE TO FOLLOW]

**NEW WAY MACHINE COMPONENTS, INC.,**
**t/a NEW WAY AIR BEARINGS AND**
**NEW WAY PRECISION**
as a Debtor and a Debtor-in-Possession


By:   */s/ Jared Schaffstall*
          Name:  Jared Schaffstall
          Title:   President and COO


**KARALIS PC**


By:   */s/ Aris J. Karalis*
          Aris J. Karalis, Esquire
          Robert W. Seitzer, Esquire
          Robert M. Greenbaum, Esquire
          1900 Spruce Street
          Philadelphia, PA  19103
          215-546-4500
          Attorneys for the Debtor


[SIGNATURE PAGE TO PLAN OF REORGANIZATION]

## **EXHIBIT A**

**Tax Return History (2019 through 2022)**

Exhibit A

| Form **1120-S** | **Tax Return History Report**<br>**Page 1** |
|---|---|

Name
**NEW WAY MACHINE COMPONENTS, INC.**

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Net receipts | 10,397,951 | 8,820,225 | 10,017,792 | 13,163,522 |
| Cost of goods sold | 5,734,568 | 5,070,555 | 5,254,026 | 9,320,012 |
| **Gross profit** | 4,663,383 | 3,749,670 | 4,763,766 | 3,843,510 |
| **Gross profit percentage** | 44.8491 | 42.5122 | 47.5531 | 29.1982 |
| Other income (loss) | 15,481 | 11,529 | 16,648 | 34,728 |
| **Total income (loss)** | 4,678,864 | 3,761,199 | 4,780,414 | 3,878,238 |
| Officer compensation | 596,000 | 675,312 | 740,212 | 591,431 |
| Salaries and wages | 1,764,369 | 1,775,322 | 1,122,176 | 1,917,201 |
| Bad debts | | | | |
| Taxes and licenses | 235,181 | 220,808 | 249,042 | 251,912 |
| Interest | 111,142 | 66,694 | 21,473 | 77,655 |
| Depreciation | 77,899 | 34,930 | 30,604 | 196,184 |
| Depletion (other than oil and gas) | | | | |
| Pension and employee benefits | 814,672 | 876,276 | 931,338 | 916,340 |
| Other deductions | 1,189,331 | 922,512 | 1,059,188 | 925,678 |
| **Total deductions** | 4,788,594 | 4,571,854 | 4,154,033 | 4,876,401 |
| **Ordinary business income (loss)** | -109,730 | -810,655 | 626,381 | -998,163 |

## **EXHIBIT B**

**2023 Balance Sheet**

New Way Machine Components Inc.
Balance Sheet
FOR PERIOD ENDING:  12/31/2023

**ASSETS**

| | |
|---|---|
| Cash | <u>116,769</u> |
| **<u>Total Cash</u>** | **<u>116,769</u>** |
| Accounts Receivable | 1,304,375 |
| Gen-Gen-Allowance for Doubtful Accounts | -14,948 |
| Shareholder Advance Insurance | 5,278 |
| Inventory - Stock | 1,695,083 |
| Inventory - WIP | 509,137 |
| Inventory - Inspection / DMR | 40,682 |
| Prepaid Other | <u>65,344</u> |
| **<u>Total Other Current Assets</u>** | **<u>3,604,949</u>** |
| **Total Current Assets** | **3,721,718** |
| Property & Equipment | 4,544,798 |
| Less Accumulated Depreciation | <u>-3,452,104</u> |
| Gen-Gen-Projects in Process | 160,152 |
| Net Fixed Asset | 1,252,846 |
| Op Lease Right of Use Assets | 1,161,769 |
| **<u>Total Assets</u>** | **<u>6,136,334</u>** |

**LIABILITIES AND EQUITY**

| | |
|---|---|
| Accounts Payable | 423,513 |
| A/P Clearing | 65,195 |
| Credit Card Clearing | -6,399 |
| Cur Portion of Op Lease Liab | 313,434 |
| Cur Portion of Long Term Debt | 1,130,325 |
| Accrued PTO | 79,027 |
| Accrued Expense Liabilities | 30,967 |
| Deferred Revenue/Rent/Cust Dep | 57,827 |
| **<u>Total Current Liabilities</u>** | **<u>2,093,889</u>** |

New Way Machine Components Inc.
Balance Sheet
FOR PERIOD ENDING:  12/31/2023

| | |
|---|---:|
| Notes Payable - Bank | 2,327,242 |
| Notes Payable - Related | 511,928 |
| Notes Payable - NH | 2,026,421 |
| Non-Cur Op Lease Liabilities | 884,242 |
| **Total Long Term Liabilities** | **5,749,834** |
| | |
| **Total Liabilities** | **7,843,723** |
| | |
| Capital Stock | 1,000 |
| Add'l Paid-In Capital | 20,284 |
| Treasury Stock | -1,069,302 |
| Encumbered Shares | -2,924,000 |
| Shareholder Draw | |
| Retained Earnings | 4,398,974 |
| Year to Date Income | -2,134,345 |
| | |
| **Total Equity** | **-1,707,389** |
| | |
| **Total Liabilities & Equity** | **6,136,334** |

*This Balance Sheet summarizes the assets, liabilities and net assets of New Way Machine Components Inc. as at December 31, 2023. It is management's representation of the organization's financial position on that date. Asterion Consulting has not audited or reviewed the financial information contained herein and therefore expresses no form of assurance on these results.*

**<u>EXHIBIT C</u>**

**2019 and 2020 Income Statement**



- 3 -

**NEW WAY MACHINE COMPONENTS, INC.**
**T/A NEW WAY AIR BEARINGS**
Consolidated Statements of Income and Retained Earnings
For the Years Ended December 31, 2020 and 2019
(See Independent Accountants' Review Report)

|  | 2020 | 2019 |
|---|---|---|
| Sales | $ 8,820,225 | $ 10,397,951 |
| Cost of Sales | 5,171,125 | 5,685,856 |
| GROSS PROFIT | 3,649,100 | 4,712,095 |
| Operating Expenses: |  |  |
| Selling, General and Administrative Expenses | 4,536,696 | 4,485,868 |
| OPERATING INCOME (LOSS) | (887,596) | 226,227 |
| Other Income (Expense): |  |  |
| Miscellaneous Income | 11,529 | 15,481 |
| Interest Expense | (61,744) | (116,092) |
| Other Non Operational Expense | 0 | (12,185) |
| Grant Income - Paycheck Protection Program | 977,800 | 0 |
| TOTAL OTHER EXPENSE | 927,585 | (112,796) |
| NET INCOME | 39,989 | 113,431 |
| Retained Earnings - Beginning | 3,811,209 | 3,697,778 |
| RETAINED EARNINGS - ENDING | $ 3,851,198 | $ 3,811,209 |

The accompanying notes are an integral part of these statements.

# **EXHIBIT D**

**2021 and 2022 Income Statement**



- 3 -

**NEW WAY MACHINE COMPONENTS, INC.**
**T/A NEW WAY AIR BEARINGS**
Consolidated Statements of Operations and Retained Earnings
For the Years Ended December 31, 2022 and 2021
(See Independent Accountants' Review Report)

|  | 2022 | 2021 |
|---|---|---|
| Sales | $ 13,163,522 | $ 10,017,792 |
| Cost of Sales | 7,956,572 | 5,344,859 |
| GROSS PROFIT | 5,206,950 | 4,672,933 |
| Operating Expenses: | | |
| Selling, General and Administrative Expenses | 4,707,646 | 4,844,707 |
| OPERATING INCOME (LOSS) | 499,304 | (171,774) |
| Other Income (Expense): | | |
| Miscellaneous Income | 34,728 | 16,648 |
| Grant Income - Employee Retention Credit | 0 | 917,156 |
| Grant Income - Paycheck Protection Program | 0 | 977,897 |
| Obsolete Inventory | (1,192,816) | 0 |
| Interest Expense | (77,655) | (21,473) |
| TOTAL OTHER INCOME (EXPENSE) | (1,235,743) | 1,890,228 |
| NET INCOME (LOSS) | (736,439) | 1,718,454 |
| Retained Earnings - Beginning | 5,510,144 | 3,851,198 |
| Adoption of ASU 2016-02, Topic 842 | (267,627) | 0 |
| Less: Distributions | (105,581) | (59,508) |
| RETAINED EARNINGS - ENDING | $  4,400,497 | $  5,510,144 |

The accompanying notes are an integral part of these statements.

## **EXHIBIT E**

**2023 Income Statement**

New Way Air Bearings
Income Statement
12/31/2023

| Description | Year Ending 12/31/23 |
|---|---|
| **Revenue** | |
| Total Revenue | **12,038,002** |
| : | |
| Total Cost of Sales | **9,934,927** |
| **Total Gross Profit** | **2,103,075** |
| : | |
| **Expenses** | |
| Trade Shows | 47,646 |
| Conferences | 4,008 |
| Seminars/Training | 11,115 |
| Travel Expenses-Meals & Enter | 14,229 |
| Travel Expenses-Trans & L | 79,118 |
| Website | 63,120 |
| Commisions | 5,765 |
| Marketing Materials | 54,205 |
| Salary/Wages SG&A | 1,417,836 |
| Salary/Wages Bonus | 6,700 |
| Wages - Tax Expense | 162,178 |
| Payroll Services | 8,525 |
| Recruiting | 5,653 |
| Insurance-Health-KHPE-Comp | 45,980 |
| Insur-EPLI | 6,832 |
| Insur-Life-Keymann | 49,955 |
| Employee Assistance Program | 14,400 |
| Bank Charges | 9,069 |
| Credit Card Processing Fee | 1,226 |
| Finance Charges - Credit Card | 11,837 |
| Charge Card Member Fee | 920 |
| Donations | 1,720 |
| Charitable Contributions-EEPre | -1,164 |
| Meals & Entertainment | 15,154 |
| Dues & Subscriptions | 9,420 |
| Tuition Reimbursement | 6,236 |
| Insurance-Package | 31,405 |
| Supplies | 67,527 |
| Software/Computer Expenses | 42,295 |
| Shop Expenses | 5,164 |
| Miscellaneous | 849 |
| Postage | 885 |
| Accounting Fees | 59,850 |
| Professional Fees | 73,484 |
| Patents | 9,162 |
| Freight | 42,483 |
| Rent Expense | 152,405 |

New Way Air Bearings
Income Statement
12/31/2023

| Description | Year Ending 12/31/23 |
|---|---|
| Repairs & Maint-Bldg | 40,687 |
| Repairs & Maint-Vehicles | 1,707 |
| Repairs & Maint-Equipment | 10,783 |
| Auto Expense | 1,548 |
| Telephone-Regular | 26,999 |
| Telephone-Cell | 7,727 |
| Cleaning | 82,972 |
| Landscaping | 5,830 |
| Utilities-Electric | 44,299 |
| Utilities-Water | 3,106 |
| Utilities-Sewer | 4,143 |
| Utilities-Trash | 27,526 |
| Research & Development | 181,666 |
| Research & Develop - Materials | 7,444 |
| Research & Develop Labor | 462,015 |
| Depreciation-Office Furn | 10,784 |
| Depreciation-Computer/Network | 82,862 |
| Depreciation-Leasehold Imp | 97,524 |
| Pension/Profit Sharing Expense | 2,989 |
| 401K Employer Contribution | 68,606 |
| Bad Debt Expense | 14,948 |
| Total Expenses | 3,723,356 |
| **Total Operating Income** | **-1,620,281** |
| Total Operating Income % | |
| : | |
| **Other Income/Expenses** | |
| : | |
| Interest Income-Other | 3,152 |
| Gain/Loss-Sale of Asset | 741 |
| Income-Other-Miscellaneous | 5,689 |
| Interest Expense | -253,660 |
| Other Expense | -269,986 |
| **Total Other Income/Expenses** | **-514,064** |
| **Total Net Income Before Tax** | **-2,134,345** |
| : | |
| **Total Net Income** | **-2,134,345** |

***This Income Statement summarizes the revenues, expenses, and net income
of New Way Machine Components Inc. for the year ending December 31,***

New Way Air Bearings
Income Statement
12/31/2023

| Description | | Year Ending 12/31/23 |
| --- | --- | --- |

*of New Way Machine Components Inc. for the year ending December 31, 2023. It is management's representation of the organization's operating results for the period. Asterion Consultinig has not audited or reviewed the financial information contained herein and therefore expresses no form of assurance on these results.*

| Description | Amount |
| --- | --- |
| PNC LOC extension charge | 10,000.00 |
| | |
| GE Part expense | 98,820.46 |
| 941 Refund for prior year | (80,510.00) |
| 2022 Jobs closed in 2023 | 106,350.86 |
| Incorrect prior year accrued expenses. | 5,193.27 |
| Removed deferred rent | (13,520.46) |
| Correct 2022 ROU Liability | 30,762.28 |
| Prior year corrections, including Fixed Assets | 112,889.28 |
| | |
| | 269,985.69 |

## **<u>EXHIBIT F</u>**

**Final Cash Collateral Order**
**(Cash Collateral Stipulation is Exhibit 1 to Final Cash Collateral Order)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| **NEW WAY MACHINE COMPONENTS, INC.** | : | **Case No. 24-11362(AMC)** |
| **t/a NEW WAY AIR BEARINGS** | : | |
| | : | |
| **Debtor** | : | |
| | : | |

**ORDER APPROVING STIPULATION AUTHORIZING DEBTOR TO USE CASH
COLLATERAL PURSUANT TO SECTION 363(c)(2)(B) OF THE BANKRUPTCY CODE
AND TO PROVIDE ADEQUATE PROTECTION**

Upon consideration of *the Stipulation Authorizing Debtor to Use Cash Collateral pursuant to Section 363(c)(2)(B) of the Bankruptcy Code and to Provide Adequate Protection* (the "Stipulation"),[1] attached hereto as Exhibit 1, entered into by and between New Way Machine Components, Inc. (the "Debtor"), by its attorneys, Karalis P.C., and PNC Bank, National Association, individually and as successor-by-merger to PNC Equipment Finance, LLC ("PNC Bank" and together with the Debtor, each a "Party" and collectively, the "Parties"), by its attorneys, Dilworth Paxson LLP; and this Court having reviewed the Stipulation; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Stipulation attached hereto as Exhibit 1 is hereby APPROVED.

2.      The Parties are authorized to take all actions necessary or appropriate to effectuate the Stipulation.

3.      The terms and provisions of the Stipulation shall immediately be effective and enforceable upon entry of this Order.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Stipulation.

4.      This Court retains jurisdiction to determine disputes regarding implementation and

enforcement of this Order and the Stipulation.


**BY THE COURT:**

_____

ASHELY M. CHAN,
UNITED STATES BANKRUPTCY JUDGE

Dated: _June 26, 2024_____

**EXHIBIT "1"**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **Chapter 11, Subchapter V** |
| | : | |
| **NEW WAY MACHINE COMPONENTS, INC.** | : | **Case No. 24-11362(AMC)** |
| **t/a NEW WAY AIR BEARINGS** | : | |
| | : | |
| **Debtor** | : | |
| | : | |

**STIPULATION AUTHORIZING DEBTOR TO USE CASH COLLATERAL
PURSUANT TO SECTION 363(c)(2)(B) OF THE BANKRUPTCY CODE
AND TO PROVIDE ADEQUATE PROTECTION**

Upon consideration of the Debtor's Motion for an Order Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001, Authorizing Debtor to Use Cash Collateral and to Provide Adequate Protection [D.I. 8], and after notice and a hearing, on this ___ day of June 2024, this Stipulation Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(B) and to Provide Adequate Protection (this "Stipulation") is entered into by and between New Way Machine Components, Inc. (the "Debtor"), by its attorneys, Karalis P.C., and PNC Bank, National Association ("PNC Bank"), individually and as successor-by-merger to PNC Equipment Finance, LLC ("PNCEF"), by its attorneys, Dilworth Paxson LLP, in this subchapter V, chapter 11 case pending before this Court, case number 24-11362(AMC) (the "Bankruptcy Case"). The Debtor and PNC Bank stipulate and agree as follows:

**A.    Debtor and Bankruptcy Case**

1.    A voluntary petition under Chapter 11, Subchapter V of the United States Bankruptcy Code (11 U.S.C. §101-1330, the "Bankruptcy Code") was filed by the Debtor on April 22, 2024 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court"). Since the Petition Date, the Debtor has remained in possession of its assets and is operating its business as a debtor-in-possession pursuant to Sections 107 and 1108 of the Bankruptcy Code.

2.    On April 23, 2024, the United States Trustee pursuant to § 1183(a) of the Bankruptcy Code appointed Holly Smith Miller, Esquire, as the Subchapter V Trustee in this Bankruptcy Case (the "Subchapter V Trustee") [D.I. 23].

**B.    The PNCEF Obligations and Collateral**

1.    On or about May 23, 2019, the Debtor and PNCEF executed a Master Loan and Security Agreement (the "Master Agreement") whereby PNCEF, in its discretion and subject to certain conditions and due diligence, agreed from time to time to loan money to the Debtor for the

acquisition of equipment.  Pursuant to the Master Agreement, each of these loans would be evidenced by a separate promissory note from the Debtor.

2.      The terms of the Security Agreement are set forth in Annex A to the Master Agreement ("Annex A").

3.      Annex A provides PNCEF with a security interest in the collateral referenced in subsections 1(a) and 1(b) thereof.  Subsection 1(b) provides, if and when, at any time, the Debtor has obligations outstanding that do not include Interim Financing Obligations (as defined below), "collateral" shall only include the Debtor's equipment, inventory and fixtures that were financed by PNCEF, when and as described on Exhibit C, attached thereto. (collectively, the "Equipment").

4.      In addition to the above, if and when, at any time, the Debtor has "Obligations" (as defined therein) outstanding that include, among other things, advances or other interim financing owing by Debtor to PNCEF or to any other direct or indirect subsidiary of the PNC Financial Services Group, Inc. ("Interim Financing Obligations"), "collateral" shall also include all personal property of the Debtor, including the categories of personal property described in detail therein. *See* Annex A § 1(a) (definition of "collateral").

5.      The security interest granted in Annex A secures all obligations owed by the Debtor to PNCEF or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc. (which includes PNC Bank).  *Id.* § 1(c) (definition of "obligations").

6.      Prior to the Petition Date, on November 18, 2020, PNCEF filed a UCC-1 financing statement with the Secretary of the Commonwealth of Pennsylvania, file number 2020111800175, naming the Debtor, as the debtor, and PNCEF, as the secured party.  On November 28, 2021, PNCEF filed a UCC-3 amendment statement with respect to its initial UCC-1 filing with the Secretary of the Commonwealth of Pennsylvania, file number 2021072800289 (the "Amended Financing Statement"), amending, describing and limiting the security interest granted to specific equipment identified in the Amended Financing Statement (the "PNCEF Collateral").[1]

7.      The security interest granted by Annex A is perfected in the Equipment, as described in the Amended Financing Statement.

8.      On or about July 12, 2019, the Debtor executed an Amended and Restated Equipment Line of Credit Note in favor of PNCEF (the "2019 PNCEF LOC Note") in the maximum principal amount of $500,000.00.  Pursuant to the terms of the 2019 PNCEF LOC Note, the Debtor would submit certain Requests for Advances to PNCEF to draw on the line of credit for the acquisition of equipment, which would set forth the specific interest rate and payment terms for such advances.

---

[1] PNC Bank and the Debtor reserve and preserve their rights to determine the scope of the collateral described in such financing statement and the scope of the security interest granted by Annex A.

#124249950v6

9.      On December 5, 2019 and December 23, 2019, PNCEF made advances to the Debtor pursuant to the 2019 PNCEF LOC Note in the amounts of $128,902.89 and $14,495.00, respectively (collectively, the "2019 Advances").

10.      On or about November 16, 2020, the Debtor executed an Equipment Line of Credit Note in favor of PNCEF (the "2020 PNCEF LOC Note") in the maximum principal amount of $175,000.00.  Pursuant to the terms of the 2020 PNCEF LOC Note, the Debtor would submit certain Requests for Term Loan or Requests for Staged Advance to PNCEF to draw on the line of credit for the acquisition of equipment.

11.      On December 24, 2020, PNCEF made an advance to the Debtor pursuant to the 2020 PNCEF LOC Note in the amount of $77,183.05 (the "2020 Advance").

12.      On or about July 8, 2020, the Debtor and PNCEF executed a Notice of Conversion (the "First Conversion Notice"), which sets forth the terms and conditions for repayment of the 2019 Advances as a term loan (the "First PNCEF Loan").  Pursuant to the First Conversion Notice, the First PNCEF Loan is to accrue interest at a fixed rate of 3.42% per annum.  Principal and interest shall be due and payable in sixty (60) equal monthly principal and interest payments of $2,603.52 each, commencing on September 4, 2020, and continuing on the same day each month thereafter.  Any outstanding principal and accrued interest shall be due and payable in full on August 4, 2025.

13.      On or about July 26, 2021, the Debtor and PNCEF executed a Notice of Conversion (the "Second Conversion Notice," and collectively with the Master Agreement, Annex A, the 2019 PNCEF LOC Note, the 2020 PNCEF LOC Note, the First Conversion Notice, and any and all documentation executed or issued in connection therewith, the "PNCEF Loan Documents"), which sets forth the terms and conditions for repayment of the 2020 Advance as a term loan (the "Second PNCEF Loan," and collectively with the First PNCEF Loan, the "PNCEF Obligations").  Pursuant to the Second Conversion Notice, the Second PNCEF Loan is to accrue interest at a fixed rate of 3.47% per annum.  Principal and interest shall be due and payable in sixty (60) equal monthly principal and interest payments of $1,403.06 each, commencing on November 26, 2021, and continuing on the same day each month thereafter.  Any outstanding principal and accrued interest shall be due and payable in full on October 26, 2026.

14.      The PNCEF Obligations are cross-defaulted with the PNC Bank Obligations (as defined below), such that an event of default with respect to any of the PNC Bank Obligations constitutes an event of default with respect to each of the PNCEF Obligations. *See* Annex A § 8(a).

15.      On May 1, 2022, PNCEF was merged into PNC Bank.

## C.      The PNC Bank Obligations and Collateral

16.      On or about December 28, 2021, the Debtor executed a Term Note in favor of PNC Bank (the "2021 Term Note") in the principal amount of $181,716.31 (the "2021 Term Loan").  Pursuant to the 2021 Term Note, the 2021 Term Loan is to accrue interest at a fixed rate of 4.05%

per annum.  Monthly principal and interest payments of $3,355.43 are required to be paid on or before the 28th day of each month.  Any outstanding principal and accrued interest shall be due and payable in full on October 27, 2026.

17.     On or about December 28, 2022, the Debtor executed a Term Note in favor of PNC Bank (the "<u>2022 Term Note</u>") in the principal amount of $600,607.15 (the "<u>2022 Term Loan</u>"). Pursuant to the 2022 Term Note, the 2022 Term Loan is to accrue interest at a fixed rate of 6.7% per annum.  Monthly principal and interest payments of $11,835.34 are required to be paid on or before the 28th day of each month.  Any outstanding principal and accrued interest shall be due and payable in full on December 28, 2027.

18.     On or about April 19, 2023, the Debtor executed an Amended and Restated Revolving Line of Credit Note in favor of PNC Bank (the "<u>LOC Note</u>," and collectively with the 2021 Term Note and the 2022 Term Note, the "<u>PNC Bank Notes</u>") for a line of credit with a maximum principal amount of $2,750,000.00 (the "<u>Line of Credit</u>"), along with an Amended and Restated Loan Agreement dated April 19, 2023 (the "<u>Loan Agreement</u>").

19.     Pursuant to the LOC Note, the Debtor is required to make monthly payments of accrued interest to PNC Bank (for the amount of accrued interest) on or before the 5th day of each month.  In addition, all outstanding principal and accrued interest is due and payable on or before the "Expiration Date," which is defined as August 31, 2023 or such later date as may be designated in writing by PNC Bank.  The Line of Credit accrues interest at the annual rate of Daily BSBY plus 2.75%.

20.     Prior to the Petition Date, the Debtor also used a purchase card issued by PNC Bank (the "<u>Purchase Card</u>," and collectively with the 2021 Term Loan, the 2022 Term Loan and the Line of Credit, the "<u>PNC Bank Obligations</u>").

21.     The PNC Bank Obligations are secured by a security interest in substantially all of the Debtor's assets (the "<u>PNC Bank Collateral</u>"), as more fully described in the Security Agreement executed by the Debtor in favor of PNC Bank on or about June 28, 2018 (the "<u>Security Agreement</u>").  "Obligations" are defined in the Security Agreement to mean "all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Debtor to PNC Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future . . . ."  *See* Security Agreement § 1(b) (definition of "Obligations").

22.     Prior to its merger with PNC Bank, PNCEF was a subsidiary of The PNC Financial Services Group, Inc.

23.     On or about September 19, 2022, the Debtor executed in favor of PNC Bank an Amended and Restated Security Agreement executed by the Debtor in favor of PNC Bank on or about September 19, 2022 (the "<u>Amended & Restated Security Agreement</u>," and collectively with the Security Agreement, the "<u>PNC Bank Security Agreements</u>").[2]

---

[2] PNC Bank asserts that the security interest granted in the Security Agreement, as ratified by the Amended and Restated Security Agreement, secures all obligations owed by the Debtor to PNC Bank or to any other direct or indirect

24.     The Amended and Restated Security Agreement specifically references the Security Agreement and provides that it shall not constitute a novation thereof and does not extinguish, cancel or impair the lien priority or effect of any lien that was established by the Security Agreement.  Moreover, by executing the Amended and Restated Security Agreement, the Debtor expressly ratified and confirmed all such liens and security interests granted under the Security Agreement.

25.     As of the date that the Amended and Restated Security Agreement was executed by the Debtor, PNCEF had been merged into PNC Bank.

26.     The terms of the PNC Bank loan documents described above were amended from time to time pursuant to: (a) a Waiver and Amendment to Loan Documents dated April 19, 2023; (b) an Amendment to Loan Documents dated May 9, 2023; (c) an Amendment to Loan Documents dated August 28, 2023; and (d) an Amendment to Loan Documents dated October 24, 2023 (collectively, the "Amendments," and collectively with the PNC Bank Notes, the Loan Agreement, the Security Agreements, and any and all other documentation executed or issued in connection therewith, the "PNC Bank Loan Documents").

27.     Pursuant to the Amendments, the Expiration Date of the Line of Credit was extended from time to time to April 30, 2024.  The rest of the obligations owed to PNC Bank as a result of the merger with PNCEF (other than the Purchase Card) are term loans with varying maturity dates that have not yet occurred.

28.     By letter dated March 20, 2024 (the "Default Letter"), PNC Bank advised the Debtor of certain Events of Default with respect to the PNC Bank Obligations and the PNCEF Obligations.  As a consequence of the Events of Default, PNC Bank elected to impose default interest with respect to each of the PNC Bank Obligations (other than the Purchase Card) and each of the PNCEF Obligations, effective as of the date of default, November 2, 2023.  On April 5, 2024, PNC Bank debited the Debtor's account at PNC Bank the amount of $33,674.56 representing default rate of interest from November 2, 2023 to April 5, 2024.  PNC Bank also permanently suspended the Debtor's right to draw on the Line of Credit.

### D.    Current Amounts Owed to PNC Bank

29.     By virtue of the Security Agreements, the PNC Bank Obligations are secured by the Debtor's "Cash Collateral" (as defined hereinafter).  PNC Bank asserts that by virtue of the Security Agreements and the merger of PNCEF into PNC Bank prior to execution of the Amended

---

subsidiary of The PNC Financial Services Group, Inc. (which includes PNCEF), such that the PNC Bank Obligations and the PNCEF Obligations are each secured by substantially all of the Debtor's assets.  PNC Bank also asserts that the security interest granted in the Security Agreement extends to the PNCEF Obligations because when the Debtor executed the Amended and Restated Security Agreement, and thereby ratified such security interest, PNCEF had merged into PNC Bank, such that the PNCEF Obligations were owed to PNC Bank.  The Debtor disputes PNC Bank's position that the PNCEF Obligations are secured by PNC Bank's security interest in substantially all of the Debtor's personal property.  PNC Bank and the Debtor preserve all rights as to that issue.

and Restated Security Agreement, the PNCEF Obligations are also secured by the Debtor's "Cash Collateral" which the Debtor disputes. The Debtor asserts that by virtue of Master Security Agreement, the PNCEF Obligations are secured by a perfected lien only in specific equipment described in the Amended Financing Statement.[3]

30.     The Debtor requires the use of "Cash Collateral" (as defined hereinafter) for the purpose of funding its operations and to operate during the pendency of the Bankruptcy Case, and the Debtor has requested that PNC Bank consent to the Debtor's use of Cash Collateral pursuant to the terms and subject to the conditions set forth herein.

31.     The Debtor's use of Cash Collateral during the Bankruptcy Case may result in a reduction in the value of the PNC Bank Collateral without a corresponding reduction in the PNC Bank Obligations and (if secured by Cash Collateral) the PNCEF Obligations.

32.     Based upon the various acknowledgments and covenants contained herein, PNC Bank is willing to consent to the Debtor's use of Cash Collateral commencing upon the date this Stipulation is approved by the Court for the purposes and for the term set forth herein and otherwise in accordance with the terms and subject to the conditions contained herein.

## E.     ACKNOWLEDGMENTS.

33.     Prior to this Stipulation, the Debtor was permitted to make use of Cash Collateral on an interim basis for the limited purposes and for the term set forth in, and otherwise in accordance with the terms and subject to the conditions contained in, (a) that certain Interim Order Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001, Authorizing Debtor to Use Cash Collateral and to Provide Adequate Protection [D.I. 38]; and (b) that certain second Interim Order Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001 [D.I. 64] (collectively, the "Interim Cash Collateral Orders").

34.     The Debtor hereby acknowledges, represents, warrants, and agrees that:

a.      The PNC Bank Loan Documents are legal, valid, and binding obligations of the Debtor and are enforceable against the Debtor in accordance with their respective terms, except to the extent contrary to federal/state bankruptcy or insolvency laws;

b.      The PNCEF Loan Documents are legal, valid, and binding obligations of the Debtor and are enforceable against the Debtor in accordance with their respective terms except to the extent contrary to federal/state bankruptcy or insolvency laws;

---

[3] PNC Bank and the Debtor reserve and preserve their rights with respect to the scope of the collateral and obligations described in the various security agreements executed by the Debtor and the financial statements filed by PNC Bank and PNCEF and whether the PNCEF Obligations and the PNC Bank Obligations are cross-collateralized.

#124249950v6

      c.      The amounts owed to PNC Bank on account of the PNC Bank Obligations as of the Petition Date, excluding legal fees and costs, were as follows:[4]

### Line of Credit (Loan No. XXXXX9977):

| | |
|---|---|
| Principal: | $2,627,242.40 |
| Interest: | $   10,033.20 |
| Amendment Fee: | $   15,000.00 |
| Bank Costs: | $        155.00 |
| | |
| Total: | $2,652,430.60 |

### 2021 Term Loan (Loan No. XXXXX5982

| | |
|---|---|
| Principal: | $104,529.65 |
| Interest: | $        233.99 |
| | |
| Total: | $104,763.64 |

### 2022 Term Loan (Loan No. XXXXX8284

| | |
|---|---|
| Principal: | $468,929.15 |
| Interest: | $   2,181.82 |
| | |
| Total: | $471,110.97 |

| | |
|---|---|
| **Purchase Card**: | $     4,439.95 |
| | |
| **Total PNC Bank Obligations** | $3,232,745.16 |

      d.      The amounts owed to PNC Bank on account of the PNCEF Obligations as of the Petition Date were as follows:

### First PNCEF Loan (Loan No. XXXX531-4)

| | |
|---|---|
| Principal: | $41,281.50 |
| Interest: | $      132.51 |

---

[4] The interest amounts set forth in Paragraphs 34(c) for the PNC Bank Obligations and 34(d) hereof for the PNCEF Obligations are the accrued interest owed by the Debtor as of the Petition Date at the non-default rate set forth in the applicable loan documents.  PNC Bank reserves and preserves the right to claim that it is owed interest at the default rate on account of the PNC Bank Obligations and PNCEF Obligations, and the Debtor reserves and preserves the right to oppose any claim for interest at the default rate, both without altering the application of Section 502(a) to proofs of claim filed in this Bankruptcy Case by PNC Bank.

|  |  |
|---|---|
| Total: | $41,414.01 |

**Second PNCEF Loan (Loan No. XXXXX531-6)**:

|  |  |
|---|---|
| Principal: | $42,093.87 |
| Interest: | $   196.70 |
| Total: | $42,290.57 |

**Total PNCEF Obligations:** **$83,704.58**

e.      PNC Bank holds duly perfected, valid, first priority liens on and security interests (collectively, the "Pre-Petition PNC Bank Liens") in the PNC Bank Collateral to secure the PNC Bank Obligations;

f.      PNCEF holds duly perfected, valid, first priority liens on and security interests (collectively, the "Pre-Petition PNCEF Liens") in the PNCEF Collateral to secure the PNCEF Obligations; and

g.      The Debtor and PNC Bank agree to make good faith efforts to resolve by future agreement (either prior to or in conjunction with the Debtor's chapter 11 plan), on or before December 31, 2024, the issues reserved and preserved between the parties in the reservation of rights in footnotes nos. 1, 2, and 3 (regarding the scope of the collateral securing the PNCEF Obligations) and in footnote no. 5 (regarding interest at the default rate as opposed to the non-default rate on account of the PNC Bank Obligations or the PNCEF Obligations).  If such issues are not resolved by agreement of the parties, then the Debtor shall commence a claim objection, adversary proceeding, or any other appropriate action seeking a determination of the relative rights of the parties on or before December 31, 2024 or the Debtor's position regarding such issues shall be deemed forever waived with prejudice.

**F.    Cash Collateral Agreement**

35.      The Debtor has requested that PNC Bank consent to the Debtor's use of Cash Collateral which the Debtor represents is necessary to fund its operations.  For purposes of this Stipulation, "Cash Collateral" shall have the meaning ascribed to it pursuant to § 363(a) of the Bankruptcy Code and shall include the proceeds, products, rents, and profits of and from all pre-petition collateral.

36.      The budget attached hereto as "Exhibit A" (the "Budget") was prepared by the Debtor and enumerates in detail the Debtor's projected collections and cash expenses of operations (collectively, the "Approved Expenses") from July 1, 2024 through the Termination Date (as defined hereinafter), as well as the projected fees and costs of the professionals retained by the Debtor (including the Subchapter V Trustee) from the Petition Date through the Termination Date (as defined hereinafter) (collectively, the "Estate's Professionals' Fees and Expenses").

#124249950v6

37.    Subject to the terms and conditions set forth herein, and on the condition precedent that this Stipulation is approved by the Court, PNC Bank hereby consents to the Debtor's use of Cash Collateral to pay only the Approved Expenses set forth in the Budget from the date this Stipulation is approved and entered as an order by the Court until the "Termination Date" which shall be the earlier of (a) 5:00 p.m. on December 31, 2024; or (b) the date upon which an Event of Default (as defined hereinafter) occurs.  The Debtor shall be permitted to exceed expenses in the Budget, on a monthly basis, by an amount not to exceed either (a) ten percent (10%) of total expenses or (b) such higher amount agreed to by the Debtor and PNC Bank. Except as precluded in Paragraph 39 hereof, the Debtor is also authorized to use Cash Collateral to pay the interim Estate's Professionals' Fees and Expenses provided that such Estate's Professionals' Fees and Expenses have been allowed by Order of the Court and further provided that the Adequate Protection Payments (as defined hereinafter) that are required to be paid to PNC Bank hereunder are paid in accordance with the terms of this Stipulation or as set forth on the Budget. Nothing herein shall preclude PNC Bank from objecting to any fee application filed by a professional retained by the Debtor or the Subchapter V Trustee, as the case may be.

38.    Nothing contained in this Stipulation shall be deemed to require PNC Bank to make loans or advances of any kind to or on behalf of the Debtor.

39.    Notwithstanding anything contained herein, Cash Collateral shall not be used by any party to (a) investigate and/or contest any lien or security interest of PNC Bank (including in its capacity as successor to PNCEF with respect to the PNCEF Obligations); (b) investigate and/or prosecute any other claim, complaint, adversary proceeding, suit, demand, action, or cause of action or claim objection against PNC Bank (including as successor to PNCEF), or (c) seek to have the Court annul, modify, or amend any part of this Stipulation without the prior written consent of PNC Bank.

40.    During the term of this Stipulation, the Debtor shall make monthly payments to PNC Bank on account of the PNC Bank Obligations and the PNCEF Obligations (other than the Purchase Card) on the dates provided in the applicable PNC Bank Loan Documents or PNCEF Loan Documents and in the amounts set forth in this Paragraph (collectively, the "PNC Payments").  For the Line of Credit, the Debtor shall make monthly interest-only payments based on the non-default rate of interest.  For the PNCEF Obligations and the PNC Bank Obligations other than the Line of Credit, the Debtor shall make monthly payments in the following amounts:[5]

| First PNCEF Loan: | $2,603.52 |
| Second PNCEF Loan: | $1,403.06 |
| 2021 Term Loan: | $3,355.43 |
| 2022 Term Loan: | $11,835.34 |

---

[5] By agreeing to accept the PNC Payments as set forth herein as adequate protection for the Debtor's use of Cash Collateral, PNC Bank is not waiving its asserted right to charge and apply interest at the default rate set forth in the PNCEF Loan Documents and the PNC Bank Loan Documents prior and subsequent to the Petition Date, which the Debtor disputes.  To the extent this dispute is not resolved by agreement of the parties, it shall be resolved in later proceedings during the Bankruptcy Case.

#124249950v6

The Debtor shall be permitted to make the PNC Payments to PNC Bank and, except as precluded in Paragraph 39 hereof, the Court-approved Estate's Professionals' Fees and Expenses whether or not such payments are included in the Budget.

## G.    ADEQUATE PROTECTION

41.    As adequate protection for any diminution in the value of the Pre-Petition PNC Bank Liens securing the PNC Bank Obligations (and the PNCEF Obligations, if and only to the extent the PNCEF Obligations are determined to be secured by the PNC Bank Collateral), caused by the Debtor's use of the Cash Collateral, to the extent the Debtor's use the Cash Collateral and such use diminishes the value of the PNC Bank Collateral:

a.    The Debtor hereby grants to PNC Bank replacement liens on and security interests in all of the Debtor's now existing and hereafter acquired personal property and assets and all cash and non-cash proceeds thereof, limited to only those types of collateral subject to the PNC Bank Pre-Petition Liens (collectively, the "Post-Petition Collateral"), to the same extent, validity and priority as the Pre-Petition PNC Bank Liens attach to the PNC Bank Collateral which replacement liens and security interests shall be deemed to be effective as of the Petition Date; provided, however, that such replacement liens and security interests shall not attach to any claims of the Debtor arising under Chapter 5 of the Bankruptcy Code, if any, or the proceeds of such claims.

b.    Any diminution in the value of the Pre-Petition PNC Bank Liens in favor of PNC Bank securing the PNC Bank Obligations (and the PNCEF Obligations, if and only to the extent the PNCEF Obligations are determined to be secured by the PNC Bank Collateral) caused by the Debtor's use of Cash Collateral which is not secured by the PNC Bank Collateral or Post-Petition Collateral or otherwise compensated through the Adequate Protection Payments shall constitute a cost and expense of administration in these Bankruptcy Cases in accordance with § 503(b)(1) of the Bankruptcy Code.

c.    The Debtor shall timely pay PNC Bank the following (all of which are collectively called the "Adequate Protection Payments"): (i) the PNC Payments; and (ii) subject to the provisions of 11 U.S.C. § 506(b), the reasonable costs and expenses of PNC Bank incurred in connection with the preparation and approval of this Stipulation, and the preservation and protection of its rights hereunder (collectively, "PNC Bank's Costs and Expenses"). To the extent that there is any dispute as to the PNC Bank's Costs and Expenses demanded, all such disputes shall be presented to the Court for resolution.

42.    The Debtor shall at all times maintain and keep its books and records, including without limitation accounts receivable, cash receipts and cash disbursements, current and updated so all business activities will be posted to such books and records with original entry in accordance with ordinary business practices.

43.    Reporting.  The Debtor shall deliver to PNC Bank and/or timely file:

#124249950v6

   (a)  A monthly report of its respective actual cash disbursements summarized in the same way as the budget is summarized on or before the 21st day of each month for the prior month period (the "Monthly Reports"), with the first Monthly Report to be provided on or before August 21, 2024;

   (b)  An accounting with respect to the Debtor's cash on hand on the Petition Date; and

   (c)  The monthly operating reports required by the U.S. Trustee.

  44.  The Debtor shall permit PNC Bank and its representatives to conduct site inspections, appraisals or any other requested evaluations regarding the PNC Bank Collateral, during regular business hours upon reasonable written notice to the Debtor from time to time as PNC Bank may request.  For purposes of this section, prior notice is "reasonable" if given at least five (5) business days prior to the intended visit date.

  45.  <u>Default; Termination</u>.

   (a)  This Stipulation shall terminate on the Termination Date;

   (b)  If the Debtor fails to pay any sums to PNC Bank when due or perform timely any other obligation hereunder ("Default"), the Debtor shall, upon five (5) business days written notice to the Debtor and its counsel, cease using Cash Collateral in which PNC Bank maintains an interest (the "Default Termination Date"), provided, however, all Approved Expenses, including payroll and the Estate's Professionals' Fees and Expenses incurred through the Default Termination Date may be paid by the Debtor after the Default Termination Date as such expenses come due or, in the case of the Estate's Professionals' Fees and Expenses, as they are approved by the Court; and provided, further that PNC Bank consents to the Debtor seeking an emergency hearing before the Court to consider the Debtor's request for the continued use of Cash Collateral after the Default Termination Date; and unless otherwise ordered by the Court, the Debtor's right to use Cash Collateral shall automatically and immediately terminate.

  46.  This Stipulation shall not be subject to any modification or amendment without the prior written consent of PNC Bank and the Debtor or the approval of the Bankruptcy Court. This Stipulation shall be binding upon PNC Bank and the Debtor and their respective successors and assigns.

  47.  No rights are intended to be created hereunder for the benefit of any third party, or creditor, or any direct, indirect, or incidental beneficiary.  This Stipulation shall inure to the benefit of and be binding upon PNC Bank, the Debtor, and their respective successors and assigns.

  48.  The performance of PNC Bank under this Stipulation is expressly conditioned upon the entry of an Order by the Bankruptcy Court approving this Stipulation.

#124249950v6

49.     The Debtor hereby agrees that all liens and/or security interests granted to PNC Bank and PNCEF pre-petition shall continue post-petition in full force and effect, without further perfection or filing under the Uniform Commercial Code by PNC Bank.

50.     All reports and notices hereunder shall be delivered by electronic mail to the following persons at the addresses indicated, which addresses may be changed from time to time upon prior written notice to all parties:

|  |  |
|---|---|
| If to PNC: | Gary A. Best<br>gary.best@pnc.com |
| With a copy to: | Jennifer L. Maleski, Esquire<br>Dilworth Paxson LLP<br>jmaleski@dilworthlaw.com |
| If to Debtor: | Andrew J. Devitt<br>ddevitt@newwayairbearings.com |
| With a copy to: | Aris J. Karalis, Esquire<br>akaralis@karalislaw.com |

51.     No waiver of one or more of the provisions of this Stipulation shall be effective unless set forth in writing and signed by the parties hereto.

52.     The rights, power, and remedies of PNC Bank and the Debtor provided herein are cumulative and not exclusive of any rights, power, or remedy provided by law or equity, and no failure or delay on the part of PNC Bank or the Debtor in exercise of any rights, power, or remedy shall operate as a waiver thereof.

53.     This Stipulation shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

54.     This Stipulation may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same Stipulation.

55.     A copy of this Stipulation shall be served within three (3) business days after its entry, by the Debtor's counsel upon (i) the Office of the United States Trustee, (ii) counsel for PNC Bank, (iii) the Subchapter V Trustee, and (iv) all parties who have timely filed requests for notices under Bankruptcy Rule 2002.

56.     Any parties objecting to the relief provide for in the Stipulation shall file with the Court written objections, stating with particularity, the basis therefor, no later than July 26, 2024, and shall serve the objections upon each of (i) counsel for the Debtor (ii) counsel for PNC Bank, (iii) the Subchapter V Trustee, and (iv) the Office of the United States Trustee.

#124249950v6

57.    In the absence of any timely filed objection, the parties may request, and the Court may order that the Stipulation shall become final and the Debtor's authority to use Cash Collateral shall continue to and through the Termination Date (on the same terms and conditions herein) without further notice, opportunity or hearing.  The Termination Date for the Debtor's continued use of Cash Collateral may be further extended by agreement of the Debtor and PNC Bank during the pendency of this Bankruptcy Case (on the same terms and conditions herein) subject to updated Budgets that are approved by agreement of the parties and by the Court for each subsequent period.

IN WITNESS WHEREOF, the Debtor and PNC Bank have caused this Stipulation to be executed as of the day and year first above written.

<div style="margin-left: 40%">

Karalis P.C.

By:____/s/ Aris J. Karalis_____
      Aris J. Karalis, Esquire
      Counsel for the Debtor


Dilworth Paxson LLP

By:____/s/ Jennifer L. Maleski_____
      Jennifer L. Maleski, Esquire
      Counsel for PNC Bank, National
      Association, individually and as successor-
      by-merger to PNC Equipment Finance, LLC

</div>

#124249950v6

# EXHIBIT "A"

Cash Collateral Budget

New Way Machine Components Inc. trading as New Way Air Bearings
Cash Collateral Budget - Monthly
Period Ending December 29th 2024

| | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | |
| AR Receipts Fulton Bank/TD Bank | 764,883 | 895,278 | 730,177 | 895,278 | 730,177 | 730,177 | 4,745,970 |
| A/R Receipts - other | 0 | 148,908 | 39,383 | 0 | 0 | 0 | 188,291 |
| **Total Cash Receipts** | 764,883 | 1,044,186 | 769,560 | 895,278 | 730,177 | 730,177 | 4,934,261 |
| **Total Product Disbursements** | | | | | | | |
| Material supplier payments (Note 2) | 176,868 | 256,510 | 168,866 | 191,510 | 196,747 | 192,866 | 1,183,367 |
| **Total Product Disbursements** | 176,868 | 256,510 | 168,866 | 191,510 | 196,747 | 192,866 | 1,183,367 |
| Operating Disbursements Payroll & Taxes | 350,000 | 350,000 | 350,000 | 525,000 | 350,000 | 350,000 | 2,275,000 |
| Repairs and Maintenance | 17,000 | 22,000 | 2,500 | 7,500 | 5,000 | 5,000 | 59,000 |
| Office expenses | 5000 | 15,000 | 5,000 | 15,000 | 10,000 | 10,000 | 60,000 |
| Freight and shipping supplies | 7,500 | 22,500 | 7,500 | 22,500 | 15,000 | 15,000 | 90,000 |
| Travel & entertainment | 2,000 | 6,000 | 2,000 | 6,000 | 4,000 | 4,000 | 24,000 |
| 401(k) | 12,000 | 24,000 | 24,000 | 36,000 | 24,000 | 24,000 | 144,000 |
| Rent 50 McDonald | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 6,760 | 40,561 |
| CAM 50 McDonald | 2,707 | 2,707 | 2,707 | 2,707 | 2,707 | 2,707 | 16,241 |
| Rent 30 McDonald | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 32,500 | 195,000 |
| Utilities | 7,500 | 22,500 | 7,500 | 22,500 | 15,000 | 15,000 | 90,000 |
| Insurance - business | 6807 | 6,807 | 6,807 | 6,807 | 13,123 | 6,807 | 47,158 |
| Insurance - medical | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 300,000 |
| Professional services (patent counsel and | 7,500 | 22,500 | 10,750 | 10,750 | 10,750 | 10,750 | 73,000 |
| Software maintenance | 1,500 | 4,500 | 1,500 | 4,500 | 3,000 | 3,000 | 18,000 |
| **Total Operating Disbursement** | 508,774 | 587,774 | 501,174 | 748,524 | 541,840 | 535,524 | 3,431,960 |
| **Operating Cash Flow** | 79,241 | 199,902 | 91,170 | -44,756 | -8,410 | 1,787 | 318,934 |
| **Other Disbursements Adequate** | | | | | | | |
| **Protection Payments** | | | | | | | |
| PNC Bank (A)- equipment      -8284 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 71,010 |
| PNC Bank (B)- equipment      -5982 | 3,356 | 3,356 | 3,356 | 3,356 | 3,356 | 3,356 | 20,136 |
| PNCEF (C)-- equipment          -5316 | 1,403 | 1,403 | 1,403 | 1,403 | 1,403 | 1,403 | 8,418 |
| PNCEF (D)-- equipment          -5314 | 2,604 | 2,604 | 2,604 | 2,604 | 2,604 | 2,604 | 15,624 |
| PNC Bank Line of Credit       -9977 | 16,000 | 16000 | 16,000 | 16,000 | 16,000 | 16,000 | 96,000 |
| Company professional fees: | | | | | | | |
| Counsel -- bankruptcy | | | 420,000 | | | | 420,000 |
| Financial advisors | | | 150,000 | | | | 150,000 |
| Sub V Trustee | | | 25,000 | | | | 25,000 |
| Accountants | | 10,000 | | | | | 10,000 |
| **Total Other Disbursements** | 35,198 | 45,198 | 655,198 | 35,198 | 35,198 | 35,198 | 816,188 |
| **Total Cash Flow** | 44,043 | 154,704 | (564,028) | (79,954) | (43,608) | (33,411) | (497,254) |
| PNC Bank Cash -- Beginning | $100,000 | $64,802 | $64,604 | $64,406 | $64,208 | $64,010 | $100,000 |
| PNC Bank Cash -- Ending | $64,802 | $64,604 | $64,406 | $64,208 | $64,010 | $63,812 | $63,812 |
| Fulton Bank/TD Bank Cash -- Beginning | $600,000 | $679,241 | $844,143 | $305,313 | $225,558 | $182,147 | $600,000 |
| Fulton Bank/TD Bank Cash -- Ending | $679,241 | $844,143 | $305,313 | $225,558 | $182,147 | $148,934 | $148,934 |
| Total Cash - Beginning | $700,000 | $744,043 | $898,747 | $369,719 | $289,766 | $246,157 | $700,000 |
| Total Cash - Ending | $744,043 | $898,747 | $369,719 | $289,766 | $246,157 | $212,746 | $212,746 |

Note 1 - Payroll includes salaries, wages and related payroll taxes and expenses
Note 2 - Includes COD and purchases on a nav as needed basis
Note 3 - Assumes amounts transferred to/from PNC for Adequate Protection Payments on an as needed basis.
Note 4 - Assumes one time cash pending update of June 30th budget for actuals.
Note 5 - Additional professional fees and costs incurred for the period from 9/1/24
through 12/31/24 (or Effective Date of Plan, if sooner), will be subject to court approval

# EXHIBIT G

**PNC Payment Schedule**

New Way Machine Components Inc. trading as New Way Air Bearings
PNC Bank Payment Schedule
Exhibit G
Prepared 9/26/24

| Period | Month | Purchase Card | 2021 Term Loan | 2022 Term Loan | First PNCEF Loan | Second PNCEF Loan | 8.19% LOC Interest | LOC Principal | Supplemental Principal Payments | LOC Balance | Total LOC Principal Payments | Total Payments to PNC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| November 30th 2024 | | $ 4,439.95 | $ 76,584.70 | $ 379,615.82 | $ 20,424.67 | $ 29,680.08 | | | | $ 2,597,242.40 | | |
| 1 | Jan-25 | 4,439.95 | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,726.18 | 30,000.00 | | 2,567,242.40 | 30,000.00 | 71,363.48 |
| 2 | Feb-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,521.43 | 5,281.22 | | 2,561,961.18 | 5,281.22 | 42,000.00 |
| 3 | Mar-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,485.39 | 5,317.26 | | 2,556,643.91 | 5,317.26 | 42,000.00 |
| 4 | Apr-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,449.09 | 5,353.56 | | 2,551,290.36 | 5,353.56 | 42,000.00 |
| 5 | May-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,412.56 | 5,390.09 | | 2,545,900.27 | 5,390.09 | 42,000.00 |
| 6 | Jun-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,375.77 | 5,426.88 | | 2,540,473.39 | 5,426.88 | 42,000.00 |
| 7 | Jul-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,338.73 | 5,463.92 | | 2,535,009.47 | 5,463.92 | 42,000.00 |
| 8 | Aug-25 | | 3,355.43 | 11,835.34 | 2,603.52 | 1,403.06 | 17,301.44 | 5,501.21 | | 2,529,508.26 | 5,501.21 | 42,000.00 |
| 9 | Sep-25 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 17,263.89 | 2,603.52 | 5,538.76 | 2,521,365.98 | 8,142.28 | 42,000.00 |
| 10 | Oct-25 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 17,208.32 | 2,603.52 | 5,594.13 | 2,513,168.13 | 8,197.85 | 42,000.00 |
| 11 | Nov-25 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 17,152.37 | 2,603.52 | 5,650.28 | 2,504,914.33 | 8,253.80 | 42,000.00 |
| 12 | Dec-25 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 17,096.04 | 2,603.52 | 5,706.61 | 2,496,604.21 | 8,310.13 | 42,000.00 |
| 13 | Jan-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 17,039.32 | 2,603.52 | 5,763.33 | 2,488,237.36 | 8,366.85 | 42,000.00 |
| 14 | Feb-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,982.22 | 2,603.52 | 5,820.43 | 2,479,813.41 | 8,423.95 | 42,000.00 |
| 15 | Mar-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,924.73 | 2,603.52 | 5,877.92 | 2,471,331.97 | 8,481.44 | 42,000.00 |
| 16 | Apr-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,866.84 | 2,603.52 | 5,935.81 | 2,462,792.64 | 8,539.33 | 42,000.00 |
| 17 | May-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,808.56 | 2,603.52 | 5,994.09 | 2,454,195.03 | 8,597.61 | 42,000.00 |
| 18 | Jun-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,749.88 | 2,603.52 | 6,052.77 | 2,445,538.74 | 8,656.29 | 42,000.00 |
| 19 | Jul-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,690.80 | 2,603.52 | 6,111.85 | 2,436,823.37 | 8,715.37 | 42,000.00 |
| 20 | Aug-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,631.32 | 2,603.52 | 6,171.33 | 2,428,048.52 | 8,774.85 | 42,000.00 |
| 21 | Sep-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,571.43 | 2,603.52 | 6,231.22 | 2,419,213.78 | 8,834.74 | 42,000.00 |
| 22 | Oct-26 | | 3,355.43 | 11,835.34 | - | 1,403.06 | 16,511.13 | 2,603.52 | 6,291.52 | 2,410,318.74 | 8,895.04 | 42,000.00 |
| 23 | Nov-26 | | 3,355.43 | 11,835.34 | - | - | 16,450.43 | 4,006.58 | 6,352.22 | 2,399,959.94 | 10,358.80 | 42,000.00 |
| 24 | Dec-26 | | 3,355.43 | 11,835.34 | - | - | 16,379.73 | 4,006.58 | 6,422.92 | 2,389,530.44 | 10,429.50 | 42,000.00 |
| 25 | Jan-27 | | - | 11,835.34 | - | - | 16,308.55 | 7,362.01 | 6,494.10 | 2,375,674.32 | 13,856.11 | 42,000.00 |
| 26 | Feb-27 | | - | 11,835.34 | - | - | 16,213.98 | 7,362.01 | 6,588.67 | 2,361,723.64 | 13,950.68 | 42,000.00 |
| 27 | Mar-27 | | - | 11,835.34 | - | - | 16,118.76 | 7,362.01 | 6,683.89 | 2,347,677.74 | 14,045.90 | 42,000.00 |
| 28 | Apr-27 | | - | 11,835.34 | - | - | 16,022.90 | 7,362.01 | 6,779.75 | 2,333,535.98 | 14,141.76 | 42,000.00 |
| 29 | May-27 | | - | 11,835.34 | - | - | 15,926.38 | 7,362.01 | 6,876.27 | 2,319,297.71 | 14,238.28 | 42,000.00 |
| 30 | Jun-27 | | - | 11,835.34 | - | - | 15,829.21 | 7,362.01 | 6,973.44 | 2,304,962.25 | 14,335.45 | 42,000.00 |
| 31 | Jul-27 | | - | 11,835.34 | - | - | 15,731.37 | 7,362.01 | 7,071.28 | 2,290,528.96 | 14,433.29 | 42,000.00 |
| 32 | Aug-27 | | - | 11,835.34 | - | - | 15,632.86 | 7,362.01 | 7,169.79 | 2,275,997.16 | 14,531.80 | 42,000.00 |
| 33 | Sep-27 | | - | 11,835.34 | - | - | 15,533.68 | 7,362.01 | 7,268.97 | 2,261,366.18 | 14,630.98 | 42,000.00 |
| 34 | Oct-27 | | - | 11,835.34 | - | - | 15,433.82 | 7,362.01 | 7,368.83 | 2,246,635.34 | 14,730.84 | 42,000.00 |
| 35 | Nov-27 | | - | 11,835.34 | - | - | 15,333.29 | 7,362.01 | 7,469.36 | 2,231,803.97 | 14,831.37 | 42,000.00 |
| 36 | Dec-27 | | - | 11,835.34 | - | - | 15,232.06 | 7,362.01 | 7,570.59 | 2,216,871.37 | 14,932.60 | 42,000.00 |
| 37 | Jan-28 | | - | - | - | - | 15,130.15 | 19,197.35 | 7,672.50 | 2,190,001.52 | 26,869.85 | 42,000.00 |
| 38 | Feb-28 | | - | - | - | - | 14,946.76 | 19,197.35 | 7,855.89 | 2,162,948.28 | 27,053.24 | 42,000.00 |
| 39 | Mar-28 | | - | - | - | - | 14,762.12 | 19,197.35 | 8,040.53 | 2,135,710.40 | 27,237.88 | 42,000.00 |
| 40 | Apr-28 | | - | - | - | - | 14,576.22 | 19,197.35 | 8,226.43 | 2,108,286.63 | 27,423.78 | 42,000.00 |
| 41 | May-28 | | - | - | - | - | 14,389.06 | 19,197.35 | 8,413.59 | 2,080,675.68 | 27,610.94 | 42,000.00 |
| 42 | Jun-28 | | - | - | - | - | 14,200.61 | 19,197.35 | 8,602.04 | 2,052,876.29 | 27,799.39 | 42,000.00 |
| 43 | Jul-28 | | - | - | - | - | 14,010.88 | 19,197.35 | 8,791.77 | 2,024,887.17 | 27,989.12 | 42,000.00 |
| 44 | Aug-28 | | - | - | - | - | 13,819.85 | 19,197.35 | 8,982.80 | 1,996,707.03 | 28,180.15 | 42,000.00 |
| 45 | Sep-28 | | - | - | - | - | 13,627.53 | 19,197.35 | 9,175.12 | 1,968,334.55 | 28,372.47 | 42,000.00 |
| 46 | Oct-28 | | - | - | - | - | 13,433.88 | 19,197.35 | 9,368.77 | 1,939,768.44 | 28,566.12 | 42,000.00 |
| 47 | Nov-28 | | - | - | - | - | 13,238.92 | 19,197.35 | 9,563.73 | 1,911,007.36 | 28,761.08 | 42,000.00 |
| 48 | Dec-28 | | - | - | - | - | 13,042.63 | 19,197.35 | 9,760.02 | 1,882,049.98 | 28,957.37 | 42,000.00 |
| 49 | Jan-29 | | - | - | - | - | 12,844.99 | 19,197.35 | 9,957.66 | 1,852,894.97 | 29,155.01 | 42,000.00 |
| 50 | Feb-29 | | - | - | - | - | 12,646.01 | 19,197.35 | 10,156.64 | 1,823,540.98 | 29,353.99 | 42,000.00 |
| 51 | Mar-29 | | - | - | - | - | 12,445.67 | 19,197.35 | 10,356.98 | 1,793,986.65 | 29,554.33 | 42,000.00 |
| 52 | Apr-29 | | - | - | - | - | 12,243.96 | 19,197.35 | 10,558.69 | 1,764,230.61 | 29,756.04 | 42,000.00 |
| 53 | May-29 | | - | - | - | - | 12,040.87 | 19,197.35 | 10,761.78 | 1,734,271.48 | 29,959.13 | 42,000.00 |
| 54 | Jun-29 | | - | - | - | - | 11,836.40 | 19,197.35 | 10,966.25 | 1,704,107.88 | 30,163.60 | 42,000.00 |
| 55 | Jul-29 | | - | - | - | - | 11,630.54 | 19,197.35 | 11,172.11 | 1,673,738.42 | 30,369.46 | 42,000.00 |
| 56 | Aug-29 | | - | - | - | - | 11,423.26 | 19,197.35 | 11,379.39 | 1,643,161.69 | 30,576.74 | 42,000.00 |
| 57 | Sep-29 | | - | - | - | - | 11,214.58 | 19,197.35 | 11,588.07 | 1,612,376.26 | 30,785.42 | 42,000.00 |
| 58 | Oct-29 | | - | - | - | - | 11,004.47 | 19,197.35 | 11,798.18 | 1,581,380.73 | 30,995.53 | 42,000.00 |
| 59 | Nov-29 | | - | - | - | - | 10,792.92 | 19,197.35 | 12,009.73 | 1,550,173.66 | 31,207.08 | 42,000.00 |
| 60 | Dec-29 | | - | - | - | - | 10,579.94 | 19,197.35 | 1,530,976.30 | 0.00 | 1,550,173.66 | 1,560,753.59 |
| | Total Payments | 4,439.95 | 80,530.32 | 426,072.24 | 20,828.16 | 30,867.32 | 908,136.68 | 593,542.96 | 2,003,699.44 | - | 2,597,242.40 | 4,068,117.07 |
| | | | | | | | | | | | $ - | |

Note 1 - For illustration purposes only, this Exhibit utilizes a fixed projected daily SOFR @4.84% plus 3.35%. In actuality, the daily SOFR is published by the Federal Reserve Bank of New York, as the administrator of the benchmark (or any successor administrator) and will more than likely change daily so that the actual interest charges under the Line of Credit will vary from the amounts illustrated herein. The actual interest amount charged calculated based on the daily SOFR +3.35% will control.
Note 2 - November 2024 values represent projected loan balances due at that time
Note 3 - The unpaid balance as of the 60 month after the Effective Date of Plan will be paid by replacement financing.

## EXHIBIT H

**Executory Contracts**

**NEW WAY MACHINE COMPONENTS, INC. t/a NEW WAY AIR BEARINGS**
**SMALL BUSINESS DEBTOR PLAN OF REORGANIZATION**
**EXHIBIT "H"**

**ASSUMED CONTRACTS AND UNEXPIRED LEASES SCHEDULE**

| <u>Non-Debtor Party</u>: | <u>Executory Contract/Unexpired Lease</u>: |
|---|---|
| 50 McDonald Boulevard, LP<br>50 McDonald Boulevard<br>Aston, PA 19014 | Non-Residential Real Estate Lease<br>Agreement (as amended) |
| Aramark Refreshment Services, LLC<br>P.O. Box 21971<br>New York, NY 10087-1971 | Equipment (Water Cooler) Lease Agreement |
| FP Mailing Solutions<br>P.O. Box 157<br>Bedford Park, IL 60499-0157 | Equipment (Postage Meter) Lease<br>Agreement |
| United Rental<br>164 Berkley Road<br>Clarksboro, NJ 08020-1064 | Equipment (Storage Container) Lease<br>Agreement |

## **EXHIBIT I**

**Financial Projections**

New Way Machine Components Inc. trading as New Way Air Bearings
Projected Disposable Income
Exhibit I

| | Plan Year 1 | Plan Year 2 | Plan Year 3 | Plan Year 4 | Plan Year 5 | Total | Footnote FN1 |
|---|---|---|---|---|---|---|---|
| Revenue | $ 9,888,000 | $ 10,184,640 | $ 10,490,179 | $ 10,804,885 | $ 11,129,031 | $ 52,496,735 | |
| Cost of goods sold | 5,979,416 | 6,253,077 | 6,358,767 | 6,529,180 | 6,725,056 | 31,845,496 | |
| Gross margin | 3,908,584 | 3,931,563 | 4,131,412 | 4,275,704 | 4,403,975 | 20,651,239 | |
| | | | | | | | |
| Operating Expenses: | | | | | | | |
| SG&A Payroll & payroll taxes | 1,582,775 | 1,589,483 | 1,690,168 | 1,740,873 | 1,793,099 | 8,396,398 | |
| Payroll benefits | 85,320 | 87,880 | 90,516 | 93,231 | 96,028 | 452,975 | |
| Business insurance | 77,425 | 81,296 | 85,361 | 89,629 | 94,110 | 427,820 | FN2 |
| Health insurance | 213,000 | 254,100 | 279,510 | 307,461 | 338,207 | 1,392,278 | FN3 |
| Utilities | 92,700 | 95,481 | 98,345 | 101,296 | 104,335 | 492,157 | |
| 50 McDonald rent | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 487,500 | |
| Travel & entertainment | 49,440 | 50,923 | 52,451 | 56,949 | 61,583 | 271,346 | |
| Software maintenance | 37,080 | 38,192 | 39,338 | 40,518 | 41,734 | 196,863 | |
| Freight and shipping supplies | 185,400 | 190,962 | 196,691 | 202,592 | 208,669 | 984,314 | |
| Repairs & maintenance | 80,000 | 82,400 | 84,872 | 87,418 | 90,041 | 424,731 | |
| Office expenses | 185,400 | 190,962 | 196,691 | 202,592 | 208,669 | 984,314 | |
| Professional services - IT | 36,000 | 40,000 | 48,000 | 49,440 | 50,923 | 224,363 | |
| Professional services - Legal Fees | 64,000 | 122,000 | 125,600 | 129,368 | 133,249 | 574,217 | |
| Professional services - Accounting | 15,000 | 15,450 | 15,914 | 16,391 | 16,883 | 79,637 | |
| Total Operating Expenses | 2,801,040 | 2,936,629 | 3,100,956 | 3,215,258 | 3,335,030 | 15,388,913 | FN4 |
| | | | | | | | |
| Operating income/(loss) | 1,107,544 | 994,934 | 1,030,456 | 1,060,447 | 1,068,945 | 5,262,326 | |
| | | | | | | | |
| Other income/(expense): | | | | | | | |
| Sale of FF&E - Lease Termination | 30,000 | | | | | 30,000 | |
| Total Other Income/(expense) | $ 30,000 | $ - | $ - | $ - | $ - | $ 30,000 | |
| | | | | | | | |
| Less Unfunded Capital Expenditures - | 50,000 | 100,000 | 200,000 | 200,000 | 100,000 | 650,000 | |

New Way Machine Components Inc. trading as New Way Air Bearings
Projected Disposable Income
Exhibit I

| | Plan Year 1 | Plan Year 2 | Plan Year 3 | Plan Year 4 | Plan Year 5 | Total | |
|---|---|---|---|---|---|---|---|
| Professional Fee Claims | | | | | | | |
| Sub V Trustee | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 105,000 | |
| Bankruptcy Counsel | 370,000 | 40,000 | 40,000 | 40,000 | 40,000 | 530,000 | |
| Financial Advisors | 80,000 | 40,000 | 40,000 | 40,000 | 40,000 | 240,000 | |
| Total Professional Fee Claims | 475,000 | 100,000 | 100,000 | 100,000 | 100,000 | 875,000 | FN5 |
| | | | | | | | |
| Net Income/(Loss) | 632,544 | 894,934 | 930,456 | 960,447 | 968,945 | 4,387,326 | |
| New Financing for PNC Balloon Payment | | | | | 880,000 | $ 880,000 | |
| Projected Disposable Income available for Plan Payments | $ 612,544 | $ 794,934 | $ 730,456 | $ 760,447 | $ 1,748,945 | $ 4,647,326 | |
| | | | | | | | |
| Class 1 - Other Priority Claims | 10,000 | | | | | 10,000 | |
| Class 2 - Secured Claim: | | | | | | | |
| PNCEF - 5314 | 20,828 | - | - | - | - | 20,828 | |
| PNCEF - 5316 | 16,837 | 14,031 | - | - | - | 30,867 | |
| PNC Term Loan - 5982 | 40,265 | 40,265 | - | - | - | 80,530 | |
| PNC Term Loan - 8284 | 142,024 | 142,024 | 142,024 | - | - | 426,072 | |
| PNC Line of Credit - Interest Payments | 208,331 | 200,606 | 189,317 | 169,179 | 140,704 | 908,137 | |
| PNC Purchase Card | 4,440 | - | - | - | | 4,440 | |
| PNC Line of Credit Principal Payments | 100,638 | 107,074 | 172,659 | 334,821 | 1,882,050 | 2,597,242 | |
| Total Class 2 Payments | 533,363 | 504,000 | 504,000 | 504,000 | 2,022,754 | 4,068,117 | FN6 |
| | | | | | | | |
| Class 3 - General Unsecured Claims | 116,875 | 116,875 | 116,875 | 116,875 | 116,875 | 584,377 | |
| Class 5 - Hackett Subordinated Claim | - | - | - | - | - | - | FN7 |
| Total Plan Payments | 660,239 | 620,875 | 620,875 | 620,875 | 2,139,629 | 4,662,494 | |
| Net Cash To Debtor | (47,694) | 174,059 | 109,580 | 139,571 | (390,684) | (15,168) | |
| | | | | | | | |
| Beginning Cash | $ 144,164 | $ 96,469 | $ 270,528 | $ 380,108 | $ 519,679 | $ 144,164 | |
| Ending Cash | $ 96,469 | $ 270,528 | $ 380,108 | $ 519,679 | $ 128,996 | $ 128,996 | |
| | | | | | | | |
| PNC Line of Credit balance | $ 2,496,604 | $ 2,389,530 | $ 2,216,871 | $ 1,882,050 | $ - | $ - | |

New Way Machine Components Inc. trading as New Way Air Bearings
Projected Disposable Income
Exhibit I

**Footnotes:**

FN1 - Plan year designations relate to 12 month periods post-effective date.

FN2 - Business insurance premiums projected to increase 5% per annum.

FN3 - Health insurance premiums projected to grow 10% per annum.

FN4 - Assumed 3% per annum expense growth in 2025-2027 except insurances.

FN5 - These Professional Fee Claims are in addition to the $702,579.62 of professional fees and costs for the first interim period ending 8/31/24, which have been filed and are pending court approval and will be paid as allowed.

FN6 - Payments to PNC of: (a) $71,363.48 in the first month after the Effective Date, (b) $42,000 per month commencing on the 2nd month and continuing through the 59th month, and (c) the payment of the unpaid principal balance of the PNC Line of Credit, plus any accrued interest at the non-default rate of interest in the 60th month.

FN7 - Per the Settlement Agreement among the Debtor, Nicholas Hackett ("Hackett") and Andrew J. Devitt ("Devitt") dated July 18, 2024, approved by Bankruptcy Court Order dated August 22, 2024, the Debtor intends to cause its nominee to fund the amount of $100,000 to Hackett (the "Discounted Payoff") within sixty (60) days after the Effective Date of the Plan.

500000

# EXHIBIT J

**Liquidation Analysis**

**New Way Machine Components Inc.**
**Liquidation Analysis**
**as at June 30th 2024**

| | | June 30th 2024 | % Collectible | Footnote | | Liquidation Recovery |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| | | | | | | |
| Cash and Cash Equivalents | $ | 900,000 | 100% | | $ | 900,000 |
| Acccounts Receivable | | 1,085,000 | 80% | | | 868,000 |
| | $ | 1,985,000 | | | $ | 1,768,000 |
| Inventory: | | | | | | |
| Raw Materials | | 144,751 | 20% | | | 28,950 |
| Work in Process | | 1,100,000 | 10% | FN1 | | 110,000 |
| Inventory Finished Goods | | 493,602 | 50% | | | 246,801 |
| Total Inventory | $ | 1,738,353 | | | $ | 385,751 |
| | | | | | | |
| **Other Prepaid** | | | | | | |
| Other - utility deposits | | 9,220 | 100% | | | 9,220 |
| Insurance | | | 0% | FN2 | | - |
| Total Other Prepaid | | | | | $ | 9,220 |
| | | | | | | |
| **PPE - net** | | | | | | |
| Delivery Vehicle | | 9,500 | 75% | | | 7,125 |
| Furniture and Fixtures | | 244,486 | 2% | FN3 | | 4,890 |
| Shop Equipment | | 490,796 | 65% | | | 319,017 |
| Office Equipment, Computers and IT | | 140,775 | 15% | FN3 | | 21,116 |
| Leasehold Improvements | | 93,556 | 0% | FN3 | | - |
| Net PPE | $ | 979,113 | | | $ | 352,148 |
| | | | | | | |
| **Other Assets** | | | | | | |
| Deposits - 30 McDonald | | 4,500 | | | | 4,500 |
| Intellectual Property | | | | | | 377,655 |
| **Total Gross Liquidation Value of Assets** | $ | 4,716,186 | | | $ | 2,897,275 |
| | | | | | | |
| **Secured Claims:** | | | | | | |
| PNC Bank | | | | | $ | 3,361,425 |
| | | | | | | |
| **Surplus/(Deficiency) after payment of Secured Claims** | | | | | $ | (464,150) |

**New Way Machine Components Inc.**
**Liquidation Analysis**
**as at June 30th 2024**
**Chapter 7 - Estate Administration**                                                    **Liquidation Recovery**

| | | |
|---|---|---|
| Auctioneer Fees & Marketing Expenses | | 109,471 |
| Miscellaneous Expenses | | 15,000 |
| Winddown Expenses - (rent,utilities, security etc) | | 127,500 |
| Trustee - Attorney | | 150,000 |
| Trustee - Accountant | | 15,000 |
| Trustee Fees - | FN4 | 110,168 |
| Total  Chapter 7 Administrative Expenses | $ | 527,139 |

**Chapter 11 Administrative Claims**

| | | |
|---|---|---|
| Professional Fees Legal - | $ | 810,000 |
| Professional Fees Financial Advisor - | | 255,000 |
| Subchapter V Trustee | | 50,000 |
| Accrued Expenses | | 35,000 |
| Accrued Wages 2 wks/Vacation 2 wks | | 344,000 |
| Accounts Payable - Post Petition | | 75,000 |
| Total Chapter 11 Administrative Claims | $ | 1,569,000 |

**Priority Claims**

| | | |
|---|---|---|
| Hackett Priority Claim | $ | 10,000 |

**Surplus/(Deficiency) in Assets for Chapter 11, Sub 5**
**Unsecured Claims & Subordinated Claims**                              $        (2,570,289)

<p align="center"><u>**SUMMARY**</u></p>

| | | |
|---|---|---|
| Liquidation Value of Assets | $ | 2,897,275 |
| Less: Chapter 7 Administrative  Expenses | | (527,139) |
| Less: Secured Claims | | (3,361,425) |
| Less: Chapter 11 Administrative and Priority Claims | | (1,569,000) |
| Less: Priority Claims | $ | (10,000) |
| **Surplus/(Deficiency) in Assets for Unsecured Claims** | $ | (2,570,289) |

**In the event of a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, there will be no assets available  to unsecured creditors.**

<u>**Footnotes**</u>
FN1 - Inventory consists primarily of  customer specific or product specific materials and sub assemblies.
FN2 - Insurance payments are payable over the term of the policy and deemed earned upon payment.
FN3 - These assets have minimal liquidation value.
FN4 - In accordance with Bankruptcy Code Section 326(a)